**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.:**

JAMES TUNDIDOR, SR., DULCE E.
TUNDIDOR, JAMES TUNDIDOR, JR.,
and PORKY'S CABARET, INC. d/b/a
BELLAS CABARET,

      Plaintiffs,

v.

CARLOS HERNANDEZ and CITY OF
HIALEAH,

      Defendants.

_____

## <u>COMPLAINT</u>

Plaintiffs JAMES TUNDIDOR, SR. ("James, Sr."), DULCE E. TUNDIDOR ("Dulce"),

JAMES TUNDIDOR, JR. ("James, Jr.," and together with James, Sr. and Dulce, the "Tundidors"),

and PORKY'S CABARET, INC. d/b/a BELLAS CABARET ("Bellas") (collectively, the

"Plaintiffs"), by and through their undersigned counsel, hereby sue Defendants Carlos Hernandez

("Hernandez" or "Mayor Hernandez") and the City of Hialeah ("Hialeah" or the "City") and allege

as follows:

### I.      <u>INTRODUCTION</u>

Four years ago, in a series of actions reminiscent of a bygone era, then-Mayor of Hialeah,

Carlos Hernandez, wielded the power of his office as a weapon against the Tundidors and their

business, Porky's Cabaret, which does business under the name Bellas Cabaret.  In retaliation for

the Tundidors' support of a family member's unsanctioned bid for political office in Hialeah,

Mayor Hernandez orchestrated a televised police raid of Bellas.  In order to maximize the punitive

and political value of the raid, it was held out as part of a human trafficking investigation, its

planning and execution was recorded by a local television station camera crew, and over a dozen officers bedecked in tactical equipment, bulletproof vests, and a ski mask stormed Bellas at 11 p.m. on a busy night.  The fig leaf of a legitimate investigation was belied by the lack of a warrant or probable cause for the raid, the complete absence of *any* evidence suggestive of human trafficking, prostitution, or criminal activity, and the inclusion of an embedded reporter clad in high heels and a bulletproof vest, as well as a parade of inspectors from Hialeah's Code Compliance Division, Fire Department, and Building Division.

Moreover, in the years and months leading up to the raid, the true motivation for the raid – retaliation and an intent to chill protected speech – was made clear by Mayor Hernandez and his cronies. During that time, Mayor Hernandez actively discouraged a member of the Tundidor family from running for an opening on the City Council, threatened the Tundidors' businesses directly and through intermediaries, and turned his political machine against them using the power and resources of the City of Hialeah.  But the Tundidors refused to be cowed by Mayor Hernandez's threats and continued to support their family member's run for a City Council position.  As a result, Mayor Hernandez made good on his threat and came down on the Tundidors and Bellas with the full might of the sixth largest municipality in Florida.

Sensationalized footage of the unlawful raid – in which a police commander referenced its purpose as combating prostitution, human trafficking, and drugs – was aired locally and posted online.  The commander's baseless and incendiary remarks became the tag line for the political opposition that was orchestrated by and funded in collaboration with Mayor Hernandez. Following the raid, Mayor Hernandez, a political action committee ("PAC") associated with Hernandez, and Hernandez's endorsees leveraged the stain of being the target of a supposed human

trafficking investigation and raid against the Tundidor family, despite knowing it was a fantasy of Hernandez's creation.

Due to Defendant Hernandez's actions, which were in direct retaliation for Plaintiffs' exercise of their rights under the First Amendment, he bears personal liability to Bellas and the Tundidors pursuant to the Civil Rights Act for the extensive damages and harms he caused. Because such actions were taken by Defendant Hernandez while serving as the final policymaker of the City of Hialeah, the City also bears liability to Bellas and the Tundidors pursuant to the Civil Rights Act for the extensive damages and harms caused by Defendant Hernandez's actions.

## II.      JURISDICTION, PARTIES, & VENUE

1.      Plaintiff James, Sr. is a resident of Miami-Dade County, Florida and is otherwise *sui juris*.

2.      Plaintiff Dulce is a resident of Miami-Dade County, Florida and is otherwise *sui juris*.

3.      Plaintiff James, Jr. is a resident of New Jersey and is otherwise *sui juris*.

4.      Collectively, Plaintiffs James, Sr., Dulce, and James Jr., own and operate Bellas, an adult entertainment venue, and the property on which it is located in the City of Hialeah.

5.      Defendant Hernandez is a resident of Miami-Dade County and is otherwise *sui juris*.

6.      Defendant Hialeah is a city located in Miami-Dade County.

7.      This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

8.      Venue lies in the Southern District of Florida because the causes of action accrued and the parties are located within this district.

9.      All conditions precedent to the filing of this lawsuit have been performed, satisfied, and/or waived.

### III.      RELEVANT BACKGROUND

#### A.  City of Hialeah

10.      Hialeah, which was incorporated in 1925, is the sixth largest municipality in the state of Florida and is comprised of approximately 20 square miles.   Hialeah, known to many as "The City of Progress," serves over 236,000 residents, of which 94% are Hispanic, including Cuban exiles, Puerto Ricans, Mexicans, and other Hispanic groups. Hialeah is home to one of the largest Spanish-speaking communities in the country.

11.      Hialeah has a "strong mayor/council" form of government; Hialeah does not have a city manager.  The mayor is the chief executive and administrative officer of the city, responsible for its day-to-day functions.

12.      The mayor has the power to "exercise the executive powers of the city and supervise all departments."[1]  More specifically, the mayor is responsible for "the administration of all departments, divisions and agencies of city government;"[2] and each municipal department and division head reports directly to the mayor.

13.      Of particular relevance, the mayor has direct oversight and supervision over the municipal divisions for code compliance, building, and planning and zoning.[3]  Likewise, while the Hialeah Chief of Police[4] and Fire Chief[5] are the principal officers of their respective departments, each is subject to the supervision of the mayor.

---

[1] Hialeah City Charter, Article IV, § 4.01.
[2] Hialeah City Charter, Article IV, § 4.01.
[3] Hialeah City Charter, Chapter 2, Article II, Division 11, Section 2-357(a)–(b).
[4] Hialeah City Charter, Article IV, § 4.04; Hialeah City Charter, Chapter 2, Article II § 2-57.
[5] Hialeah City Charter Chapter 2, Article II, § 2-87.

14.     The City Council consists of Hialeah residents, elected in city-wide elections, to seven consecutively-numbered council seats, Group I through VII.  No more than four council seats are up for election at the same time, and elections are held in November of odd-numbered years.  Councilmembers serve four-year terms and cannot serve more than three consecutive terms.

15.     The City Council is tasked with passing legislation, approving the city's budget, and approving the mayor's appointment of department heads.  The City Council passes legislation by majority vote and may override the mayor's veto by an affirmative vote of five councilmembers.

**B.  <u>The Tundidors & Porky's</u>**

16.     James Sr. and Dulce were married for over twenty years and James Jr. is their adult son.  The Tundidors are life-long residents of Hialeah.

17.     Dating back to the 1980's, the Tundidor family established local businesses in Hialeah, including the adult entertainment venue and club now known as Erotica Cabaret.

18.     In October 2009, James, Sr. purchased a property located at 885 S.E. 14th Street, Hialeah, Florida (the "Property"). The Property included a pre-existing structure that housed Porky's Cabaret, Inc. ("Porky's"), an adult entertainment venue, which had operated on the Property for several decades.

19.     At the time that James, Sr. purchased the Property, Dulce purchased Porky's, the business.

20.     On October 20, 2009, Dulce applied for the following new occupational licenses on Porky's behalf: (a) drinking places; (b) restaurant; and (c) night club, each of which is required by Hialeah (collectively the "Licenses").  Each of the applications for the Licenses bears a stamp and signature evidencing that the Licenses were approved by the Department of Environmental Resource Management on November 6, 2009.

21.     By the end of 2009, Porky's was fully operational, with a full-service restaurant and bar and live entertainment.

22.     Between 2009 and 2012, Hialeah renewed Porky's Licenses without issue.

23.     In 2013, Porky's registered the fictitious name "Bellas Cabaret" ("Bellas") and began doing business as Bellas, effectively rebranding Porky's, the cabaret of local lore.

24.     Starting in 2013, Porky's sought to renew its Licenses under the name Bellas Cabaret and did so successfully in 2013, 2014, 2015, and 2016.

25.     However, in 2017, Hialeah advised that it placed a "hold" on the Licenses and assessed a penalty against Bellas, which Bellas was required to pay in order to renew the Licenses. Starting in 2017 and continuing through the present day, Bellas paid all applicable penalties along with the renewal fees in order to renew the Licenses.

26.     In 2017, Bellas submitted all required documentation for the 40-year recertification. On December 12, 2017, Alexis Riveron, Hialeah's Building Official, signed the Letter of Recertification of a 40-year Old or Older Building for the Property, which confirmed that "according to the inspection reports prepared by a registered professional engineer or architect, [Bellas] is structurally and electrically safe for continued occupancy."

27.     Bellas was subject to yearly "annual assembly" inspections by the Hialeah Fire Prevention Bureau.  During the annual assembly inspections, the Hialeah Fire Prevention Bureau would assess whether Bellas was compliant with the Florida Fire Prevention Code and identify any code provisions with which it was not in compliance.

28.     Sometimes the annual assembly inspections resulted in the identification of issues that required remediation, including the inspections which occurred in 2017 and 2018.  In each case – prior to 2019, the Hialeah Fire Prevention Bureau provided a short time frame for any

identified issues to be remediated, and then returned for reinspection.  Prior to 2019, each time that Bellas was subjected to an inspection, it timely complied with any required remediation, and ultimately passed each inspection and received the approval of the Hialeah Fire Prevention Bureau.

### C. **Former Mayor Hernandez**

29.     Defendant Hernandez began his career in Hialeah.

30.     Following more than 20 years as a police officer, Defendant Hernandez retired from the Hialeah Police Department and then pursued political office in Hialeah.

31.     In 2005, Defendant Hernandez was elected to an open seat on the Hialeah City Council.  During his terms on the City Council, he was elected by the councilmembers to the roles of vice president of the council in 2007 and president of the council in 2009.

32.     In 2011, the then-mayor of Hialeah, Julio Robaina ("Robaina"), resigned half-way through his four-year term, leaving a permanent vacancy in the office of the mayor of Hialeah.

33.     By virtue of his role as president of the council at the time of Robaina's departure from office, Defendant Hernandez was appointed mayor of Hialeah on May 23, 2011.[6]

34.     Shortly thereafter, Defendant Hernandez successfully ran for mayor in a special election and served the remainder of Robaina's term.  Defendant Hernandez then ran for and was elected mayor twice more, in November 2013 and November 2017, and his final term expired in November 2021.

### D. **Jesus Tundidor**

35.     Jesus Tundidor ("Jesus"), James Sr.'s son, was born and raised in Hialeah. Now married, Jesus, along with his wife, raises his two daughters in Hialeah.

---

[6] Pursuant to section 2.01(c)(1) of the Hialeah City Charter, if a mayor resigns, the vacancy "shall" be filled by the City Council president.

36.     Jesus graduated with a master's degree in business administration from Florida International University and held the position of senior legislative aide for then-State Senator Rene Garcia ("Senator Garcia").  Senator Garcia, a former Hialeah councilman and state representative, introduced Jesus to politics and public service.  While working for Senator Garcia from 2013 until 2015, Jesus focused on healthcare legislation and budget priorities.

37.     Following his work with Senator Garcia in Tallahassee and South Florida, Jesus returned to his native Hialeah and began a career in healthcare.  Soon after, Jesus sought to become involved in local policy-making.

38.     To that end, Jesus approached Hialeah Councilmember Vivian Casals-Munoz ("Councilmember Casals-Munoz"), who had recently won reelection, and asked to be appointed to the City of Hialeah Planning and Zoning Board.  Councilmember Casals-Munoz appointed Jesus to the Planning and Zoning Board, where he served as a board member and vice chair of the board until 2018.

### IV.     FACTUAL ALLEGATIONS

### A.  Jesus and the Tundidors Make an Enemy of Mayor Hernandez

39.     By 2019, Defendant Hernandez had served on the Hialeah City Council and multiple terms as mayor, and had established a well-oiled political machine. Many businesses and businessmen contributed to his political campaigns and to political action committees and electioneering communication organizations for Hernandez's benefit and the benefit of Hernandez's endorsees. One of the committees used by Hernandez for this purpose was called Citizens for Efficient Government.  Citizens for Efficient Government was established by Glenn Rice ("Rice"), who served as its chairperson, treasurer, and registered agent.  Rice, a former city

of Hialeah police officer, was Hernandez's longtime friend and bodyguard who worked for Hernandez's 2011 and 2013 campaigns.

40.     Using his political machine and the resources available to him as mayor, Defendant Hernandez acted a powerful gatekeeper of the seven City Council seats established by section 2.02(b) of the Hialeah City Charter, actively endorsing candidates and leveraging his influence to fund the campaigns of his approved candidates.   Because a mayoral veto of any legislation otherwise approved by a majority of the City Council may be overridden by an affirmative vote of five councilmembers, controlling the council, or having the councilmembers beholden to him, was to Mayor Hernandez's benefit.

41.     As life-long Hialeah residents and business owners in Hialeah, the Tundidors participated in the political process, supporting candidates and issues that they believed would benefit their family, the residents of the city, and their businesses located in Hialeah.  For example, in March 2013, James, Sr. contributed $10,000 to Citizens for Efficient Government for the benefit of Hernandez and his endorsees.

42.     As Jesus became more involved in the Planning and Zoning Board, his desire to become more involved in local politics grew.  In 2017, Jesus approached then-Mayor Hernandez to ask for his support to run for City Council in the 2017 election cycle.  Mayor Hernandez denied his request and told Jesus he would be supporting another candidate.  Mayor Hernandez then told Jesus he should wait for the 2019 election cycle to run for a seat on the City Council.

43.     It was crucial for Mayor Hernandez's agenda and success as mayor to count on, at a minimum, a majority vote in the City Council.  City ordinances require four affirmative votes of the council to be adopted and overriding the mayor's veto of a resolution or ordinance requires the

vote of at least 5 councilmembers.[7]  The allegiance of at least four of the seven councilmembers would ensure Mayor Hernandez's political reach remained unobstructed and unchallenged.

44.  Jesus read the writing on the wall and sat out of the 2017 election cycle.

45.  The following year, Jesus again approached Mayor Hernandez to get his support to run for a council seat in 2019.  Jesus reached out to Mayor Hernandez's trusted chief of staff, Arnaldo "Arnie" Alonso, and separately to Ceaser Mestre, Jr., Mayor Hernandez's friend and advisor, requesting a meeting with Hernandez to request Hernandez's support.  Both responded with a resounding "no;" Mayor Hernandez did not approve of Jesus' candidacy, nor would Hernandez support Jesus.

46.  Notwithstanding Mayor Hernandez's clear rejection of Jesus' candidacy for the City Council, in November 2018, Jesus filed his candidate qualifying documents, announcing his intention to run for the City Council in Group IV, in the 2019 elections.

47.  On November 16, 2018, James, Sr. hosted a fundraiser to kick off Jesus' campaign, raising over $25,000.

48.  In December 2018, Jesus met with former Councilmember Luis Gonzalez ("Gonzalez"), who had been elected to the Hialeah City Council in 2005, 2009, and 2013. Gonzalez served on the City Council alongside Hernandez between 2005 and 2011, and continued to be aligned with Hernandez after he was appointed, then elected, mayor.  When his third consecutive term expired in 2017, Gonzalez was unable to seek reelection until he sat out one election cycle.[8]

---

[7] Hialeah City Charter, §§ 3.04 (a), 3.04(b), 3.05.
[8] The Hialeah City Charter prohibits that a councilmember be elected to more than three consecutive terms.  Hialeah City Charter, § 2.02(d).

49.     The objective of Jesus' meeting with Gonzalez was to see whether Gonzalez would intercede on Jesus' behalf to get Mayor Hernandez's support for his campaign.  Jesus showed Gonzalez how successful his fundraising efforts had been.  Gonzalez expressed concern and revealed that Hernandez may want Gonzalez to run against Jesus.

50.     Thereafter, Mayor Hernandez went out of his way to threaten Jesus with his political machine and urge Jesus to stand down.

51.     In early 2019, there was a fundraiser at the Hialeah Racetrack and Casino to raise funds for Senator Garcia's bid for Miami-Dade County Commissioner, which drew out Hialeah's elected officials and those aspiring for the coveted seats on Hialeah's City Council.  Among those in attendance were Mayor Hernandez and Jesus, whose campaign for a seat on the City Council was well underway.

52.     As Mayor Hernandez was leaving, he called Jesus over to him. Once they were alone, Mayor Hernandez told Jesus that he was not sure why Jesus wanted to run now and that Jesus should wait to run. Mayor Hernandez also told Jesus,

> Everybody here likes you and laughs with you and smiles with you, but at the end of the day, they will all be on my side because I have the muscle. I don't care how much you raise in contributions, I will raise more.

53.     Mayor Hernandez, also referenced the Tundidor family's adult entertainment venues as a political pressure point that would be used against Jesus in an election.

54.     Jesus asked Mayor Hernandez what he wanted, to which Mayor Hernandez replied, "sit this election out and I'll walk you in, in 2021."  The conversation ended and Jesus left.

## B.  Candidates in Hialeah's 2019 Election Cycle

55.     The 2019 City Council elections were crowded with thirteen candidates vying for four open council seats: Groups I, II, III, and IV.

56. In the Group I seat, Monica Perez ran against Lourdes Lozano, who was endorsed by Mayor Hernandez and received a campaign contribution from Hernandez's Hialeah for Progress PAC.

57. Four contenders vied for the Group III seat,[9] including Jackie Garcia-Roves, who was endorsed by Mayor Hernandez and also received a campaign contribution from Hialeah for Progress PAC. Milly Herrera, one of Jackie Garcia-Roves' opponents was arrested by the Hialeah Police Department ("HPD") while campaigning, for campaigning.

58. Among the candidates running for a council seat was Oscar De la Rosa ("De la Rosa"). In June 2019, De la Rosa and Jesus met in a downtown Doral coffee shop. During that meeting, De la Rosa revealed that then-Mayor Hernandez had promised to support De la Rosa's candidacy with one condition: De la Rosa must change to the Group IV race to run against Jesus.

59. De la Rosa did switch to the Group IV race and, in so doing, won Hernandez's endorsement and a contribution from Hialeah for Progress PAC. De la Rosa would go on to win the Group IV election against Mike Horgan, while Jesus switched to the Group II race.

60. After switching from Group IV, Jesus ran for the Group II council seat, opposed by Gonzalez who ran with Hernandez's backing and received multiple contributions from Hialeah for Progress PAC.

C. **Mayor Hernandez Threatens the Tundidors Again**

61. After the fundraiser for Senator Garcia, Mayor Hernandez sent a message to James, Sr., who received a call from a politically active businessman, Jesus Navarro to discuss "the situation" between Hernandez and Jesus.

---

[9] The other candidates that faced off in the Group III primary were Ricardo Rodriguez-Blanco and Eduardo Macaya.

62.     At Navarro's request, James, Sr. and James, Jr met with Navarro and his son, Christian Navarro (together with Jesus Navarro, the "Navarros") in their offices in Miami Lakes, Florida.   The Navarros were longtime supporters of Mayor Hernandez and contributors to his campaigns and affiliated PACs.  The Navarros relayed a message to James, Sr.:  Mayor Hernandez would attack the Tundidor family's businesses if Jesus did not drop out of the race.

63.     James, Sr. responded that Jesus would not drop out of the race and would continue the race on his own accord.

64.     On July 15, 2019, Jesus received a call from the City of Hialeah, City Attorney's Office to discuss the Licenses issued to Bellas that were on hold since 2017 and were being renewed yearly upon payment of a penalty and renewal fee.   The call was especially bizarre because Jesus is not and has never been an officer, employee, agent, or representative of Porky's or Bellas.  Jesus' name and phone number never appeared in any applications or documentation submitted to the City of Hialeah or any other authority in connection with Porky's or Bellas.  Any issues regarding the Licenses should have been directed to Dulce or James, Jr.

65.     Jesus advised the Hialeah assistant city attorney that she should direct her inquiries to James, Jr.

66.     Two years after the Licenses were placed on hold, James, Jr. received a voicemail from the City Attorney's Office to schedule a meeting regarding the Licenses for the following day, July 16, 2019.  The meeting was rescheduled for July 30, 2019.

**D.  <u>The Raid</u>**

67.     On Thursday, July 25, 2019, Bellas was open for business:  the kitchen was serving food, drinks were being poured at the bar, patrons populated the main floor, and the entertainers danced.   When suddenly at 11:07 p.m., members of the HPD burst through the door without

invitation, without permission, and without a search warrant articulating probable cause and executed by a judicial officer.   The HPD officers included members of the Community Enhancement Unit ("CEU"), Community Response Team ("CRT"), Crime Scene Investigation ("CSI"), Narcotics Unit, and Special Victim's Unit ("SVU" and together with CEU, CRT, CSI, and the Narcotics Unit, the "Police").



68.     The Police were wearing dark clothing and black bullet proof vests with "police" insignia across the chest.  At least one officer wore a black ski mask, showing only his eyes.



69.     Over a dozen officers entered the Property, getting the immediate attention of the staff, patrons, and entertainers, who were in various stages of undress.  In loud, booming voices, the Police yelled for the music to stop and the lights to be turned on inside the adult entertainment venue.

70.     Once the music was off and the lights were turned on, the Police demanded that everyone stop what they were doing and sit down.  The dancers, staff, and patrons held their hands up in surrender to the authority of the Police.



71.     Then everyone in the building was systematically rounded up.  Bar staff were ordered out from behind the bar, entertainers were directed off the stage and out of the dressing room, and all patrons were seated together. The employees, managers, and dancers were seated together in a different area and interviewed separately.  Many of the staff and patrons were subjected to Police pat-downs or the passing of the police officer's hands over the body of a clothed person to detect concealed weapons, drugs, or other contraband.

72.     The Police held the patrons inside the establishment for approximately an hour, checked their identifications and belongings and then released them, while the scantily-dressed

dancers were escorted by the Police to the dressing room, which is inaccessible to the public, to check their identification and conduct searches of their belongings and inside their lockers:



73.     The Police brought a K-9 unit, likely a drug detection dog, to conduct a sniff search of Bellas, including, without limitation, areas inaccessible to the public such as the dancers' dressing room and lockers:



74.     James, Jr. was present during the raid and identified himself as the person in charge. Police escorted James, Jr. around the Property and demanded that he provide them with access to all spaces, including those that were locked and not accessible to the public.   For example, the Police demanded that James Jr. provide them with access to a locked office, two locked closets, and the bathrooms in the basement level that were locked.   The Police also accessed the basement level, which was not open to the public.   All spaces were searched and photographed by the Police.

75.     The unadulterated chaos and confusion caused by the unjustified and unexpected Police intrusion at an adult entertainment venue during business hours was aggravated by the presence of a television reporter and cameraman from a local, Spanish-language channel, "américa tevé."



76.     Adriana Quintana, the reporter who also donned a bullet-proof vest with "POLICE" displayed across her chest (the "Reporter"), and her cameraman, followed the Police into Bellas,

uninvited and without permission, to capture images of the raid and Bellas' patrons and dancers, and to interview the Police commander mid-raid:



77.    The Police also granted the media outlet access to all areas of the club, including those that were not open to the public.



78.     During the raid, James, Jr. approached an HPD officer, Y. Perez ("Officer Perez"), whom he recognized from childhood.  Officer Perez's father had instructed James, Jr. in martial arts and Officer Perez had done community outreach with his father's students.  James, Jr. asked Officer Perez what was going on.  Officer Perez responded, "sorry man, this came from the big boss," impliedly referring to then-Mayor Hernandez.

79.     Commander Fernando Villa spoke to James, Jr. and to Dulce after the Police raid. He commended them, saying that in his 20 years as an officer, it was the first time he had seen such a "clean" strip club.  Unfortunately, he further advised, the building officials were going to come in to look at the Property as "part of protocol."

80.     Immediately following the unlawful Police incursion into Bellas, there was a parade of "who's who" from Hialeah's Code Enforcement Department, Fire Department, and Building Department, including Alexis Riveron, Jr., the Hialeah Building Official ("Riveron"), Rey Regalado, the Chief Building Inspector ("Regalado"), Miguel Mendez, the Chief Electrical Inspector ("Mendez"), Juan Cascardo, the Plumbing Inspector, Marcos Cardorso, a Code Enforcement Officer, Paul Garcia, an Assistant Fire Marshal, and Michael Diaz, a Fire Inspector (collectively, the "Inspectors").  The Police illegally procured unfettered access to all of the Property including spaces not accessible to members of the public, such as the Property's attic and basement, and ushered the Inspectors through the building reaping the fruits of the poisonous tree.

**E.  The Pretextual Raid was Preplanned**

81.     The raid was orchestrated by then-Mayor Hernandez, leveraging the resources of the City for his personal agenda.  Hernandez used his former colleagues, turned enforcers, at the HPD to execute on his vendetta.

82.     The raid was planned for days in advance.  Documents produced by Hialeah in response to public records requests show that Hialeah employees were actively investigating the Tundidors days before the raid.  On July 23, 2019, the Police (i) generated reports from the Driver and Vehicle Information Database ("DAVID") for Dulce, James, Sr., James, Jr, and John Tundidor, James, Sr.'s brother ("John"); (ii) pulled a "company report" for "Porky's Inc." from a criminal justice information system; (iii) printed information from Bellas' webpage and social media; and (iv) downloaded images of the Property from Google Earth.  On July 24, 2019, the Police continued their investigation of the Tundidors, including by generating reports from Electronic License and Vehicle Information System ("ELVIS"), a database available to law enforcement to query federal and national information systems.  At the behest of the Police, the ELVIS database produced "individual report plus associates" reports for Dulce, James, Sr., James, Jr., and John.

83.     In a memorandum from Mendez, the Chief Electrical Inspector, and Regalado, the Chief Building Inspector, to Riveron, the Building Official, and others, Mendez and Regalado confirmed that "Police scheduled the inspection" of Bellas.  Moreover, Hialeah's Building Division had ample notice of the scheduled raid as evidenced by records produced by Hialeah to the Miami-Dade County Unsafe Structures Board, which included microfilms associated with the Property, including original building plans and surveys dating back to 1966, which were retrieved by Hialeah on July 24, 2019 at 1:44 p.m.

84.     While the purported reason for the aggressive intrusion into Bellas during business hours was "human trafficking," nothing in the Police report identifies what cause the Police had to suspect that Bellas was involved in any aspect of a human trafficking operation.  Put simply, that is because there was no probable cause to believe Bellas was involved in human trafficking.

Rather, as the Code Compliance Case Worksheet aptly notes, this was a property inspection "by a code team set up of a police, building, fire, and code."

85.     Despite the planned nature of the raid, no warrant articulating probable cause and executed by a Judge was obtained by the HPD and no attempt was made to obtain one. No emergencies or exigent circumstances were identified by the Police – there was no fleeing felon, no destruction of evidence, no search incident to a lawful arrest, and no fire.  Nor can any exigent circumstances be plausibly established in light of the multi-departmental coordination and pre-raid investigation into the Tundidors and the Property.

F.   **Defendants Leverage the Media against the Tundidors**

86.     In a further display of the malicious intent and true purpose of the raid, the Reporter and/or américa tevé were contacted and provided with advance notice of the raid.  According to the sensationalized, highly-edited footage aired by the television station and published on the américa tevé website, the Reporter and cameraman were invited to and participated in a pre-raid briefing led by Commander Villa. At the briefing, Commander Villa states to a group of police officers, two officials from the Hialeah Fire Department, Mendez, the Chief Electrical Inspector, the Reporter, and the cameraman that the objective of the raid is "human trafficking." The briefing footage shows Mendez, the Chief Electrical Inspector, showing officers drawings of the Property. The cameraman, who rode in the back seat of a police vehicle, recorded footage from the patrol car, with the police officer driving and communicating through his radio.

87.     Aggravating the unlawful search of the Property, the sensationalized broadcast shows as staff and scantily dressed dancers are rounded up and detained on the main floor of the venue.  In the broadcast, the Reporter notes that the actions are being taken "in search of human trafficking" and pans to an interview with Commander Villa who says "we are looking for anyone

under the age of eighteen or anyone who is being forced to work there." Commander Villa then tells the Reporter, "this is a very important operation to take care of our citizens and these victims of human trafficking."

88.     The edited video footage also shows the process described above wherein the patrons on the one hand, and dancers and staff on the other hand, are separated.  In the broadcast, the Reporter narrates, confirming this protocol, and further observing that they were each interviewed separately in order to obtain information about possible victims of trafficking. Halfway through the report, Commander Villa is interviewed again and advises, with distaste, that Police identified one dancer who is nineteen years old, feigning concern over her exposure to alcohol since she cannot legally consume it.  The Reporter then discusses a patron who was found to be carrying a firearm, but who was not arrested.  The Reporter reveals that "minutes later they discovered" that the basement level of the Property was being converted into a VIP area.  The Reporter and cameraman then gained access into the basement level where the Police can be seen with Mendez, who himself confirmed that the basement was not in use.

89.     The video also showed Mendez posting the "red tag" notice and labeling the Property as an "Unsafe Building," with the Reporter stating that the Property will remain under investigation, and Commander Villa opining that "businesses like this" bring prostitution, drugs, and underage drinking.  The segment concludes with a statement that the Property will remain closed until further notice "for the good of the community."

90.     Mayor Hernandez and Hialeah invited the media presence as yet another intimidation tactic that could be leveraged against the Tundidors and Jesus.  Indeed, the media outlet facilitated Mayor Hernandez's harassment of the Tundidors, ensuring that the false narrative – predicated on political vengeance – would be distributed widely to the electorate.

### G.  **Violations Alleged by Hialeah**

91.     Consistent with Mayor Hernandez's political objective, the Inspectors cited Bellas for numerous violations and shut down all operations.

92.     The Fire Department generated a report detailing 14 violations of the Florida Fire Prevention Code, some of which simply involved moving a few pieces of furniture and replacing lightbulbs, smoke detectors, and breakers.  A couple of the violations, however, dated back to a 2014 permit, which issue had not been raised in the prior annual assembly inspections conducted by the Hialeah Fire Prevention Bureau.

93.     The Code Enforcement and Building Divisions issued notices of violation for deteriorated parking lot requiring maintenance and a missing dumpster enclosure; exterior signage that was replaced without a permit; missing occupational licenses for ATM's and vending machines; and alterations to the interior and exterior of the Property without permits.  Additionally, the Building Division, under the supervision of then-Mayor Hernandez, concluded that the Property was "unsafe" under § 8-5(b) of the Miami-Dade County Code of Ordinances.  The Property was red-tagged – meaning that a red notice was posted on the Property advising the public that the structure was unsafe and closed to the public.

94.     Following the designation of the Property as an Unsafe Structure by Riveron, Hialeah's Building Official, Bellas was forced to cease its operations and to prevent all public access to the Property pending remediation or resolution of the violations. Bellas was forced to remain closed until January 8, 2020 when it reopened under strict conditions imposed by Hialeah.

### H.  **The Raid Was a Political Weapon**

95.     Hernandez's punitive actions against the Tundidors did not dissuade Jesus from pursuing his candidacy or the Tundidors from supporting Jesus' candidacy.

96.   On July 29, 2019, days after the raid, Jesus refiled to run for the Hialeah City Council, switching races from Group IV, the race De la Rosa followed him into at Mayor Hernandez's behest, to Group II, where Gonzalez and three other candidates were vying for the same council seat.

97.   That same day, américa tevé aired the edited footage of the unlawful raid of Bellas, including Commander Villa's unfounded references to human trafficking, prostitution, and drugs, to its local Spanish-speaking audience in South Florida.

98.   The harm inflicted on the Tundidors for their support of Jesus' campaign and Jesus' persistence as a candidate was weaponized in the televised footage that was also made available online.

99.   Mayor Hernandez's political machine did not waste time capitalizing on his orchestrated raid of Bellas, the Tundidors' most visible income-generating asset.  The political advertisements that followed echoed Commander Villa's statements.  A "robocall," sponsored by Hernandez's Hialeah for Progress PAC, containing the following prerecorded message, was made to Hialeah residents:

> Attention Hialeah, did you all see that in the news reports how the money from prostitution, drugs and human trafficking are financing the campaign of Jesus Tundidor? . . . If you didn't hear about it, do not stop looking in the news. We cannot permit that this element comes into power in our city of Hialeah where we are raising our children and grandchildren.

100.   Shortly after the robocall, Gonzalez, now Jesus' opponent in Group II, held a press conference, seemingly directed by Mayor Hernandez.  Seated behind Gonzalez were two sitting councilmembers who had received Mayor Hernandez's support and contributions from Hialeah for Progress PAC.  Additionally, Gonzalez was flanked by campaign signs for Mayor Hernandez's slate for the 2019 election:  Garcia-Roves, De La Rosa, Lozano, and Gonzalez.

101.    At the conference, Gonzalez used the raid as Mayor Hernandez intended, stating,

Today, I denounce the money from prostitution, human trafficking, and drugs [that] is being used to defame my name and to help a candidate who is against me.

102.    Gonzalez even escalated the rhetoric against Jesus and the Tundidors further by stating,

His campaign Political PAC of the candidate Tundidor and his account are completely financed and a large part by his family and by the industry that they represent. In addition, the same week that Jeffrey Epstein committed suicide in prison, one of those strip clubs was closed.

103.    Meanwhile, mailers paid for by Hialeah for Progress PAC were sent to Hialeah residents.  The glossy print ads featured photos of James, Sr. with Jesus, as well as images of semi-nude dancers and stacks of cash.  The mailers conspicuously state that James, Sr. gifted Jesus $50,000 for his campaign and likened the Tundidors to an organized crime family by stating that the Tundidors own two strip clubs in Hialeah that account for murders, prostitution, human trafficking, and drugs.





104.    Additionally, numerous articles were published by local newspapers highlighting the false accusations and referencing the "human trafficking" raid.

105.    Jesus and Gonzalez qualified in the primaries and had a run-off election.  Despite Mayor Hernandez' machinations, Jesus prevailed and won himself a seat on the City Council.

**I.    Damages Incurred**

106.    Bellas was unexpectedly shut down on July 25, 2019. While the Tundidors were able to relocate some employees and entertainers to Erotica, many others had to be let go.

107.    Due to the raid, the illegal search, and the red tagging that resulted from it, all revenue associated with Bellas suddenly stopped, while the costs of owning and maintaining the Property and the business remained.  Bellas did not generate revenue from July 26, 2019 through January 8, 2020 when it reopened with a limited capacity.

108.    Additionally, Bellas was forced to and did hire counsel specializing in municipal governance at Weiss Serota Helfman Cole + Bierman ("Weiss Serota") in connection with the violations issued at and following the raid. Bellas agreed to and has paid fees in connection with Weiss Serota's representation of Bellas exceeding $100,000.

109.    As the owner of the Property, James, Sr. was obligated to pay penalties to Hialeah in connection with the violations.

110. As part of the remediation process and resolution of the violations, Hialeah required that Bellas prepare and submit a life safety plan to address and prioritize the alleged violations. Bellas hired SLS Consulting, Inc. to prepare a life-safety plan and $m^2e$ Consulting Engineers to supplement the life-safety plan and provide a proposed timeline for the remediation project.

111. Bellas remained closed from July 26, 2019 through January 8, 2020, when Hialeah finally permitted Bellas to re-open for business, but with a reduced occupancy load and a fire watch posted on the Property, the expense of which was borne by Bellas and James, Sr.

112. Additionally, Hialeah's closure of Bellas required James, Jr., who spearheaded these tasks on Bellas' behalf, to take immediate steps to remediate the alleged violations, including hiring architects, engineers, and contractors to begin a fast-tracked remediation.

113. James, Jr. was forced to cancel a paid trip abroad scheduled for the week of the raid in order to address the unexpected closure and prepare the Property for the electricity to be shut off by Hialeah.

114. Mayor Hernandez's threats and the raid that followed created mental anguish, embarrassment, and emotional distress for James, Sr., Dulce, and James, Jr.  They have suffered from sleep difficulties and other physical ailments.

115. Following the raid, the Tundidors have been concerned for their safety and the safety of their families.  After experiencing the Police being weaponized against them, they have been unable to feel secure in their homes and businesses.

116. The reputation of Bellas and the Tundidors was tarnished by the publicized, unlawful, "human trafficking" raid orchestrated by Mayor Hernandez, and the grossly inaccurate, televised mid-raid statements of Commander Villa regarding human trafficking, prostitution, and drugs.

117.  James, Sr. retained counsel to send cease and desist letters to Gonzalez, Hialeah for Progress PAC, and Sasha Tirador, Gonzalez's campaign consultant.

118.  While Defendant Hernandez remained in the mayor's office, the Tundidors worried that Hernandez, with the power and resources of Hialeah, would seek to fabricate evidence, complaints, and violations with the sole purpose of shutting down their businesses and destroying their livelihood because they exercised their First Amendment right to free speech by supporting Jesus' candidacy for political office.

119.  Plaintiffs are entitled to punitive damages to punish Defendant Hernandez's reprehensible conduct and to deter its future occurrence. Defendant Hernandez's conduct was reprehensible in that it violated Plaintiffs' right to free speech and to be free from warrantless searches by the government.  It was reckless in its disregard for Plaintiffs' constitutional rights and it was motivated by an evil intent – to unfairly influence the election, to retain power, and to deter Plaintiffs from continuing to support and fund Jesus' campaign for political office.

120.  Plaintiffs are entitled to and demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988(b).

## COUNT I – VIOLATION OF THE CONSTITUTIONAL RIGHT TO FREE SPEECH AND FREEDOM OF ASSOCIATION
### (against Defendant Hernandez)

121.  Plaintiffs reincorporate by reference the allegations set forth in paragraphs 1 through 120 as if fully set forth herein.

122.  The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

123.     The First Amendment protects not only the enumerated rights of free speech and association, but the right to be free from retaliation by a public official for the exercise of that right.

124.     The Civil Rights Act, 42 U.S.C. § 1983, creates a cause of action for violations of rights guaranteed under the Constitution of the United States.  The Act provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action  at law, suit in equity, or other proper proceeding for redress . . . .

125.     Both the Court of Appeals for the Eleventh Circuit and the Supreme Court of the United States have long held that public officials may not retaliate against private citizens because of the exercise of their First Amendment rights.

126.     Pursuant to Article VII, Section 7.02 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was subject to the standard of conduct and code of ethics for public officers established by general law and as provided by the Florida Constitution.

127.     Pursuant to § 112.311(5), Florida Statutes, in his capacity as mayor and a public officer, Defendant Hernandez was "bound to uphold the Constitution of the United States and the State Constitution and to perform efficiently and faithfully [his] duties under the laws of the federal, state, and local governments." Further, he was "bound to in [his] official acts, the highest standards of ethics . . . regardless of personal considerations, recognizing that promoting the public interest and maintaining the respect of the people in their government must be of foremost concern." *Id.*

128.     Pursuant to §§ 112.313(6) and 112.3136, Florida Statutes, in his capacity as mayor, a public officer, and the chief administrative officer of Hialeah, Defendant Hernandez was prohibited from the corrupt "use or attempt to use . . . his official position or any property or

resource which may be within his . . . trust, or perform his . . . official duties, to secure a special privilege, benefit, or exemption for himself . . . or others."

129.    By supporting Jesus Tundidor's run for political office in Hialeah, the Plaintiffs engaged in speech that is protected by the First Amendment.

130.    When Jesus reached out to seek Defendant Hernandez's support for his candidacy, he was told that Defendant Hernandez did not approve of Jesus' candidacy and would not support him.

131.    During a fundraiser event for the benefit of Senator Garcia, Defendant Hernandez expressly told Jesus that he did not approve of Jesus' run for office.  Defendant Hernandez then went a step further.  In a statement foreshadowing things to come and loaded with unspoken meaning, then-Mayor Hernandez reminded Jesus that Jesus was politically vulnerable because of the Tundidor family's adult entertainment businesses.

132.    Following the fundraiser, Defendant Hernandez sent a message to James, Sr. and expressed that, if Jesus did not abandon the race, Defendant Hernandez would take action against Tundidor businesses, which included Bellas.

133.    When Jesus and the Tundidors refused to stand down, Defendant Hernandez, with malicious purpose, orchestrated a dramatic raid of Bellas by the Police under the guise of a human trafficking operation.  The raid served to harass and intimidate Jesus and Plaintiffs, to stain Jesus and the Plaintiffs' reputations, to provide illegal access for a parade of code inspectors, and hamper the Tundidors' ability to continue supporting Jesus' campaign.  Over a dozen officers entered upon the premises on a busy night in July of 2019, despite lacking a warrant or probable cause to obtain one.  The Police found no evidence of human trafficking – the entire premise of the raid was part of a political hit – and a slew of inspectors used the illegal access provided by the warrantless

search to identify a number of code violations which they used as justification for red-tagging the Property and shutting down the business.

134.    During the raid, HPD Officer Perez responded to questioning from James, Jr. about the purpose of the raid by stating, "sorry man, this came from the big boss," impliedly referring to Defendant Hernandez, who was at that time the mayor of Hialeah.

135.    Defendant Hernandez's retaliatory actions, which included the attempted assassination of the Tundidors' character and an assault on Bellas, would likely deter a person of ordinary firmness from the exercise of their First Amendment rights.

136.    As established by Defendant Hernandez's own words to Jesus and the message conveyed to James, Sr., Defendant Hernandez's unlawful, retaliatory actions were in direct response to Jesus refusing to stand down from his run for political office and the Plaintiffs' support of Jesus.

137.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, Bellas was closed for business for nearly six months, was only permitted to re-open with limited capacity, and incurred hundreds of thousands of dollars of damages associated with lost profits, fines, remediation efforts, and legal fees, and the Tundidors and Bellas were branded in the media and in political communications by Defendant Hernandez's allies as being associated with human trafficking, prostitution, drugs, and more.

138.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, the Tundidors suffered mental anguish, embarrassment, and emotional distress, and have since the date of the raid suffered from sleep difficulties and other physical ailments

**WHEREFORE**, Plaintiffs respectfully request the entry of a judgment in their favor for lost profits, compensatory damages, reputational harm, emotional distress, and attorneys' fees,

together with pre-judgment interest, court costs, and for such other and further relief as this Court deems just and proper. Plaintiff reserves the right to seek punitive damages at the appropriate time.

## COUNT II – VIOLATION OF THE CONSTITUTIONAL RIGHT TO FREE SPEECH AND FREEDOM OF ASSOCIATION (against Defendant City of Hialeah)

139.    Plaintiffs reincorporate by reference the allegations set forth in paragraphs 1 through 120 as if fully set forth herein.

140.    In his capacity as mayor, Defendant Hernandez was the final policymaker for the city of Hialeah.

141.    Pursuant to Article II, Section 2.01 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez had, *inter alia*, the following powers and duties: a) "to exercise the executive powers of the city and supervise all departments," b) "to enforce the charter and ordinances of the city and all applicable county, state or federal general laws, special laws or ordinances," and c) "to inquire into the conduct of any municipal office, department, agency or officer and investigate municipal affairs."

142.    Pursuant to Article IV, Section 4.01 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was "the chief administrative officer of the city," "responsible for the administration of all city affairs," and responsible for "the administration of all departments, divisions and agencies of city government."

143.    Pursuant to Chapter 2, Article II, Division 11, Sec. 2-357 of the Code of Ordinances of Hialeah, in his capacity as mayor, Defendant Hernandez was ultimately responsible for the direct oversight and supervision of the municipal divisions for code compliance, building, and planning and zoning.

144.     Pursuant to Article IV, Sections 4.04 and 4.05 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was the supervisor of the chief of police and the fire chief.

145.     Pursuant to Article VII, Section 7.02 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was subject to the standard of conduct and code of ethics for public officers established by general law and as provided by the Florida Constitution.

146.     Pursuant to § 112.311(5), Florida Statutes, in his capacity as mayor and a public officer, Defendant Hernandez was "bound to uphold the Constitution of the United States and the State Constitution and to perform efficiently and faithfully [his] duties under the laws of the federal, state, and local governments." Further, he was "bound to in [his] official acts, the highest standards of ethics . . . regardless of personal considerations, recognizing that promoting the public interest and maintaining the respect of the people in their government must be of foremost concern." *Id.*

147.     Pursuant to §§ 112.313(6) and 112.3136, Florida Statutes, in his capacity as mayor, a public officer, and the chief administrative officer of Hialeah, Defendant Hernandez was prohibited from the corrupt "use or attempt to use . . . his official position or any property or resource which may be within his . . . trust, or perform his . . . official duties, to secure a special privilege, benefit, or exemption for himself . . . or others."

148.     By supporting Jesus Tundidor's run for political office in Hialeah, the Plaintiffs engaged in speech that is protected by the First Amendment.

149.     When Jesus reached out to seek Defendant Hernandez's support for his candidacy, he was told that Defendant Hernandez did not approve of Jesus' candidacy and would not support him.

150.    During a fundraiser event for the benefit of Senator Garcia, Defendant Hernandez expressly told Jesus that he did not approve of Jesus' run for office.  Defendant Hernandez then went a step further. In a statement foreshadowing things to come and loaded with unspoken meaning, then-Mayor Hernandez reminded Jesus that Jesus was politically vulnerable because of the Tundidor family's adult entertainment businesses.

151.    Following the fundraiser, Defendant Hernandez sent a message to James, Sr. and expressed that, if Jesus did not abandon the race, Defendant Hernandez would take action against Tundidor businesses, which included Bellas.

152.    When Jesus and the Tundidors refused to stand down, Defendant Hernandez, with malicious purpose, orchestrated a dramatic raid of Bellas by the Police under the guise of a human trafficking operation.  The raid served to harass and intimidate Jesus and Plaintiffs, to stain Jesus and the Plaintiffs' reputations, to provide illegal access for a parade of code inspectors, and hamper the Tundidors' ability to continue supporting Jesus' campaign.  The Police entered upon the premises on a busy night in July of 2019, despite lacking a warrant or probable cause to obtain one.  The Police found no evidence of human trafficking – the entire premise of the raid was part of a political hit – and a slew of inspectors used the illegal access provided by the warrantless search to identify a number of code violations which they used as justification for red-tagging the Property and shutting down the business.

153.    In his capacity as mayor, Defendant Hernandez was the supervisor and final decisionmaker of all of the departments involved in the raid, which was orchestrated for a corrupt political purpose in plain violation of the protections of the First Amendment.  In his capacity as mayor, Defendant Hernandez's decision to cause the raid to occur was not subject to reversal or

veto by any other governing body or official, and Defendant Hernandez's decision had legal effect without further action by any other governing body.

154.    During the raid, HPD Officer Perez responded to questioning from James, Jr. about the purpose of the raid by stating, "sorry man, this came from the big boss," impliedly referring to Defendant Hernandez, who was at that time the mayor of Hialeah.

155.    Defendant Hernandez's retaliatory actions, which included the attempted assassination of the Tundidors' character and an assault on Bellas, would likely deter a person of ordinary firmness from the exercise of their First Amendment rights.

156.    As established by Defendant Hernandez's own words to Jesus and the message conveyed to James, Sr., Defendant Hernandez's unlawful, retaliatory actions were in direct response to Jesus refusing to stand down from his run for political office and the Tundidors' support of Jesus.

157.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, Bellas was closed for business for nearly six months, was only permitted to re-open with limited capacity, and incurred hundreds of thousands of dollars of damages associated with lost profits, fines, remediation efforts, and legal fees, and the Tundidors and Bellas were branded in the media and in political communications by Defendant Hernandez's allies as being associated with human trafficking, prostitution, and drugs.

158.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, the Tundidors suffered mental anguish, embarrassment, and emotional distress, and have since the date of the raid suffered from sleep difficulties and other physical ailments.

**WHEREFORE**, Plaintiffs respectfully request the entry of a judgment in their favor for lost profits, compensatory damages, reputational harm, emotional distress, and attorneys' fees,

together with pre-judgment interest, court costs, and for such other and further relief as this Court deems just and proper. Plaintiff reserves the right to seek punitive damages at the appropriate time.

## COUNT III – VIOLATION OF THE CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES
### (against Defendant Hernandez)

159.     Plaintiffs reincorporate by reference the allegations set forth in paragraphs 1 through 120 as if fully set forth herein.

160.     Pursuant to Article II, Section 2.01 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez had, *inter alia*, the following powers and duties: a) "to exercise the executive powers of the city and supervise all departments," b) "to enforce the charter and ordinances of the city and all applicable county, state or federal general laws, special laws or ordinances," and c) "to inquire into the conduct of any municipal office, department, agency or officer and investigate municipal affairs."

161.     Pursuant to Article IV, Section 4.01 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was "the chief administrative officer of the city," "responsible for the administration of all city affairs," and responsible for "the administration of all departments, divisions and agencies of city government."

162.     Pursuant to Chapter 2, Article II, Division 11, Sec. 2-357 of the Code of Ordinances of Hialeah, in his capacity as mayor, Defendant Hernandez was responsible for the direct oversight and supervision of the Community Development Department, which includes the divisions for code compliance, building, and planning and zoning.

163.     Pursuant to Article IV, Sections 4.04 and 4.05 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was the supervisor of the chief of police and the fire chief.

164.    By supporting Jesus Tundidor's run for political office in Hialeah, the Plaintiffs engaged in speech that is protected by the First Amendment.

165.    When Jesus reached out to seek Defendant Hernandez's support for his candidacy, he was told that Defendant Hernandez did not approve of Jesus' candidacy and would not support him.

166.    During a fundraiser event for the benefit of Senator Garcia, Defendant Hernandez expressly told Jesus that he did not approve of Jesus' run for office.  Defendant Hernandez then went a step further.  In a statement foreshadowing things to come and loaded with unspoken meaning, then-Mayor Hernandez reminded Jesus that Jesus was politically vulnerable because of the Tundidor family's adult entertainment businesses.

167.    Following the fundraiser, Defendant Hernandez sent a message to James, Sr. and expressed that, if Jesus did not abandon the race, Defendant Hernandez would take action against Tundidor businesses, which included Bellas.

168.    When Jesus and the Tundidors refused to stand down, Defendant Hernandez, with malicious purpose, orchestrated a dramatic raid of Bellas by the Police under the guise of a human trafficking operation.  The raid served to harass and intimidate Jesus and Plaintiffs, to stain Jesus and the Plaintiffs' reputations, to provide illegal access for a parade of code inspectors, and hamper the Tundidors' ability to continue supporting Jesus' campaign.  The Police entered upon the premises on a busy night in July of 2019, despite lacking a warrant or probable cause to obtain one.  The Police found no evidence of human trafficking – the entire premise of the raid was part of a political hit – and a slew of inspectors used the illegal access provided by the warrantless search to identify a number of code violations which they used as justification for red-tagging the Property and shutting down the business.

169.    During the raid, HPD Officer Perez, responded to questioning from James, Jr. about the purpose of the raid by stating, "sorry man, this came from the big boss," impliedly referring to Defendant Hernandez, who was at that time the mayor of Hialeah.

170.    Defendant Hernandez's retaliatory actions, which included the attempted assassination of the Tundidors' character and an assault on Bellas, would likely deter a person of ordinary firmness from the exercise of their First Amendment rights.

171.    As established by Defendant Hernandez's own message conveyed to James, Sr., Defendant Hernandez's unlawful, retaliatory actions were in direct response to Jesus refusing to stand down from his run for political office and the Tundidors' support of Jesus.

172.    The Fourth Amendment to the U.S. Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, *against unreasonable searches and seizures*, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  (emphasis added). The consequence of violating the Fourth Amendment is the exclusion of all evidence obtained during the search, including evidence that may otherwise have been observable to a patron at the property because of the "fruit of the poisonous tree" doctrine.

173.    The Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises and extends to administrative inspections designed to enforce regulatory statutes.

174.    While Bellas, as a liquor-serving establishment, is a closely regulated business under Florida law, the raid at issue in this case was not an inspection by law enforcement personnel to determine compliance with provisions of the beverage law.  Indeed, as the Code Compliance

Case Worksheet establishes, the raid was in fact a property inspection "by a code team set up of a police, building, fire, and code."

175.    However, despite the planned nature of the raid, no warrant for an administrative inspection or articulating probable cause and executed by a Judge was obtained by the Police and no attempt was made to obtain one. No emergencies or exigent circumstances were identified by the Police – there was no fleeing felon, no destruction of evidence, no search incident to a lawful arrest, and no fire.  Nor can any exigent circumstances be plausibly established in light of the multi-departmental (and media) coordination and pre-raid investigation into the Tundidors and the Property.

176.    Moreover, entry into the Property based upon exigencies would have been limited in scope to its purpose; but Hialeah did not limit its unlawful incursion into the Property in any way.  The scope of the search was highly invasive as personnel from Hialeah entered spaces not open to the public, including behind the bar, the dancers' dressing room, electrical closets, storage areas, kitchen areas, offices, the basement, and even the attic spaces under the roof of the building.

177.    Additionally, even if Hialeah had obtained a warrant for an administrative inspection of Bellas, the inspection was not appropriately limited in its execution.  By way of illustration, on an annual basis, Bellas was subject to inspection by the Hialeah Fire Department, and each annual inspection was conducted much differently, cooperatively, and without incident. Prior inspections did not include an assemblage of over a dozen police officers from the Community Enhancement Unit, Community Response Team, Crime Scene Investigation, Narcotics Unit, and Special Victim's Unit entering the building on a busy night, decked out in tactical gear and masks. Prior inspections did not involve the Police yelling in loud, booming voices for the music to stop and the lights to be turned on. Prior inspections did not involve

completely shutting down the operation of the business, and detaining every patron for more than an hour, while the belongings of each were searched and their identities checked.  Prior inspections did not require or involve interactions with Bellas' patrons.  Prior inspections did not involve interviewing every member of the staff and searching their lockers.  Prior inspections were completely cooperative, and were not conducted under the guise of a human trafficking investigation unsupported by probable cause.  Prior inspections did not include embedded reporters in bulletproof vests and televised interviews by police commanders referencing human trafficking, prostitution, and drugs, which was particularly egregious and malicious in this instance given the complete absence of any evidence of any of the foregoing on the Bellas premises and Commander Villa's statement to Dulce and James, Jr. that Bellas was "clean."

178.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, Bellas was closed for business for nearly six months, was only permitted to re-open with limited capacity, and incurred hundreds of thousands of dollars of damages associated with lost profits, fines, remediation efforts, and legal fees, and Bellas and the Tundidors were branded in the media and in political communications by Defendant Hernandez's allies as being associated with human trafficking, prostitution, and drugs, as was his intent.

179.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, the Tundidors suffered mental anguish, embarrassment, and emotional distress, and have since the date of the raid suffered from sleep difficulties and other physical ailments.

**WHEREFORE**, Plaintiffs respectfully request the entry of a judgment in their favor for lost profits, compensatory damages, reputational harm, emotional distress, and attorneys' fees,

together with pre-judgment interest, court costs, and for such other and further relief as this Court deems just and proper. Plaintiff reserves the right to seek punitive damages at the appropriate time.

<u>**COUNT IV – VIOLATION OF THE CONSTITUTIONAL RIGHT**</u>
<u>**TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES**</u>
**(against Defendant City of Hialeah)**

180.    Plaintiffs reincorporate by reference the allegations set forth in paragraphs 1 through 120 as if fully set forth herein.

181.    In his capacity as mayor, Defendant Hernandez was the final policymaker for the city of Hialeah.

182.    Pursuant to Article II, Section 2.01 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez had, *inter alia*, the following powers and duties: a) "to exercise the executive powers of the city and supervise all departments," b) "to enforce the charter and ordinances of the city and all applicable county, state or federal general laws, special laws or ordinances," and c) "to inquire into the conduct of any municipal office, department, agency or officer and investigate municipal affairs."

183.    Pursuant to Article IV, Section 4.01 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was "the chief administrative officer of the city," "responsible for the administration of all city affairs," and responsible for "the administration of all departments, divisions and agencies of city government."

184.    Pursuant to Chapter 2, Article II, Division 11, Sec. 2-357 of the Code of Ordinances of Hialeah, in his capacity as mayor, Defendant Hernandez was responsible for the direct oversight and supervision of the Community Development Department, which includes the divisions for code compliance, building, and planning and zoning.

185.    Pursuant to Article IV, Sections 4.04 and 4.05 of the Hialeah City Charter, in his capacity as mayor, Defendant Hernandez was the supervisor of the chief of police and the fire chief.

186.    By supporting Jesus Tundidor's run for political office in Hialeah, the Plaintiffs engaged in speech that is protected by the First Amendment.

187.    When Jesus reached out to seek Defendant Hernandez's support for his candidacy, he was told that Defendant Hernandez did not approve of Jesus' candidacy and would not support him.

188.    During a fundraiser event for the benefit of Senator Garcia, Defendant Hernandez expressly told Jesus that he did not approve of Jesus' run for office. Hernandez then went a step further.  In a statement foreshadowing things to come and loaded with unspoken meaning, then-Mayor Hernandez reminded Jesus that Jesus was politically vulnerable because of the Tundidor family's adult entertainment businesses.

189.    Following the fundraiser, Defendant Hernandez sent a message to James, Sr. and again expressed that, if Jesus did not abandon the race, Defendant Hernandez would take action against Tundidor businesses, which included Bellas.

190.    When Jesus and the Tundidors refused to stand down, Defendant Hernandez, with malicious purpose, orchestrated a dramatic raid of Bellas by the Police under the guise of a human trafficking operation.  The raid served to harass and intimidate Jesus and Plaintiffs, to stain Jesus and the Plaintiffs' reputations, to provide illegal access for a parade of code inspectors, and hamper the Tundidors' ability to continue supporting Jesus' campaign.  The Police entered upon the premises on a busy night in July of 2019, despite lacking a warrant or probable cause to obtain one.  The Police found no evidence of human trafficking – the entire premise of the raid was part

of a political hit – and a slew of inspectors used the illegal access provided by the warrantless search to identify a number of code violations which they used as justification for red-tagging the Property and shutting down the business.

191.   In his capacity as mayor, Defendant Hernandez was the supervisor and final decisionmaker of all of the departments involved in the raid, which was orchestrated for a corrupt political purpose in plain violation of the protections of the First Amendment.  In his capacity as mayor, Defendant Hernandez's decision to cause the raid to occur was not subject to reversal or veto by any other governing body or official, and Defendant Hernandez's decision had legal effect without further action by any other governing body.

192.   During the raid, HPD Officer Perez, responded to questioning from James, Jr. about the purpose of the raid by stating, "sorry man, this came from the big boss," impliedly referring to Defendant Hernandez, who was at that time the mayor of Hialeah.

193.   Defendant Hernandez's retaliatory actions, which included the attempted assassination of the Tundidors' character and an assault on Bellas, would likely deter a person of ordinary firmness from the exercise of their First Amendment rights.

194.   As established by Defendant Hernandez's own words to Jesus and the message conveyed to James, Sr., Defendant Hernandez's unlawful, retaliatory actions were in direct response to Jesus refusing to stand down from his run for political office and the Tundidors' support of Jesus.

195.   The Fourth Amendment to the U.S. Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, *against unreasonable searches and seizures*, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things

to be seized." (emphasis added).   The consequence of violating the Fourth Amendment is the exclusion of all evidence obtained during the search, including evidence that may otherwise have been observable to a patron at the property because of the "fruit of the poisonous tree" doctrine.

196.    The Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises and extends to administrative inspections designed to enforce regulatory statutes.

197.    While Bellas, as a liquor-serving establishment, is a closely regulated business under Florida law, the raid at issue in this case was not an inspection by law enforcement personnel to determine compliance with provisions of the beverage law.   Indeed, as the Code Compliance Case Worksheet establishes, the raid was in fact a property inspection "by a code team set up of a police, building, fire, and code."

198.    However, despite the planned nature of the raid, no warrant for an administrative inspection or articulating probable cause and executed by a Judge was obtained by the Police and no attempt was made to obtain one. No emergencies or exigent circumstances were identified by the Police – there was no fleeing felon, no destruction of evidence, no search incident to a lawful arrest, and no fire.   Nor can any exigent circumstances be plausibly established in light of the multi-departmental coordination and pre-raid investigation into the Tundidors and the Property.

199.    Moreover, entry into the Property based upon exigencies would have been limited in scope to its purpose; but Hialeah did not limit its unlawful incursion into the Property in any way.   The scope of the search was highly invasive as personnel from Hialeah entered spaces not open to the public, including behind the bar, the dancers' dressing room, electrical closets, storage areas, kitchen areas, offices, the basement, and even the attic spaces under the roof of the building.

200.    Additionally, even if Hialeah had obtained a warrant for an administrative inspection of Bellas, the inspection was not appropriately limited in its execution.  By way of illustration, on an annual basis, Bellas was subject to inspection by the Hialeah Fire Department, and each annual inspection was conducted much differently, cooperatively, and without incident. Prior inspections did not include an assemblage of officers from the Community Enhancement Unit, Community Response Team, Crime Scene Investigation, Narcotics Unit, and Special Victim's Unit entering the building on a busy night, decked out in tactical gear and masks.    Prior inspections did not involve the Police yelling in loud, booming voices for the music to stop and the lights to be turned on. Prior inspections did not involve completely shutting down the operation of the business, and detaining every patron for more than an hour, while the belongings of each were searched and their identities checked.  Prior inspections did not require or involve interactions with Bellas' patrons.  Prior inspections did not involve interviewing every member of the staff and searching their lockers.  Prior inspections were completely cooperative, and were not conducted under the guise of a human trafficking investigation unsupported by probable cause.  Prior inspections did not include embedded reporters in bulletproof vests and televised interviews by police commanders referencing human trafficking, prostitution, and drugs, which was particularly egregious and malicious in this instance given the complete absence of any evidence of any of the foregoing on the Bellas premises and Commander Villa's statement to the Dulce and James, Jr. that Bellas was "clean."

201.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, Bellas was closed for business for nearly six months, was only permitted to re-open with limited capacity, and incurred hundreds of thousands of dollars of damages associated with lost profits, fines, remediation efforts, and legal fees, and Bellas and the Tundidors were branded in

the media and in political communications by Defendant Hernandez's allies as being associated with human trafficking, prostitution, and drugs.

202.    As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, the Tundidors suffered mental anguish, embarrassment, and emotional distress, and have since the date of the raid suffered from sleep difficulties and other physical ailments.

**WHEREFORE**, Plaintiffs respectfully request the entry of a judgment in their favor for lost profits, compensatory damages, reputational harm, emotional distress, and attorneys' fees, together with pre-judgment interest, court costs, and for such other and further relief as this Court deems just and proper. Plaintiff reserves the right to seek punitive damages at the appropriate time.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all claims so triable.


Dated: July 24, 2023


Respectfully submitted,

BAST AMRON LLP
*Counsel for the Plaintiffs*
One Southeast Third Avenue, Suite 2410
Miami, FL 33131
Telephone: 305.379.7904
Facsimile: 786.206.8740
Email: pklock@bastamron.com
Email: lcarreras@bastamron.com

By:   */s/ Lissette M. Carreras*
Peter J. Klock II, Esq. (FBN 103915)
Lissette M. Carreras, Esq. (FBN 018079)