UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-22747-ALTMAN/Reid

**JAMES TUNDIDOR, SR.**, *et al.*,

     *Plaintiffs*,

*v.*

**CARLOS HERNANDEZ**, *et al.*,

     *Defendants*.

_____/

## ORDER

Carlos Hernandez and the City of Hialeah, our Defendants, have filed a Joint Motion to Dismiss the Plaintiffs' Complaint [ECF No. 12]. Upon careful review of the Motion, the briefing, and the governing law, we hereby **ORDER and ADJUDGE** that the Defendants' Joint Motion to Dismiss is **DENIED**.

### THE FACTS[1]

Our Plaintiffs—James Tundidor, Sr. ("James Sr."), Dulce E. Tundidor ("Dulce"), and their son, James Tundidor, Jr. ("James Jr.") (collectively, the "Tundidors")—are "life-long residents" of Hialeah, Florida (the "City").[2] Complaint [ECF No. 1] ¶ 16. In 2009, James Sr. "purchased a property located at 885 S.E. 14th Street" in Hialeah (the "Property"), which "housed Porky's Cabaret, Inc. ('Porky's'), an adult entertainment venue[.]" *Id.* ¶ 18. At that same time, "Dulce purchased Porky's,

---

[1] We accept the allegations in the Plaintiffs' Complaint [ECF No. 1] as true for purposes of this Order. *See Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) ("In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but 'legal conclusions without adequate factual support are entitled to no assumption of truth.'" (quoting *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (cleaned up))).

[2] Also a Plaintiff in this case is Porky's Cabaret, Inc., an "adult entertainment venue" doing business under the name "Bellas Cabaret." Compl. ¶¶ 4, 23. "Collectively, [ ] James Sr., Dulce, and James Jr., own and operate Bellas . . . and the property on which it is located[.]" *Id.* ¶ 4 (cleaned up).

the business," *id.* ¶ 19, and applied for "new occupational licenses on Porky's behalf" to operate it as a bar, restaurant, and nightclub (collectively, the "Licenses"), *id.* ¶ 20. Those "[l]icenses were approved by the [City's] Department of Environmental Resource Management on November 6, 2009," and were "renewed without issue" between 2009 and 2012. *Id.* ¶¶ 21–22.

In 2013, Porky's rebranded as "Bellas Cabaret" ("Bellas") and renewed its annual licenses under that new name without issue between 2013 and 2016.[3] *See id.* ¶¶ 23–24. While, "in 2017, [the City] . . . placed a 'hold' on the Licenses and assessed a penalty against Bellas, . . . Bellas paid all applicable penalties along with the renewal fees in order to renew the Licenses." *Id.* ¶ 25. As part of that "recertification" process, Bellas received a building inspection, "which confirmed that . . . [Bellas] is structurally and electrically safe for continued occupancy." *Id.* ¶ 26 (cleaned up). Bellas had also "received the approval of the Hialeah Fire Prevention Bureau" in "each inspection" it was subject to "[p]rior to 2019[.]" *Id.* ¶ 28. Still, Bellas would soon find itself in the crosshairs of the "well-oiled political machine" that called the shots in the City. *Id.* ¶ 39.

Carlos Hernandez, our Defendant, was appointed mayor of Hialeah on May 23, 2011, *id.* ¶ 33, and served in that office until November 2021, *see id.* ¶ 34. Towards the end of Hernandez's second term, Jesus Tundidor ("Jesus"), James Sr.'s *other* son, "approached then-Mayor Hernandez to ask for his support to run for City Council in the 2017 election cycle." *Id.* ¶¶ 34, 42. Hernandez "denied [Jesus's] request and told Jesus he would be supporting another candidate" and added that Jesus "should wait for the 2019 election cycle to run for a seat on the City Council." *Id.* ¶ 42. Jesus took that advice and waited until November 2018 to file "his candidate qualifying documents [and] announc[e] his intention to run for the City Council . . . in the 2019 elections." *Id.* ¶ 46.

---

[3] The Complaint consistently refers to the adult-entertainment venue as "Bellas," rather than the possessive "Bella's." *See generally* Compl. We'll do the same.

At a campaign event in early 2019, Hernandez told Jesus "that he was not sure why Jesus wanted to run now and that Jesus should wait to run," just as he did the previous election cycle. *Id.* ¶ 52. During that conversation, Hernandez gave Jesus the following warning:

> Everybody here likes you and laughs with you and smiles with you, but at the end of the day, they will all be on my side because I have the muscle. I don't care how much you raise in contributions, I will raise more.

*Ibid.* Hernandez "also referenced the Tundidor family's adult entertainment venues as a political pressure point that would be used against Jesus in an election." *Id.* ¶ 53. As it turned out, Hernandez was supporting Jesus's *opponent*, former City Council member Luis Gonzalez, who "served on the City Council alongside Hernandez between 2005 and 2011, and continued to be aligned with Hernandez after he was appointed, then elected, mayor." *Id.* ¶ 48; *see also id.* ¶ 60 ("Jesus ran for the Group II council seat, opposed by Gonzalez who ran with Hernandez's backing and received multiple contributions from Hialeah for Progress PAC.").

After the fundraiser, "James Sr. . . . received a call from a politically active businessman, Jesus Navarro, to discuss 'the situation' between Hernandez and Jesus [Tundidor]." *Id.* ¶ 61 (cleaned up). James Sr. and James Jr. then had a meeting with Navarro, who told them that "Mayor Hernandez would attack the Tundidor family's business if Jesus did not drop out of the race." *Id.* ¶ 62. Undeterred by this threat, James Sr. "responded that Jesus would not drop out of the race and would continue the race on his own accord." *Id.* ¶ 63. On July 15, 2019, Jesus—who "is not and has never been an officer, employee, agent, or representative of Porky's or Bellas"—received a call from the Hialeah City Attorney's Office to discuss the club's licenses, which had been on hold since 2017. *Id.* ¶ 64. Jesus forwarded the inquiry to James Jr., who scheduled a meeting with the City Attorney's Office for July 30, 2019, to discuss the licenses. *Id.* ¶ 66. That meeting never took place.

That's because, on the evening of July 25, 2019—while Bellas was open for business—over a dozen members of the Hialeah Police Department ("HPD") burst through the club's door "without

invitation, without permission, and without a search warrant[.]" *Id.* ¶ 67. After ordering that "the music [ ] stop and the lights [ ] be turned on inside the adult entertainment venue," the HPD began "systematically round[ing] up" everyone inside. *Id.* ¶¶ 70–71; *see also id.* ¶ 71 ("Bar staff were ordered out from behind the bar, entertainers were directed off the stage and out of the dressing room, and all patrons were seated together."). Over the course of the next "hour," *id.* ¶ 72, the officers interviewed the club's "employees, managers, and dancers," conducted "pat-downs" on "[m]any of the staff and patrons," and "escorted" "the scantily-dressed dancers . . . to the dressing room, which is inaccessible to the public, to check their identification and conduct searches of their belongings and inside their lockers," *ibid.* Accompanying the HPD throughout the entire raid was a television reporter and cameraman from a local Spanish-language channel, "américa tevé." *Id.* ¶ 75. The reporter, who "donned a bullet-proof vest with 'POLICE' displayed across her chest, and her cameraman, followed the [p]olice into . . . all areas of the club, including those that were not open to the public." *Id.* ¶ 77 (cleaned up).

James Jr., who was present for the raid, soon "identified himself as the person in charge" to the HPD. *Id.* ¶ 74. "Police escorted James Jr. around the [club] and demanded that he provide them with access to all spaces, including those that were locked and not accessible to the public." *Ibid.* (cleaned up). Specifically, "the [p]olice demanded that James Jr. provide them with access to a locked office, two locked closets, and the bathrooms in the basement level that were locked." *Ibid.* "The [p]olice also accessed the basement level, which was not open to the public." *Ibid.* When James Jr. asked one of the officers "what was going on," that officer "responded, 'sorry man, this came from the big boss[.]'" *Id.* ¶ 78. The "big boss," the Plaintiffs believe, "refer[red] to [ ] Hernandez," the mayor at the time. *Ibid.*

"[A]fter the [p]olice raid," Commander Fernando Villa of the HPD sought out James Jr. and Dulce (who was also on site by this time) to "commend[ ]" them, relaying that, "in his 20 years as an

officer, it was the first time he had seen such a 'clean' strip club." *Id.* ¶ 79. Even so, Villa told them that "the building officials were going to come in to look at the Property as 'part of protocol.'" *Ibid.* Bellas was then descended upon by "a parade of [officials] from Hialeah's Code Enforcement Department, Fire Department, and Building Department[.]" *Id.* ¶ 80.

Those inspectors "cited Bellas for numerous violations and shut down all operations." *Id.* ¶ 91. Specifically, the "Fire Department generated a report detailing 14 violations of the Florida Fire Prevention Code, some of which simply involved moving a few pieces of furniture and replacing lightbulbs, smoke detectors, and breakers," and others "dated back to a 2014 permit, which issue had not been raised in the prior annual assembly inspections conducted by the Hialeah Fire Prevention Bureau." *Id.* ¶ 92. The "Code Enforcement and Building Divisions issued notices of violation for deteriorated parking lot requiring maintenance and a missing dumpster enclosure; exterior signage that was replaced without a permit; missing occupational licenses for ATM's [sic] and vending machines; and alterations to the interior and exterior of the Property without permits." *Id.* ¶ 93. The Building Division also ordered "that the Property was 'unsafe' under § 8-5(b) of the Miami-Dade County Code of Ordinances," thus forcing Bellas to cease its operations and "prevent[ing] all public access to the Property pending remediation or resolution of the violations." *Id.* ¶¶ 93–94. Bellas remained closed "until January 8, 2020[,] when it reopened under strict conditions imposed by [the City]." *Id.* ¶ 94.

The Tundidors would later learn from "public records requests" that "[t]he raid was planned for days in advance" and that "[City] employees were actively investigating the Tundidors days before the raid." *Id.* ¶ 82. Leading up to the raid, HPD had "generated reports" of the Tundidors' driving records, "pulled a 'company report' for 'Porky's Inc.' from a criminal justice information system," "printed information from Bellas'[s] webpage and social media[,] . . . downloaded images of the Property from Google Earth," and retrieved "microfilms associated with the Property, including original building plans and surveys dating back to 1966[.]" *Id.* ¶¶ 82–83. The City's Chief Electrical

Inspector, Miguel Mendez, also prepared a memorandum addressed to other building officials, which "confirmed that 'Police scheduled the inspection' of Bellas." *Id.* ¶ 83. And, immediately before the HPD raided Bellas, Commander Villa gave a "pre-raid briefing" to various police officers and building officials (and the media team from américa tevé), at which he explained that "the objective of the raid is 'human trafficking,'" *id.* ¶ 86, and noted that they were "looking for anyone under the age of eighteen or anyone who is being forced to work there," *id.* ¶ 87. Although the police "identified one dancer who is nineteen years old" and another "patron who was found to be carrying a firearm, but who was not arrested," no evidence of human trafficking was ever found. *Id.* ¶ 88.

Jesus remained steadfast and refiled to run for the Hialeah City Council on July 29, 2019. *See id.* ¶ 96. "That same day, américa tevé aired the edited footage of the [ ] raid of Bellas, including Commander Villa's [ ] references to human trafficking, prostitution, and drugs, to its local Spanish-speaking audience in South Florida." *Id.* ¶ 97. The raid soon became a key issue in the campaign, with "Hernandez's Hialeah for Progress PAC" sponsoring a "robocall" to Hialeah residents with the following pre-recorded message:

> Attention Hialeah, did you all see that in the news reports how the money from prostitution, drugs and human trafficking are financing the campaign of Jesus Tundidor? . . . If you didn't hear about it, do not stop looking in the news. We cannot permit that this element comes into power in our city of Hialeah where we are raising our children and grandchildren.

*Id.* ¶ 99. The PAC also ran "glossy print ads" that "likened the Tundidors to an organized crime family by stating that the Tundidors own two strip clubs in Hialeah that account for murders, prostitution, human trafficking, and drugs." *Id.* ¶ 103. Gonzalez (Jesus's opponent) also capitalized on the optics of the raid, denouncing at a press conference the "money from prostitution, human trafficking, and drugs [that] is being used to defame [his] name and to help a candidate who is against [him.]" *Id.* ¶ 101. Despite all this, Jesus went on to win the election. *Id.* ¶ 105.

On July 24, 2023, the Tundidors and Bellas sued Hernandez and the City, asserting violations of the First, Fourth, and Fourteenth Amendments against each Defendant. *See* Compl. ¶¶ 121–38 (for "violation of the constitutional right to free speech and freedom of association (against Defendant Hernandez)") (Count I); *id.* ¶¶ 139–58 (same as to the City) (Count II); *id.* ¶¶ 159–79 (for "violation of the constitutional right to be free from unreasonable searches and seizures (against Defendant Hernandez)") (Count III); *id.* ¶¶ 180–202 (same as to the City) (Count IV). Hernandez and the City have since filed a Joint Motion to Dismiss ("MTD") [ECF No. 12] as to all counts. We'll consider that Motion here.[4]

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will

---

[4] One preliminary matter. In their Reply, the Defendants point out that the "Plaintiffs' 27-page response violates the Southern District of Florida Local Rules, by exceeding the 20-page limit." Reply [ECF No. 25] at 1 n.1 (citing S.D. FLA. L.R. 7.1(c)(2)). But the Defendants' 22-page Motion to Dismiss and 14-page Reply *both* violate our District's page-limit rules. *See* S.D. FLA. L.R. 7.1(c)(2) ("[A] reply memorandum shall not exceed ten (10) pages."). Because both parties have filed overlength briefs, we'll exercise our discretion to overlook these offsetting procedural errors. *See Silva v. Baptist Health S. Fla., Inc.*, 2015 WL 12030094, at *1 (S.D. Fla. Apr. 14, 2015) (Williams, J.) ("A district court has discretion to apply the district's local rules and the Eleventh Circuit grants the district court's interpretation 'great deference.'" (quoting *Reese v. Herbert*, 527 F.3d 1253, 1267 (11th Cir. 2008))); *see generally* BENJAMIN FRANKLIN, POOR RICHARD'S ALMANACK 17 (U.S.C. Publ'g Co., 1914) ("Clean your finger, before you point at my spots."). But we'll require the parties to abide by our Local Rules in all future filings.

reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

**ANALYSIS**

The Defendants advance five arguments: (1) that the Complaint is an impermissible shotgun pleading; (2) that "the individual Plaintiffs lack standing to recover damages allegedly suffered by a corporate entity (i.e. 'Bellas')"; (3) that "Hernandez is immune from suit" under the doctrine of qualified immunity; (4) that the "Plaintiffs have failed to state a claim against the City imposing municipal liability"; and (5) that the "Plaintiffs have not properly alleged a cognizable claim for a violation of their constitutional rights." MTD at 3–5. [5] We'll consider each in turn.

## I.       The Form of the Plaintiffs' Pleading

The Defendants first argue that the Complaint should be dismissed as a shotgun pleading because the "Plaintiffs fail to provide separate and distinct allegations of each individual Plaintiff . . . against each Defendant." *Id.* at 5. We disagree.

To comply with federal pleading standards, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). And, "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." FED. R. CIV. P. 10(b). "A 'shotgun pleading' is one that lacks

---

[5] Because the Plaintiffs must properly state their constitutional claims to overcome Hernandez's qualified-immunity defense, we'll consider the Defendants' separately briefed argument that the Plaintiffs have "fail[ed] to allege any cognizable [c]onstitutional violation" in the context of our qualified-immunity analysis. MTD at 19.

the minimum clarity, brevity, or coherence required by Rules 8 and 10 of the Federal Rules of Civil Procedure." *Lozano v. Prummell*, 2022 WL 4384176, at *2 (M.D. Fla. Sept. 22, 2022) (Steele, J.). As the Eleventh Circuit has explained, a complaint is a shotgun pleading if it:

> (1) contains multiple counts where each count adopts the allegations of all preceding counts; (2) is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) fails to separate into a different count each cause of action; or (4) asserts multiple claims against multiple defendants without specifying which defendant is responsible for which act.

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).

The Defendants' problem with the Complaint—that it alleges "claims against the Defendants by all *Plaintiffs* in each count," MTD at 5 (emphasis added)—doesn't fall within any of the *Weiland* categories. Nor does the Complaint deprive the Defendants of "adequate notice of the claims against them." *Continental 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1140 (M.D. Fla. 2018) (Chappell, J.). (citing *Weiland*, 792 F.3d at 1323). On the contrary, the Complaint describes *at length* how each Plaintiff was harmed by the Defendants' alleged actions.[6] So, the Defendants are simply wrong that the Complaint does not "detail[ ]or distinguish[ ] how the business or each of the three [individual] Plaintiffs were individually injured." MTD at 5 (cleaned up).

Where a complaint's factual allegations, "which [are] incorporated into each count[,] contain[ ] very specific allegations as to the damages suffered by each Plaintiff" and "arise out of the same transaction or occurrence," the "interests of clarity are served by including multiple Plaintiffs in each

---

[6] *See, e.g.*, Compl. ¶ 107 ("Due to the raid, the illegal search, and the red tagging that resulted from it, all revenue associated with Bellas suddenly stopped, while the costs of owning and maintaining the Property and the business remained. Bellas did not generate revenue from July 26, 2019 through January 8, 2020 when it reopened with a limited capacity."); *id.* ¶ 109 ("As the owner of the Property, James, Sr. was obligated to pay penalties to Hialeah in connection with the violations."); *id.* ¶ 113 ("James, Jr. was forced to cancel a paid trip abroad scheduled for the week of the raid in order to address the unexpected closure and prepare the Property for the electricity to be shut off by Hialeah."); *id.* ¶ 114 ("Mayor Hernandez's threats and the raid that followed created mental anguish, embarrassment, and emotional distress for James, Sr., Dulce, and James, Jr. They have suffered from sleep difficulties and other physical ailments.").

count." *Am. Coastal Ins. Co. v. Electrolux Home Prods., Inc.*, 2019 WL 2411195, at *2 (M.D. Fla. June 7, 2019) (Chappell, J.). That's precisely what we have here. We thus reject the Defendants' assertion that the Complaint must be dismissed as a shotgun pleading.

## II.      Article III Standing

Next, the Defendants insist that "the individual Plaintiffs lack standing . . . because they were not individually injured, and instead seek damages from injuries purportedly suffered by the business." MTD at 6. They also argue that Bellas *itself* lacks standing, since it "did not incur any damages because of a constitutional violation, but [because of its] failure to comply with the [City] Code." *Id.* at 7–8.

To have standing to bring a claim in federal court, a plaintiff must show that he plausibly suffered an "injury in fact" that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). An "'injury-in-fact' requires an invasion of a legally protected interest." *Smith v. Roundtree*, 704 F. App'x 831, 833 (11th Cir. 2017) (quoting *Hollywood Mobile Ests., Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011)). The Supreme Court also recognizes a doctrine of "prudential standing, 'which comprises three non-constitutional, non-jurisdictional, policy-based limitations on the availability of judicial review[,] [including] . . . 'that the plaintiff . . . cannot rest his claim to relief on the legal rights or interests of third parties.'" *Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cnty.*, 541 F. Supp. 3d 1334, 1342 (M.D. Fla. 2021) (Badalamenti, J.) (first quoting *Mulhall v. Unite Here Loc. 355*, 618 F.3d 1279, 1290 (11th Cir. 2010); and then quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

A federal district court retains jurisdiction over a case so long as "at least one plaintiff has standing to raise each claim." *Florida v. U.S. Dep't of Health & Hum. Servs.*, 648 F.3d 1235, 1243–44 (11th Cir. 2011); *see also ibid.* (collecting cases). But, where "multiple plaintiffs seek monetary damages in their own names, each plaintiff must establish standing" for jurisdiction to exist over that plaintiff's

claims. *Alabama v. Cardona*, 2024 WL 3607492, at *8 (N.D. Ala. July 30, 2024) (first citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417, 430–42 (2021); and then citing *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017)); *see also* Compl. at 31, 35, 40, 46 (requesting damages for "lost profits, compensatory damages, reputational harm, [and] emotional distress" for each count).

### a. The Tundidors' Standing

We'll start with the Tundidors individually. As a general rule, a business entity's economic injury does not bestow standing on the entity's individual owners. *See, e.g.*, *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 729 (8th Cir. 2001) ("It is well established that a shareholder or officer of a corporation cannot recover for legal injuries suffered by the corporation." (first citing *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Ag.*, 123 F.3d 1098, 1102 (8th Cir. 1997); and then citing *Chance Mgmt., Inc. v. South Dakota*, 97 F.3d 1107, 1115–16 (8th Cir. 1996))). The Defendants are therefore correct that "James Jr."—as well as the other Individual Plaintiffs—"cannot establish lost profits on behalf of Bellas[.]" MTD at 6; *see also Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. Jan. 1981) ("The district court was correct in its holding that a stockholder cannot maintain an action under [42 U.S.C. § 1983] for damages suffered by a corporation in which he owns shares." (cleaned up)).

But a business owner may nonetheless bring a suit in his personal capacity if he has "a direct, personal interest in a cause of action[,] . . . even if the corporation's rights are also implicated." *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990); *see also Corey Airport Servs., Inc. v. City of Atlanta*, 2007 WL 9717221, at *4 (N.D. Ga. May 23, 2007) ("[T]he fact that these injuries arose from the same conduct as the corporate injuries does not preclude a finding of direct and independent injury to individual plaintiffs for standing purposes." (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1319 (9th Cir. 1989))); *S. Atl. Cos., LLC v. Sch. Bd. of Orange Cnty.*, 699 F. App'x 842, 850–51 (11th Cir. 2017) (Jordan, J., concurring in part) (collecting cases for the proposition that an individual

has standing to bring "a First Amendment retaliation claim stemming from enforcement actions taken against her business" (cleaned up)).

Here, the allegedly unconstitutional raid didn't just cause economic harm to Bellas. As the Complaint plainly alleges, the raid caused each of the Tundidors to suffer their own distinct injuries. *See, e.g.*, Compl. ¶ 109 ("As the owner of the Property, James Sr. was obligated to pay penalties to Hialeah in connection with the violations." (cleaned up)); *id.* ¶ 116 ("The reputations of . . . the Tundidors [were] tarnished by the publicized, unlawful, 'human trafficking' raid orchestrated by Mayor Hernandez, and the grossly inaccurate, televised mid-raid statements of Commander Villa regarding human trafficking, prostitution, and drugs."); *id.* ¶ 114 ("Mayor Hernandez's threats and the raid that followed created mental anguish, embarrassment, and emotional distress for James, Sr., Dulce, and James, Jr. They have suffered from sleep difficulties and other physical ailments."). That's enough for the Tundidors to challenge the constitutionality of the raid in their individual capacities. *See Irish Lesbian & Gay Org. v. Guiliani*, 143 F.3d 638, 650 (2d Cir. 1998) ("[A] § 1983 [plaintiff] could seek compensatory damages for 'not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation[,] . . . personal humiliation, and mental anguish and suffering.'" (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986))); *see also Crider v. Williams*, 2022 WL 3867541, at *6 (11th Cir. Aug. 30, 2022) ("To have Article III standing at this stage, then, the [plaintiffs] must allege an injury in fact, causation, and redressability all connected to [the defendant's allegedly unconstitutional acts.]").[7]

---

[7] Although the Plaintiffs advance two claims under the Fourth Amendment, *see* Compl. ¶¶ 159–79 (Count III); *id.* ¶¶ 180–202 (Count IV), we must not confuse "Fourth Amendment 'standing' . . . and Article III standing," which "the Supreme Court has clearly and consistently distinguished," *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020). "[W]hile '[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search,' it 'should not be confused with Article III standing, which is jurisdictional and must be assessed before' addressing other aspects of a Fourth Amendment claim." *Ibid.* (first quoting *Byrd v. United States*, 584 U.S. 395, 410–11 (2018); and then citing *Rakas v. Illinois*, 439 U.S. 128,

Additionally, because the Tundidors allege that the Defendants retaliated against them for exercising *their* First Amendment rights, *see, e.g.*, Compl. ¶ 136 ("Defendant Hernandez's unlawful, retaliatory actions were in direct response to Jesus refusing to stand down from his run for political office and the Plaintiffs' support of Jesus."), they have "standing to assert an injury sustained as a result [of exercising those rights] and [are] not bringing claims on behalf of third parties," *Rasche v. Vill. of Beecher*, 336 F.3d 588, 595 n.8 (7th Cir. 2003); *see also Wood v. Fla. Dep't of Educ.*, 2024 WL 3371318, at *1 n.1 (N.D. Fla. Apr. 19, 2024) (Walker, J.) ("[F]or a First Amendment retaliation claim[,] . . . the injury analysis would seem to turn on whether [the plaintiffs] suffered a concrete injury in the past and faced retaliation as a result [of speaking]."). And the Tundidors *have* sufficiently pled that they were injured by Hernandez's alleged retaliation. *See* Compl. ¶ 137 ("As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, the Tundidors suffered mental anguish, embarrassment, and emotional distress, and have since the date of the raid suffered from sleep difficulties and other physical ailments."). The Tundidors have thus "alleged a sufficiently concrete and individualized injury as a result of the[ir] exercise of [th]eir personal First Amendment rights." *White v. Sch. Bd. of Hillsborough Cnty.*, 636 F. Supp. 2d 1272, 1280 (M.D. Fla. 2007) (Whittemore, J.).

One more thing. The Defendants claim that the Complaint pleads "identical conclusory allegations" on the issue of damages—and that the Tundidors haven't *specifically* shown that they each have standing to pursue "lost profits, compensatory damages, [damages for] reputational harm, [damages for] emotional distress, and attorney's fees." MTD at 6. But, while the Tundidors must

---

140 (1978))); *see also Crider*, 2022 WL 3867541, at *7 ("Fourth Amendment 'standing' is not distinct from the merits, is not jurisdictional, and can therefore be waived." (cleaned up)). Accordingly, our "threshold jurisdictional" inquiry here is limited only to whether the Plaintiffs have Article III standing to bring their claims—*viz.*, whether they've each suffered a redressable injury that flows from the Defendants' actions. *AT&T Mobility, LLC v. NASCAR, Inc.*, 494 F.3d 1356, 1359 (11th Cir. 2007).

"demonstrate standing separately for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (cleaned up), they've done just that by establishing their standing to pursue *some* form of retrospective damages, *cf. ibid.* ("[N]otwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief." (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983))); *see also TransUnion*, 594 U.S. at 431 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (*for example, injunctive relief and damages*)." (emphasis added) (cleaned up)). "Scrutinizing and comparing different types of potential damages" goes to "the underlying merits" of the claims, *In re Furstenberg Fin. SAS*, 2016 10707012, at *4 (S.D. Fla. July 27, 2016) (Bloom, J.), and is therefore irrelevant to the question of Article III standing, *see Gardner v. Mutz*, 962 F.3d 1329, 1338–39 (11th Cir. 2020) ("[B]ecause standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim." (cleaned up)).

### b.  Bellas's Standing

The Defendants also say that Bellas (the business) lacks standing because any injury it may have suffered "resulted from *valid* [enforcement actions for] violations of the Florida Building Code and various sections of the City of Hialeah Code of Ordinances." MTD at 7 (cleaned up). But that argument erroneously takes "an issue that is part and parcel of a Fourth Amendment claim on the merits"—*viz.*, whether the Defendants' administrative search of Bellas was reasonable—"and mistakenly treat[s] it as an Article III-based jurisdictional prerequisite." *Ross*, 963 F.3d at 1063; *cf. Crider*, 2022 WL 3867541, at *7 ("The Fourth Amendment seizure is an element—that is, it goes to the merits—of the [plaintiffs'] malicious-prosecution claim.").

As to standing, Bellas has alleged a concrete injury: the profits it lost "[d]ue to the raid, the [allegedly] illegal search, and the red tagging that resulted from it," Compl. ¶ 107, and it "ha[s] permissibly asserted [that] money damages would redress" that injury, *Crider*, 2022 WL 3867541, at *7;

14

*see also* Compl. ¶ 137 ("As a result of Defendant Hernandez's orchestration of the raid for a corrupt political purpose, Bellas . . . incurred hundreds of thousands of dollars of damages associated with lost profits, fines, remediation efforts, and legal fees[.]"). Bellas has therefore pled sufficient facts to "form an Article III case or controversy" challenging the raid. *Crider*, 2022 WL 3867541, at *7; *see also S. Atl. Cos.*, 699 F. App'x at 850 (Jordan, J., concurring in part) (recognizing that "a single retaliatory act [can] support[ ] two distinct claims arising from the same set of facts . . . [where] the allegations are that the [defendant] specifically retaliated against [the individual plaintiffs] for their individual-capacity speech by going after their company").

\* \* \*

The Plaintiffs have advanced "factual allegations [that] 'plausibly and clearly allege a concrete injury,'" which is traceable to the Defendants' conduct—*i.e.*, the allegedly retaliatory and unconstitutional raid on Bellas—and which would be adequately redressed by damages. *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332, 1338–39 (11th Cir. 2021) (quoting *Thole v. U. S. Bank N.A*, 590 U.S. 538, 544 (2020)). That's enough to establish their standing for now. *See O'Donnell v. RCO Legal, P.S., Inc.*, 2018 WL 1871946, at *2 (N.D. Ga. Mar. 22, 2018) ("[T]he complaint need only state a plausible claim that each element of standing is satisfied[.]" (citing *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016))). We remind the parties, however, "that each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *McDonald v. City of Pompano Beach*, 556 F. Supp. 3d 1334, 1347 (S.D. Fla. 2021) (Altman, J.) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The Defendants, therefore, will be free to revisit their challenges to the Plaintiffs' Article III standing at summary judgment—and at all subsequent stages of the case.

### III.    Qualified Immunity

Turning to the merits, we'll start by addressing the Plaintiffs' two constitutional claims against Hernandez. *See* Compl. ¶¶ 121–38 (Count I: First Amendment); *id.* ¶¶ 159–79 (Count III: Fourth Amendment). On both counts, Hernandez argues that he's "entitled to qualified immunity for the alleged acts and/or omissions" underlying those claims. MTD at 8.

Qualified immunity "protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). Once that's established, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Ibid.* To qualify as "clearly established," a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)). As such, "the doctrine of qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

Hernandez has met his threshold burden of establishing that "his actions were within the scope of his discretionary authority as mayor." *Lozman v. City of North Bay Vill.*, 2009 WL 10699944, at *6 (S.D. Fla. Feb. 12, 2009) (Altonaga, J.) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). An official acts within his discretionary authority when his "action[,] 'in general[,] [is] a part of his job-related powers and responsibilities,'" irrespective of "whether the alleged act was 'committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.'" *Reaves v. City of Montgomery*, 2024 WL 1349020, at *9 (M.D. Ala. Mar. 29, 2024) (emphasis omitted) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)).

As Mayor of Hialeah, Hernandez had "the power to 'exercise the executive powers of the city and supervise all departments,'" and he exercised "direct oversight and supervision over the municipal divisions for code compliance, building, and planning and zoning," as well as over the police and fire departments. Compl. ¶¶ 12–13 (quoting HIALEAH, FLA., CHARTER art. IV § 4.01). Given his legitimate executive authority and supervisory responsibilities over the departments that conducted the "search of Bellas," Hernandez was acting within the scope of his discretionary authority "by allegedly supervising [those] departments and agencies" at the time of the search. MTD at 11 (citing *McGriff v. City of Miami Beach*, 522 F. Supp. 3d 1225, 1252 (S.D. Fla. 2020) (Ungaro, J.)); *cf. Flaig v. City of Hanceville*, 2006 WL 8436786, at *11 (N.D. Ala. Sept. 20, 2006) (reasoning that qualified immunity applied because the "[defendant], as Mayor of the City of Hanceville, . . . and, as the senior executive for the municipality, has a duty to enforce the law."); *Muszik v. Town of Redington Shores*, 2024 WL 2273187, at *8 (M.D. Fla. May 20, 2024) (Honeywell, J.) ("[R]eporting and pursuing the investigation of suspected violations falls within the outer perimeters of [the defendant's] job-related duties as the town mayor.").

The burden therefore shifts to the Plaintiffs to show that Hernandez's "actions establish a constitutional violation of [their] rights and . . . [that] the law prohibiting such a violation was clearly

established." *Lozman*, 2009 WL 10699944, at *6. We'll consider the Plaintiffs' two constitutional claims separately.

### a.   The Plaintiffs' First Amendment Claim against Hernandez (Count I)

#### i.   The Alleged Constitutional Violation

In Count I, the Plaintiffs allege that Hernandez violated the First Amendment by "orchestrat[ing] a dramatic raid of Bellas" in "direct response to . . . the Plaintiffs' support of Jesus [Tundidor's city council campaign]," to "harass and intimidate [them] . . . and hamper the[ir] ability to continue supporting Jesus'[s] campaign." Compl. ¶¶ 133, 136.

The First Amendment "'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To state a viable claim for First Amendment retaliation, a plaintiff must allege (1) that he engaged in "speech or [an] activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected speech or activity and the adverse action." *Warren v. DeSantis*, 631 F. Supp. 3d 1188, 1195 (N.D. Fla. 2022) (Hinkle, J.) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). "If any of the three elements is not satisfied, no constitutional violation has occurred, and qualified immunity will apply." *Lozman*, 2009 WL 10699944, at *7.

Our Plaintiffs properly allege that they engaged in constitutionally protected speech "[b]y supporting Jesus Tundidor's run for political office in Hialeah[.]" Compl. ¶ 148; *see also Abella v. Simon*, 522 F. App'x 872, 874 (11th Cir. 2013) ("The First Amendment 'affords the broadest protection to . . . political expression[.]'" (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995))). Specifically, all of the Plaintiffs allegedly "fund[ed] Jesus'[s] campaign for political office," Compl. ¶ 119, and thus undertook an act "which fall[s] within the First Amendment's protection of speech and

political association," *Ala. Democratic Conf. v. Att'y Gen. of Ala.*, 838 F.3d 1057, 1062 (11th Cir. 2016) (quoting *FEC v. Colo. Republican Fed. Campaign Comm'n*, 533 U.S. 431, 440 (2001)).[8]

As to the second element, an official's conduct "adversely affect[s] the protected speech," *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019) (citing *Bailey v. Wheeler*, 843 F.3d 473, 480–81 (11th Cir. 2016)), if it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights," *Bailey*, 843 F.3d at 481 (quoting *Bennett*, 423 F.3d at 1254). Because this is an *objective* standard, a plaintiff needn't also allege that his speech was *actually* chilled. *See Bennett*, 423 F.3d at 1254 ("[W]e d[o] not focus on the plaintiff's subjective, actual chilling. Instead, we objectively assess[ ] the defendants' actions [and] an actual chill is not necessary to state a First Amendment violation[.]"). "[S]ince there is no justification for harassing people for exercising their constitutional rights," the allegedly retaliatory conduct's "effect on freedom of speech . . . need not be great in order to be actionable." *Prospero v. Sullivan*, 2023 WL 9023287, at *14 (S.D. Ga. Dec. 29, 2023) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

Over the course of the raid, the Plaintiffs recount, HPD officers—including "[a]t least one officer [in] a black ski mask, showing only his eyes," Compl. ¶ 68—"systematically rounded up"

---

[8] In their Reply, the Defendants say that these allegations "are wholly conclusory and lack the necessary factual support specifically identifying how each Plaintiff 'supported' Jesus'[s] run." Reply [ECF No. 25] at 3–4 (citing Compl. ¶¶ 129, 148, 164, 188). For two reasons, we disagree. *First*, the Defendants misunderstand our pleading standard. Although we "are not bound to accept as true a *legal* conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (emphasis added), the Plaintiffs don't merely plead the "naked assertion" that they engaged in protected speech, *id.* at 557; *see also ibid.* at 555 ("[A] formulaic recitation of the elements of a cause of action will not do[.]" (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986))). Instead, the Plaintiffs tell us precisely *how* they engaged in First Amendment activity—*i.e.*, "[b]y supporting Jesus Tundidor's run for political office," Compl. ¶ 148—which is a *factual* allegation we must accept as true, *see Iqbal*, 556 U.S. at 678 ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true[.]" (citing *Twombly*, 550 U.S. at 555)). *Second*, even if that allegation weren't enough, the Plaintiffs also explain that they supported Jesus's campaign by "fund[ing]" it. Compl. ¶ 119. Drawing all reasonable inferences in favor of the Plaintiffs—as we must at this stage of the case, *see Jackson v. Okaloosa County*, 21 F.3d 1531, 1534 (11th Cir. 1994) ("[I]n reviewing motions to dismiss we accept as true the facts stated in the complaint and all reasonable inferences therefrom." (cleaned up))—we're satisfied that all Plaintiffs have plausibly engaged in protected conduct.

everyone in the venue, *id.* ¶ 71, "held the patrons inside the establishment for approximately an hour," *id.* ¶ 72, and overtook "all of the Property[,] including spaces not accessible to members of the public," *id.* ¶ 80—all of which was recorded and aired on television by a news team Hernandez "invited to" follow along, *id.* ¶ 86; *see also id.* ¶ 90 ("Mayor Hernandez and Hialeah invited the media presence as yet another intimidation tactic that could be leveraged against the Tundidors[.]"). Bellas was then "forced to cease its operations and to prevent all public access to the Property[.]" *Id.* ¶ 94. These actions, "*improperly motivated as alleged*, would likely be sufficient to deter a person of ordinary firmness" from continuing to speak, "especially as the adverse effect need not be substantial" to state a retaliation claim. *Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1343 (S.D. Fla. Mar. 3, 2014) (Altonaga, J.) (emphasis added); *see also ibid.* (finding this prong satisfied where "the City repeatedly cited Plaintiffs for code violations" and "the City shut down the [plaintiff's business] twice, including once during a peak weekend").

Pleading the third element of a retaliation claim requires the plaintiff to plausibly show that "the defendant was subjectively motivated to take the adverse action because of the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008)). At the motion-to-dismiss stage, the "[p]laintiff must identify a sequence of events from which 'a retaliatory motive can be inferred[,]' notwithstanding other non-retaliatory motives the defendant may harbor." *Eisenberg*, 1 F. Supp. 3d at 1344 (quoting *Lippman v. City of Miami*, 719 F. Supp. 2d 1370, 1374 (S.D. Fla. 2010) (Marra, J.)).

Taking the Complaint's allegations as true, we conclude that the Plaintiffs have pled sufficient facts from which we can infer that Hernandez's allegedly retaliatory actions were taken "to deter [the] Plaintiffs from continuing to support and fund Jesus'[s] campaign for political office." Compl. ¶ 119.[9]

---

[9] The Plaintiffs *also* allege that "Hernandez's unlawful, retaliatory actions were in direct response to Jesus refusing to stand down from his run for political office," in addition to "the Plaintiffs' support of Jesus." Compl. ¶ 136. But Jesus is not a party to this action and has "never been an officer,

In the Plaintiffs' view, several different events from the months leading up to the July 2019 raid suggest that their support for the campaign "was a motivating factor behind [the] harm" they suffered. *Smith*, 532 F.3d at 1278 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)).

By November 2018, the Tundidors began publicly backing Jesus's campaign for city council, *see* Compl. ¶ 47 ("On November 16, 2018, James Sr. hosted a fundraiser to kick off Jesus'[s] campaign, raising over $25,000." (cleaned up)), just as they did in many municipal elections, *id.* ¶ 17 ("As life-long Hialeah residents and business owners in Hialeah, the Tundidors participated in the political process, supporting candidates and issues that they believed would benefit their family, the residents of the city, and their businesses located in Hialeah."). Given "how successful [the] fundraising efforts had been," *id.* ¶ 49, that campaign began to pose a threat to Hernandez's preferred candidate, *see id.* ¶ 50 ("Thereafter, Mayor Hernandez went out of his way to threaten Jesus with his political machine and urge Jesus to stand down."). Seeing that Hernandez wanted to prevent Jesus's candidacy, *see id.* ¶ 54 ("Jesus asked Mayor Hernandez what he wanted, to which Mayor Hernandez replied, 'sit this election out[.]'"), it's reasonable to infer that Hernandez would also want to curb the campaign's

---

employee, agent, or representative of Porky's or Bellas." Compl. ¶ 64. Although some district courts in our Circuit have suggested that the First Amendment's protection against retaliation (at least in the context of public employment) extends to the speech "of immediate family members," *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1303 (M.D. Ala. 2012) (citing *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)), "our precedent firmly states that a district court opinion cannot . . . clearly establish[ ] the law" for qualified-immunity purposes, *Gonzalez v. Lee Cnty. Housing Auth.*, 161 F.3d 1290, 1302 n.38 (11th Cir. 1998) (cleaned up). And, as recently as 2017, the Eleventh Circuit explicitly held that it was "*not* clearly established that it would violate [a person's] free speech rights to take adverse action because her [family member] had engaged in protected speech." *Gaines v. Wardynski*, 871 F.3d 1203, 1212 (11th Cir. 2017) (emphasis added). The Plaintiffs fail to identify a more-recent case suggesting otherwise. *See generally* Resp. [ECF No. 20]. Because Hernandez would be entitled to qualified immunity on any claim premised on *Jesus*'s speech, *see, e.g.*, *Priester*, 208 F.3d at 925 (noting that qualified immunity shields from liability an official whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (cleaned up)), we'll consider only the Plaintiffs' protected conduct here, *see Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

fundraising efforts—including those by the Plaintiffs, who were "support[ing] and fund[ing]" the campaign, *id.* ¶ 119; *see also* ¶ 52 ("Mayor Hernandez also told Jesus, . . . 'I have the muscle. I don't care how much you raise in contributions, I will raise more.'"). In fact, in "early 2019," Hernandez had declared that "the Tundidor family's adult entertainment venues . . . would be used against Jesus in an election." Compl. ¶ 53.

Soon after, Hernandez—through the Navarros, who were "longtime supporters of Mayor Hernandez and contributors to his campaigns and affiliated PACs"—"relayed a message" to James Sr. that Hernandez "would attack the Tundidor family's businesses if Jesus did not drop out of the race." *Id.* ¶ 62. That the Navarros then met with "James Sr. and James Jr.," *id.* ¶ 61 (cleaned up), suggests that Hernandez was interested in discouraging the Tundidors' support for (and funding of) Jesus's campaign—*i.e.*, their protected speech, *see Randall v. Scott*, 610 F.3d 701, 713 (11th Cir. 2010) ("[E]xpression of political views without interference from state officials who wish to discourage that interest and expression[ ] lies at the core of values protected by the First Amendment.")—in addition to undercutting the campaign itself. But the Tundidors continued to support Jesus anyway, *see* Compl. ¶ 63 ("James Sr. responded that Jesus would not drop out of the race and would continue the race on his own accord." (cleaned up)), teeing up "Hernandez's punitive actions against the Tundidors" (and their business) for "supporting Jesus'[s] candidacy," *id.* ¶ 95. With Bellas out of operation, the Plaintiffs had less money to support Jesus's campaign. *See id.* ¶ 107 ("Due to the raid . . . and the red tagging that resulted from it, all revenue associated with Bellas suddenly stopped, while the costs of owning and maintaining the Property and the business remained.").

Given these specific allegations about Hernandez's "political objective" in thwarting Jesus's political campaign, *id.* ¶ 91, the Plaintiffs' financial backing of the campaign, and the Tundidors' unwillingness to cease that support even after receiving threats—especially, that Hernandez "orchestrated a dramatic raid of Bellas . . . to harass and intimidate [the] Plaintiffs, to stain . . . the

Plaintiffs' reputations, and [to] hamper the Tundidors' ability to continue supporting Jesus' campaign," Compl. ¶ 133—"the allegations taken as a whole are sufficient to infer a retaliatory motive," *Eisenberg*, 1 F. Supp. 3d at 1345.

Resisting this conclusion, the Defendants offer two arguments—both unpersuasive.

*First*, the Defendants contend (in their Reply) that there "are no allegations of how Hernandez purportedly 'orchestrated a dramatic raid of Bellas,' let alone that the 'dramatic raid' was done at his hand at all." Reply [ECF No. 25] at 12. They quickly retreat from that assertion, though, conceding in the following footnote that the Plaintiffs "attempt[] to link Hernandez as orchestrating the events of July 25, 2019, [through] HPD Officer Perez stat[ing] that 'this came from the big boss[,]' impliedly referring to Defendant Hernandez." *Id.* at 12 n.4 (cleaned up) (quoting Compl. ¶ 134). In the Defendants' view, however, "'big boss' could refer to anyone other than Mayor Hernandez, including . . . the Chief of Police." *Ibid.* That may be. But, given Hernandez's supervisory authority over the police, *see* Compl. ¶ 13 ("[T]he Hialeah Chief of Police . . . is subject to the supervision of the mayor." (first citing City of Hialeah, Fla., Charter art. IV § 4.04; and then citing City of Hialeah, Fla., Code of Ordinances ch. 2, art. II § 2-57))—and Navarro's message that "*Hernandez* would attack the Tundidor family's businesses if Jesus did not drop out of the race," *id.* ¶ 62 (emphasis added)—it's *also* reasonable to conclude that Officer Perez was referring to Hernandez. And, since we must "draw[] all reasonable inferences in the plaintiff's favor" in reviewing a motion to dismiss, *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (cleaned up), the Defendants' alternative interpretations are irrelevant (for now).

*Second*, the Defendants argue that the "Plaintiffs do not become immune from compliance with applicable Codes and regulations because a family member runs for political office," Reply at 12, and that "Bellas did not incur any damages because of a constitutional violation, but for the business's

failure to comply with the Code," MTD at 7–8.[10] True, a defendant can defeat a retaliation claim by showing that "it would have taken the same actions absent Plaintiffs' protected conduct." *Eisenberg*, 1 F. Supp. 3d at 1344; *see also Smith*, 532 F.3d at 1278 ("[O]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant . . . [to] show that he would have taken the same action in the absence of the protected activity[.]" (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999))). But "this burden-shifting analysis is not appropriate at the motion to dismiss phase." *Eisenberg*, 1 F. Supp. 3d at 1344 (first quoting *Johnson v. Conway*, 2013 WL 5493380, at *4 n.3 (N.D. Ga. Sept. 30, 2013); then citing *O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011); then citing *Smith*, 532 F.3d at 1270; and then citing *Thaddeus-X*, 175 F.3d 378); *see also Bivins v. Franklin*, 688 F. Supp. 3d 1258, 1266 (N.D. Ga. 2013) ("Without the power of discovery, plaintiffs would almost never have the ability to determine the motivations of opposing parties.").

So, while Hernandez will be free at summary judgment to present evidence to rebut the Plaintiffs' allegations that the scope of the raid was unreasonable, *cf. Lippman*, 719 F. Supp. 2d at 1376 n.7 (recognizing that "cases standing for the proposition that arguable probable cause to arrest provides police officers with qualified immunity from First Amendment claims[,] . . . arise in the summary judgment context, where there is record evidence of arguable probable cause"), it's enough

---

[10] In support of this argument, the Defendants attach to their Motion to Dismiss a "Compliance Agreement between the City and . . . James, Sr.," which lists "all the violations identified during the July 25, 2019 enforcement action, together with the agreed upon steps for their resolution[.]" MTD at 2 n.1 (citing Compliance Agreement [ECF No. 12-1]). In general, courts shouldn't consider "matters outside the pleadings" when ruling on a motion to dismiss, unless the court converts the motion into one for summary judgment and gives the parties "a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d). The one exception to this rule is the "incorporation by reference doctrine," which allows us to "consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018). We won't be considering this exhibit because it isn't "central" to any of the Plaintiffs' claims—*i.e.*, it isn't a "necessary part of [the Plaintiffs'] effort to make out a claim" for the Defendants' alleged violations of the First or Fourth Amendments. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

for now that the "Plaintiffs have met their burden in alleging their protected conduct was a motivating factor," *Eisenberg*, 1 F. Supp. 3d at 1344.

The Plaintiffs have therefore stated a valid First Amendment retaliation claim against Hernandez.

### ii. Clearly Established Law

Having found that Hernandez's actions (as alleged) violated the Plaintiffs' rights under the First Amendment, we must now determine whether those rights were "'clearly established' at the time of the violation,'" such that Hernandez was sufficiently "on notice that his conduct would be clearly unlawful[.]" *Vinyard v. Wilson*, 311 F.3d 1340, 1349–50 (11th Cir. 2002) (emphasis omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). A plaintiff "may show that 'the contours of [a] right were clearly established in [one of three] ways.'" *Bailey*, 843 F.3d at 484 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)).

*First*, "a plaintiff may identify a materially similar case from relevant precedent." *Ibid.* (citing *Loftus*, 690 F.3d at 1204); *see also Sullenberger v. City of Coral Gables*, 2024 WL 262530, at *9 (S.D. Fla. Jan. 24, 2024) (Altman, J.) ("In our District, only the 'decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law.'" (quoting *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007))). Under this method, a court must consider "whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case." *Loftus*, 690 F.3d at 1204 (quoting *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012)).

*Second*, "a plaintiff may rely on a 'broader, clearly established principle [that] should control the novel facts [of the] situation.'" *Bailey*, 843 F.3d at 484 (quoting *Loftus*, 690 F.3d at 1204–05); *see also Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) ("[T]he principle must establish with 'obvious

clarity' that 'in the light of pre-existing law the unlawfulness [of the official's conduct is] apparent.'"
(quoting *Vinyard*, 311 F.3d at 1351)). In other words, the law may be clearly established where "[t]he
'reasoning, though not the holding of' prior cases[,] . . . send[s] the same message to reasonable
officers in novel factual situations." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)
(quoting *Hope v. Pelzer*, 536 U.S. 730, 743 (2002)).

   *Third*, "a plaintiff may satisfy the 'clearly established' requirement when the defendant's
conduct 'lies so obviously at the very core of what the [First Amendment] prohibits that the
unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'"
*Bailey*, 843 F.3d at 484 (quoting *Loftus*, 690 F.3d at 1205). Relatedly, an official's act violates clearly
established law "where [the] conduct is 'so bad that case law is not needed to establish that the conduct
cannot be lawful.'" *Ibid.* (quoting *Vinyard*, 311 F.3d at 1350).

   For starters, orchestrating a raid on a business in retaliation for its political speech hits at "the
very core of what the Fourth Amendment prohibits." *Ibid.* (cleaned up). Political speech "'is the
essence of self-government,' 'occupies the highest rung of the hierarchy of First Amendment values,
and is entitled to special protection[.]'" *Carter v. City of Melbourne*, 731 F.3d 1161, 1169 (11th Cir. 2013)
(quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)); *see also ibid.* ("[D]onating or independently
spending money to support or criticize candidates for public office 'is central to the meaning and
purpose of the First Amendment.'" (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329
(2010))). The First Amendment resolutely stands "to protect unpopular individuals from retaliation—
and their ideas from suppression—at the hand of an intolerant society." *McIntyre*, 514 U.S. at 357; *see
also Nieves*, 587 U.S. at 412 (Gorsuch, J., concurring in part) ("If the state could use these laws not for
their intended purposes but to silence those who voice unpopular ideas, little would be left of our
First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant
fiefdoms of our own age."). The "expression of political views without interference from state officials

26

who wish to discourage that interest and expression[ ] lies at the core of values protected by the First Amendment." *Randall*, 610 F.3d at 713. Taking the Complaint's allegations as true, we think that Hernandez's organizing a raid of Bellas to suppress political speech—"actions reminiscent of a bygone era,"[11] Compl. at 1—qualifies as conduct "so egregious that [Hernandez] did not need case law to know what he allegedly did was unlawful," *Bailey*, 843 F.3d at 484 (cleaned up).

But even if that weren't the case, binding caselaw from the Eleventh Circuit shows with "obvious clarity" that this sort of retaliation is constitutionally prohibited. *Loftus*, 690 F.3d at 1205. This Circuit "has held since at least 1988 that it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights[.]" *Bennett*, 423 F.3d at 1255 (quoting *Ga. Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988)); *see also Ga. Ass'n of Educators*, 856 F.2d at 145 ("The Government may not retaliate against individuals or associations for their exercise of First Amendment rights 'by imposing sanctions for the expression of particular views it opposes.'" (quoting *Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464 (1979))). And, more specifically, our Circuit has found it *clearly unlawful* for a government official to "[e]ngage[ ] in a *campaign of retaliation and intimidation* against [citizens] because of their support of [a political cause]." *Bennett*, 423 F.3d at 1249 (emphasis added).

Beyond this broad principle against political retaliation, though, the "particularized facts" from which that principle arose, *Vinyard*, 311 F.3d at 1351, are "materially similar" to the facts of our case, *Bailey*, 843 F.3d at 848—placing it "beyond debate" that Hernandez had "fair warning that his conduct violated the law," *Gates v. Khokar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (cleaned up).

---

[11] For many of Hernandez's erstwhile constituents, these actions are also painfully reminiscent of a bygone regime. *See* Compl. ¶ 10 ("Hialeah . . . serves over 236,000 residents, . . . including Cuban exiles[.]"); *Movimiento Democracia, Inc. v. Johnson*, 193 F. Supp. 3d 1353, 1378 (S.D. Fla. 2016) (Gayles, J.) ("We acknowledge, as a widely-accepted truth, that Cuba does violate human rights[,] . . . includ[ing through] . . . the use of government threats, . . . intimidation, and . . . harassment . . . to prevent free expression[.]" (cleaned up)).

In *Bennett*, the Eleventh Circuit concluded that the government defendants "had 'fair warning' that retaliating against the plaintiffs for their support of [a ballot] referendum would violate the plaintiffs' constitutional rights and, if the plaintiffs' allegations are true, would lead to liability under § 1983." 423 F.3d at 1256. Just like the Tundidors, the plaintiffs in *Bennett* were "local business owners who supported" an electoral campaign against the political establishment. *Id.* at 1249; *see also id.* at 1248–49 ("In 1998, Forsyth County, Georgia voters considered a referendum that would have established a county-wide police force and diminished the power of the Forsyth County Sheriff's Department. . . . Sheriff Hendrix opposed the referendum. . . . Along with other citizens, they formed a committee in support of the referendum and sponsored a debate on the matter."). And, much like the actions of Hernandez and his "political machine" in our case, Compl. ¶ 40, the defendants in *Bennett* "formed a 'Strike Force' within the [Police] Department" to "engage[ ] in a campaign of retaliation and intimidation against the plaintiffs because of their support of the referendum," *Bennett*, 423 F.3d at 1249; *accord* Compl. ¶ 81 ("Hernandez used his [ ] colleagues, turned enforcers, at the HPD to execute on his vendetta.").

That campaign included "access[ing] government databases to obtain confidential information on the plaintiffs," *Bennett*, 423 F.3d at 1249,[12] "mail[ing] flyers to 35,000 homes in Forsyth County calling the plaintiffs the 'real criminals,'" *ibid.*,[13] and abusing the power of the police to "intimidate[ ] or otherwise harass[ ] the plaintiffs," *id.* at 1254.[14] The Eleventh Circuit made clear that this sort of

---

[12] *Accord* Compl. ¶¶ 82–83 ("[T]he Police generated reports from the Driver and Vehicle Information Database for [the Tundidors]; pulled a 'company report' for 'Porky's Inc.' from a criminal justice information system; . . . [and] generat[ed] reports from Electronic License and Vehicle Information System, a database available to law enforcement to query federal and national information systems." (cleaned up)).

[13] *Accord* Compl. ¶ 103 ("[M]ailers paid for by [Hernandez's] Hialeah for Progress PAC . . . likened the Tundidors to an organized crime family[.]").

[14] *Compare Bennett*, 423 F.3d at 1249 (alleging that the defendants "stopped their cars without reason and issued false traffic citations"), *with* Compl. ¶ 133 ("Hernandez, with malicious purpose, orchestrated a dramatic raid of Bellas by the Police under the guise of a human trafficking

conduct violated the "clearly established" right to be free from "retaliation . . . for exercising [one's] First Amendment rights." *Id.* at 1255. We'll follow that unambiguous precedent here.

If an official "may not issue $35 in parking tickets" or "ridicule [someone] for bringing a birthday cake to the office" in retaliation for protected speech, *ibid.* (first citing *Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003); and then citing *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982)), it follows that an official cannot "engage[ ] the punitive machinery of government" to raid and shut down a business in retaliation for its political activities, *ibid.* (quoting *Garcia*, 348 F.3d at 729). Given our Circuit's binding precedent—and the egregious nature of Hernandez's alleged conduct—holding that an "objectively reasonable government official facing the[se] circumstances" could somehow conclude that Hernandez's retaliatory actions were legal would require us to say that such an attack on the "very core of what the [First Amendment] prohibits" is not obviously unconstitutional. *Loftus*, 690 F.3d at 1205 (cleaned up). We (obviously) won't be doing that. The Defendants' Motion to Dismiss Count I is **DENIED**.

### b.  The Plaintiffs' Fourth Amendment Claim against Hernandez (Count III)

#### i.  The Alleged Constitutional Violation

Count III alleges that Hernandez also violated the "Fourth Amendment's prohibition on unreasonable searches and seizures," Compl. ¶ 172, when he "orchestrated a dramatic raid of Bellas by the Police under the guise of a human trafficking operation," *id.* ¶ 168.

Although "the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises," the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 699, 700 (1987). That's especially the case for "commercial property employed in 'closely

---

operation. . . . The Police found no evidence of human trafficking—the entire premise of the raid was part of a political hit[.]").

regulated' industries that have no reasonable expectation of privacy over their products, which historically have been the subject of government oversight." *Crosby v. Paulk*, 187 F.3d 1339, 1346 (11th Cir. 1999) (cleaned up) (quoting *Burger*, 482 U.S. at 700). For such industries, "'legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment' because adequate privacy protection may be provided 'by regulatory schemes authorizing warrantless inspections.'" *Ibid.* (quoting *Donovan v. Dewey*, 452 U.S. 594, 598, 599 (1981)). "Consequently, an administrative inspection of a closely regulated business is a 'well-established exception to the warrant requirement' for a search." *Ibid.* (quoting *Burger*, 482 U.S. at 712). As a "liquor-serving establishment," Bellas "is a closely regulated business[.]" Compl. ¶ 174; *cf. Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970) ("[T]he liquor industry long [has been] subject to close supervision and inspection[.]").

The Plaintiffs, however, claim that "the police raid conducted under [Hernandez's] direction," Plaintiffs' Response ("Resp.") [ECF No. 20] at 16, which was "conducted without a search warrant," Compl. ¶ 67, "was not an administrative search of a closely regulated business" at all—and (even if it was), "it was unreasonably excessive in execution or exceeded the permissible scope," Resp. at 16 (citing *Bruce v. Beary*, 498 F.3d 1232, 1244, 1248 (11th Cir. 2007)).

While "[a]dministrative inspections . . . are generally an exception to the Fourth Amendment's general probable cause and warrant requirement," that exception is not absolute. *Landau*, 2023 WL 6622208, at *5. Two exceptions (to the exception) are relevant here. *One*, "[t]he administrative search exception does not confer authority on law enforcement to ignore the requirement for a warrant where 'the primary purpose [of the search] was to detect evidence of ordinary criminal wrongdoing.'" *Bruce*, 498 F.3d at 1239 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). *Two*, "an otherwise proper administrative search is violative of the Fourth Amendment if it is conducted in an unreasonable manner." *Landau*, 2023 WL 6622208, at *5 (citing *Donovan*, 452 U.S. at 598). As such,

"the general analysis as to whether an administrative search is unconstitutional proceeds in two analytical steps: (1) whether the search was a true administrative search rather than pretext for an investigation of ordinary criminal wrongdoing; and (2) if it was a true administrative search, whether the search was conducted reasonably under the Fourth Amendment." *Ibid.*

A warrantless "administrative" search is pretextual—and thus unconstitutional, *see Bruce*, 498 F.3d at 1243 n.19 ("A factual finding of pretext would require, of course, the legal conclusion of unconstitutional unreasonableness." (citing *Burger*, 482 U.S. at 691))—if "the primary purpose of [the] search . . . was to detect evidence of 'ordinary criminal wrongdoing,'" *Landau*, 2023 WL 6622208, at *6 (quoting *Bruce*, 498 F.3d at 1243); *see also Bruce*, 498 F.3d at 1239 ("In *Burger*, the Court rejected the idea that an administrative inspection may be used to gather evidence as part of what is, in reality, a criminal investigation." (citing *Burger*, 482 U.S. at 691, 716 n.27)).

Here, the Plaintiffs have plausibly alleged that the raid was not "an administrative search of a closely regulated business," limited to "the enforcement of the applicable codes and ordinances." Resp. at 17 (first citing Compl. ¶¶ 175–77, 198–200; and then citing *Club Retro, L.L.C. v. Hilton*, 556 F.3d 181, 192, 200 (5th Cir. 2009)). The Complaint makes clear that the police's "purported reason for the aggressive intrusion into Bellas during business hours was 'human trafficking.'" *Id.* at 84. The police officers *themselves*, in other words, didn't even frame the raid as an administrative search. At the pre-raid briefing, Commander Villa explicitly said "that the objective of the raid is 'human trafficking.'" Compl. ¶ 86; *see also id.* ¶ 87 ("Commander Villa [said] 'we are looking for anyone under the age of eighteen or anyone who is being forced to work there.' Commander Villa then tells the Reporter, 'this is a very important operation to take care of our citizens and these victims of human trafficking.'"). To promote that "protocol" during the raid, "patrons . . . , dancers[,] and staff . . . were each interviewed separately in order to obtain information about possible victims of trafficking." *Id.* ¶ 88. And the administrative inspectors descended on the scene only *after* the police activity was complete.

31

*See id.* ¶ 79 ("Commander Fernando Villa spoke to James, Jr. and to Dulce after the Police raid. He . . . further advised [that] the building officials were going to come in to look at the Property as 'part of protocol.'"). Even under the police's stated reason for the raid, then, the first "hour" (at least), *id.* ¶ 177, was nothing more than a textbook police search "to detect evidence of ordinary criminal wrongdoing," *Bruce*, 498 F.3d at 1239 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)).[15]

When "commercial property is searched for contraband or evidence of crime[,] . . . '[o]nly in the face of "exigent circumstances," where obtaining a warrant would greatly compromise important law enforcement objectives, does the warrant requirement yield.'" *Swint*, 51 F.3d at 996 (quoting *United States v. Pantoja–Soto*, 739 F.2d 1520, 1523 (11th Cir. 1984)). It's undisputed that the search of Bellas was conducted without a warrant. *See* Compl. ¶ 168 ("The Police entered upon the premises on a busy night in July of 2019, despite lacking a warrant[.]"); MTD at 22 ("There is nothing in [the City] Code that obligates officers to . . . present a warrant as a precondition to conducting [an administrative] inspection." (cleaned up)). That makes the search "*per se* unreasonable under the Fourth Amendment" absent some *other* "specifically established and well-delineated exception[ ]" to the warrant requirement, *Swint*, 51 F.3d at 995 (quoting *United States v. Alexander*, 835 F.2d 1406, 1408 (11th Cir. 1988)).

---

[15] The Eleventh Circuit has recognized that an administrative search is "not rendered invalid because it is accompanied by *some* suspicion of [criminal] wrongdoing." *Bruce*, 498 F.3d at 1242 (emphasis added) (citing *United States v. Villamonte–Marquez*, 462 U.S. 579, 584 n.3 (1983)). We needn't determine here "what degree of suspicion is required to invalidate a warrantless administrative search," though, *Landau*, 2023 WL 6622208, at *8, because the Plaintiffs plausibly allege *both* that there was no criminal suspicion accompanying the search, *see, e.g.*, Compl. ¶ 84 ("[N]othing in the Police report identifies what cause the Police had to suspect that Bellas was involved in any aspect of a human trafficking operation. Put simply, that is because there was no probable cause to believe Bellas was involved in human trafficking."); *id.* ¶ 79 ("Commander Fernando Villa . . . [said] that in his 20 years as an officer, it was the first time he had seen such a 'clean' strip club."), *and* that the police weren't conducting an administrative search to begin with, *see, e.g., id.* ¶ 177 ("Prior inspections were completely cooperative, and were not conducted under the guise of a human trafficking investigation unsupported by probable cause."). The whole raid, the Plaintiffs have plausibly alleged, was simply a sham (a ruse) to target the Plaintiffs for their unwillingness to bend to Hernandez's exhortations.

As the Plaintiffs correctly note, "there were no emergencies or exigent circumstances" that would've allowed the police to search Bellas without a warrant. Resp. at 23; *see also* Compl. ¶ 85 ("No emergencies or exigent circumstances were identified by the Police—there was no fleeing felon, no destruction of evidence, no search incident to a lawful arrest, and no fire."); *see generally United States v. Holloway*, 290 F.3d 1331, 1334–35 ("The [exigent-circumstances] exception encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." (collecting cases)). And the Defendants fail to show that any *other* exception to the warrant requirement insulates their search here.

In the Defendants' view, the search was constitutional because James Jr. "provided [HPD] access to the property." MTD at 21 (citing Compl. ¶ 74). True, "a warrantless entry is valid when it is based upon the consent of a [ ] party whom the police, at the time of entry, reasonably believed possessed authority over the premises." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 280 (1990)). But the Plaintiffs claim that the raid was "without permission," Compl. ¶ 67—a factual allegation we must accept as true. Plus, because the Defendants "bear[ ] the burden of proving that the search was justified by [voluntary] consent," *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021) (first citing *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007); and then citing *Bashir v. Rockdale County*, 445 F.3d 1323, 1328 (11th Cir. 2006)), "it would be inappropriate for the Court to engage in this [fact-intensive inquiry] on [a] Motion to Dismiss," *Clayton v. Walton*, 2011 WL 6337687, at *4 (N.D. Ga. Dec. 16, 2011). While the Defendants will be free to advance this argument after discovery, it doesn't carry the day here.

Additionally, the Defendants say that "the City Code expressly vests officers with the unqualified rights to enter [a liquor-serving] establishment at any time, including during business hours," and that "nothing in the City Code limits an inspection, either through a police investigation

or fire code provision, to certain areas of an establishment not open or accessible to the public." Reply at 5; *see also* HIALEAH, FLA., CODE OF ORDINANCES ch. 18, art. V, § 18-208 ("It shall be unlawful for any establishment providing entertainment and/or consumption of alcoholic beverages to refuse or prevent reasonable inspection by police officers during *any time* in which the establishment is open for business." (emphasis added)). Two problems with this.

*First*, the Defendants never explain how that provision authorizes an administrative search in furtherance of "a human trafficking operation." Compl. ¶ 84. An ordinance *can* validly authorize warrantless searches if "[s]uch administrative inspections . . . are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business." *Bruce*, 498 F.3d at 1239 (citing *Burger*, 482 U.S. at 702–03). And an ordinance "is constitutional if the state has a substantial interest in regulating the particular business, the inspection is necessary to further the regulatory scheme, and the statute's inspection program, in view of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." *Ibid.* (citing *Burger*, 482 U.S. at 702–03). But, where the authorizing ordinance fails to "carefully limit[ ] [a search's] time, place, [or] scope," or "limit the discretion of the inspecting officers," a search pursuant to it is not protected by the administrative-search exception to the Fourth Amendment's general warrant requirement. *Id.* at 1240 (quoting *Burger*, 482 U.S. at 718 (Brennan, J., dissenting)); *see also Colonnade*, 397 U.S. at 77 ("Where a statute authorizes the inspection but makes no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply.").

Our Defendants don't identify any local or state "regulatory scheme" governing the prevention of human trafficking at adult-entertainment venues. Instead, the Defendants point to § 18-208, which purports to authorize the "reasonable inspection by police offices" of "any establishment

providing entertainment and/or consumption of alcoholic beverages" during business hours. HIALEAH, FLA., CODE OF ORDINANCES ch.18, art. V, § 18-208.[16] But that provision *doesn't* promulgate any regulations pertaining to entertainment venues or bars that could lawfully be monitored via a warrantless administrative search. Without that, "a human trafficking operation" cannot be an administrative search, Compl. ¶ 84, since such an operation necessarily *isn't* conducted "for the purpose of learning whether a particular business is conforming *to the statute* regulating that business," *Bruce*, 498 F.3d at 1239 (emphasis added). And, because the raid wasn't an administrative search, "the Fourth Amendment and its various restrictive rules apply." *Colonnade*, 397 U.S. at 77. At summary judgment, the Defendants *might* be able to identify an administrative scheme that could be seen as reasonably sanctioning their human-trafficking raid. For now, though, the Plaintiffs have met their burden of establishing that the raid was just a warrantless search untethered from any effort to monitor administrative compliance.

*Second*, the Defendants cannot retroactively justify a warrantless criminal search by later offering, "during the course of litigation and as justification for their qualified immunity defenses," a "*post hoc* argument that they were entitled to search the premises anyways" pursuant to an administrative-search statute. *Landau*, 2023 WL 6622208, at *16 (citing *Bakri v. City of Daytona Beach*, 716 F. Supp. 2d 1165, 1172–73 (M.D. Fla. 2010) (Antoon, J.)). "[A]t the time of the constitutional

---

[16] We have serious reservations about the constitutionality of § 18-208. Believing that it *justifies* the raid, the Defendants boast that the ordinance "expressly vests officers with the unqualified right to enter [the] establishment at any time, including during business hours[,] [for] a police investigation . . . , [and access] certain areas of an establishment not open or accessible to the public." Reply at 5. But the "unqualified" scope of the ordinance actually *undermines* its constitutionality. *See Burger*, 482 U.S. at 702 ("[I]n defining how a statute limits the discretion of the inspectors, we have observed that it must be 'carefully limited in time, place, and scope.'" (quoting *United States v. Biswell*, 406 U.S. 311, 315 (1972))). Obviously, the Constitution's restrictions on police conduct take precedence over a local ordinance's authorization of police conduct. *See, e.g., Johnson v. Nocco*, 91 F.4th 1114, 1118 n.7 (11th Cir. 2024) ("The Fourth Amendment is applicable to the states and local government through the Due Process Clause of the Fourteenth Amendment." (citing *Mapp v. Ohio*, 367 U.S. 643, 659 (1961))). So, even if the City Code *itself* presents no such limitation on the search, the Fourth Amendment does.

violation," the HPD did not "proclaim[ ] . . . [to be] conducting an administrative search." *Ibid.* Instead, the police officers said that they were "looking for anyone under the age of eighteen or anyone who is being forced to work there." *Id.* ¶ 87. Because Hernandez was not simply overseeing "'a good faith' inspection under the [ordinance] at the time of the events at issue, . . . he was not entitled to use it as a ruse to gain access to [non-public areas], nor may he rely on it now in attempting to justify the" unconstitutional search. *Bakri*, 716 F. Supp. 2d at 1173.

Plus, as we've said, *even if* the search had been a true administrative search that was primarily premised on "inspecting [the Tundidors'] business for statutory compliance," *Landau*, 2023 WL 6622208, at *7, it still may have violated the Plaintiffs' Fourth Amendment rights if it was not conducted reasonably. "As with any search, . . . the scope and execution of an administrative inspection must be reasonable in order to be constitutional." *Bruce*, 498 F.3d at 1244. To be reasonable, "an administrative . . . search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Id.* at 1248 (quoting *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998)). While "a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment," *WBY, Inc.*, 766 F. App'x at 859 (quoting *Lewis*, 674 F.3d at 1303), the Eleventh Circuit has observed that a search accompanied by a "'massive show of force' is not the sort of conduct that was approved by the Supreme Court in *Burger*" as reasonable, *id.* at 1245 (quoting *Crosby*, 187 F.3d at 1350).

Our Plaintiffs have plausibly alleged that the execution and scope of the Bellas raid was unreasonable. In depicting the events of the raid, the Complaint recounts:

> [S]uddenly at 11:07 p.m., members of the HPD burst through the door . . . wearing dark clothing and black bullet proof vests with 'police' insignia across the chest. At least one officer wore a black ski mask, showing only his eyes. Over a dozen officers entered the Property, getting the immediate attention of the staff, patrons, and entertainers, who were in various stages of undress. In loud, booming voices, the Police yelled for the music to stop and the lights to be turned on inside the adult entertainment venue. Once the music was off and the lights were turned on, the Police demanded that everyone stop what they were doing and sit down. The dancers, staff,

and patrons held their hands up in surrender to the authority of the Police. Then everyone in the building was systematically rounded up. . . . The Police held the patrons inside the establishment for approximately an hour[.] . . . The Police brought a K-9 unit, likely a drug detection dog, to conduct a sniff search of Bellas[.]

Compl. ¶¶ 67–73 (cleaned up).

The Eleventh Circuit has expressed grave skepticism about the reasonableness of similar tactics in other cases—especially where (1) "[p]atrons [are] ordered to sit and be quiet and [are] not permitted to leave for at least twenty minutes," *WBY, Inc.*, 766 F. App'x at 859; *cf.* Compl. ¶ 71 ("The Police held the patrons inside the establishment for approximately an hour[.]");[17] (2) officers wear tactical gear, *compare Swint*, 51 F.3d at 993 ("The team was dressed in black and at least some of the members wore ski masks to conceal their identities."), *and Bruce*, 498 F.3d at 1236 ("Some of the officers were dressed in SWAT uniforms—ballistic vests imprinted with SWAT in big letters, camouflage pants, and black boots."), *with* Compl. ¶ 68 ("The Police were wearing dark clothing and black bullet proof vests with 'police' insignia across the chest. At least one officer wore a black ski mask, showing only his eyes."); (3) officers "order[ ] the employees to line up" to be "patted down and searched," *Bruce*, 498 F.3d at 1236; *cf.* Compl. ¶ 71 ("Many of the staff . . . were subjected to Police pat-downs[.]"); and (4) the police "us[e] . . . aggressive language," *WBY, Inc.*, 766 F. App'x at 862; *cf.* Compl. ¶ 69 ("[T]he Police demanded that everyone stop what they were doing and sit down.").

As further evidence of the unreasonableness of *this* inspection, the Plaintiffs tell us that *prior* inspections "did not include an assemblage of officers from the Community Enhancement Unit, Community Response Team, Crime Scene Investigation, Narcotics Unit, and Special Victim's Unit entering the building on a busy night, decked out in tactical gear and masks," did not "involve the Police yelling in loud, booming voices for the music to stop and the lights to be turned on," did not "involve completely shutting down the operation of the business, and detaining every patron for more

---

[17] *See also WBY, Inc.*, 766 F. App'x at 862 ("[T]he officers ostensibly were there to conduct license and permit checks, which did not necessarily require interaction with patrons.").

than an hour, while the belongings of each were searched and their identities checked," did not "require or involve interactions with Bellas' patrons," and "did not involve interviewing every member of the staff and searching their lockers." Compl. ¶ 200; *see also Swint*, 51 F.3d at 999 (holding that an administrative inspection was unreasonable in part because "[a]dministrative inspections conducted on the Club and its predecessor establishment both before and after the two raids at issue in this case were accomplished without the massive show of force and excessive intrusion witnessed in [the raids]").

The Defendants try hard to distinguish the facts of the July 25th raid from the cases the Plaintiffs rely on. We're unmoved. Unlike in *Swint*, the Defendants point out, "[h]ere, only a single alleged 'raid' was conducted." Reply at 6. But, given that the Eleventh Circuit has found standalone raids unreasonable too, *see, e.g.*, *Bruce*, 498 F.3d at 1248 ("We hold only that . . . the administrative *search* of Bruce's Premises exceeded its limited scope and was, therefore, unreasonable[.]" (emphasis added)); *WBY, Inc.*, 766 F. App'x at 862 ("[A] jury reasonably could have concluded that the *inspection* here 'resembled a criminal raid' more than a 'regular, routine' administrative inspection[.]" (emphasis added) (cleaned up)), this distinction doesn't really matter.

Nor does the absence of patrons "who had weapons pointed at their faces," MTD at 7 (quoting *Club Retro, L.L.C. v. Hilton*, 566 F.3d 181, 200 (5th Cir. 2009)), change our conclusion that the search, as pled, may have been unreasonable. In *WBY, Inc.*, the Eleventh Circuit declined to hold that "the lack of evidence showing the officers' use of firearms [was] dispositive" to the reasonableness inquiry, observing that, "[w]hile the officers did not draw or point weapons, they did engage in other intimidating behavior, such as shoving or grabbing employees, wearing masks, and using unprovoked profanity and aggressive language." 766 F. App'x at 862. As such, "[b]ecause we evaluate reasonableness under the 'totality of the circumstances,' the fact that no weapons were drawn, though certainly relevant, does not alone sink [the Plaintiffs'] claim." *Ibid.* (quoting *Lewis*, 674 F.3d at 1303).

And our Plaintiffs *have* identified other examples of intimidating behavior that's sufficient to show that the search was unreasonably executed. *See* Compl. ¶ 70 ("[T]he Police demanded that everyone stop what they were doing and sit down. The dancers, staff, and patrons held their hands up in surrender to the authority of the Police."); *id.* ¶ 71 ("[E]veryone in the building was systematically rounded up. Bar staff were ordered out from behind the bar, entertainers were directed off the stage and out of the dressing room, and all patrons were seated together. . . . Many of the staff and patrons were subjected to Police pat-downs or the passing of the police officer's hands over the body of a clothed person to detect concealed weapons, drugs, or other contraband.").

The Defendants also say that our case differs materially from *Bruce* because, in that case, "the police were investigating stolen vehicles, not human trafficking as alleged here[,] . . . [and] '[c]urbing human trafficking is a substantial governmental interest; and [ ] the warrantless inspections permitted by the ordinance served that interest.'" Reply at 6 (quoting *Wacko's Too, Inc. v. City of Jacksonville*, 2023 WL 2237864, at *14 (M.D. Fla. Feb. 27, 2023) (Corrigan, J.)). There are (at least) two problems with this. *One*, whether an administrative search furthers a "substantial government interest" is relevant to our evaluation of the reasonableness of the regulatory *scheme* permitting warrantless inspections, *see Crosby*, 187 F.3d at 1346 ("[T]here must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." (quoting *Burger*, 482 U.S. at 702))—but it tells us nothing about the reasonableness of the *search* itself, *see Bruce*, 498 F.3d at 1244 ("Although a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not [be]."). *Two*, even if that weren't the case, the *Bruce* Court observed that the statutory scheme at issue there *did* further a substantial state interest. *See id.* at 1239 ("The statute authorizing such inspections is constitutional [only] if the state has a substantial interest in regulating the particular business . . . . The Florida Supreme Court has determined that Florida Statute § 812.055

conforms to th[is] criteri[on.]" (cleaned up)). Contra the Defendants' position, then, *Bruce*'s facts are on point here.

Perhaps recognizing the futility of this position, the Defendants pivot to arguing that, irrespective of the search's constitutionality, James Jr., "as an operator of Bellas," MTD at 6, and James Sr., who owns the Property, Compl. ¶ 18 ("In October 2009, James, Sr. purchased a property . . . that housed Porky's Cabaret, Inc."), are not "entitled to damages for the alleged Fourth Amendment violation," MTD at 6. We disagree.

Although one's "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home," *United States v. Hall*, 47 F.3d 1091, 1095 (11th Cir. 1995) (citing *Donovan*, 452 U.S. at 598–99), "[a]n owner or operator of a business" nonetheless has some "expectation of privacy in commercial property, which society is prepared to consider to be reasonable," *Burger*, 482 U.S. at 699; *see also WBY, Inc.*, 766 F. App'x at 858 ("Because an owner or operator of commercial property 'has a reduced expectation of privacy' in this context, the standard for what may be reasonable under the Fourth Amendment is correspondingly broader." (quoting *Burger*, 482 U.S. at 702–03)). The Eleventh Circuit has instructed that "a commercial proprietor has a reasonable expectation of privacy only in those areas where affirmative steps have been taken to exclude the public." *Hall*, 47 F.3d at 1096 (citing *Air Pollution Variance Bd. v. W. Alfalfa Corp.*, 416 U.S. 861, 865 (1974)).

Here, the Plaintiffs plausibly allege that the raid intruded on precisely these areas. According to the Complaint, the police "procured unfettered access to all of the Property including spaces not accessible to members of the public, such as the Property's attic and basement[.]" Compl. ¶ 80. They also searched "the dressing room," "a locked office, two locked closets, and the bathrooms in the basement level that were locked," all of which were "not accessible to the public." *Id.* ¶¶ 72–74. James Jr. and James Sr., therefore, have shown that the raid "plausibly infringed on 'an expectation of privacy

that society is prepared to consider reasonable[.]'" *Mundy v. Hambright*, 2014 WL 2895475, at *5 (S.D. Ga. June 24, 2014) (quoting *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987)).

* * *

After taking the Complaint's factual allegations as true—and drawing all reasonable inferences in favor of the Plaintiffs—we conclude that the Plaintiffs have plausibly alleged that the July 25th raid violated their Fourth Amendment rights *either* because it was an invalid warrantless search *or* because it was an administrative inspection that was unreasonable in its scope and execution.

### ii.    Clearly Established Law

To hold Hernandez liable on Count III, then, the Plaintiffs must show that their rights to be free from warrantless criminal searches or unreasonably executed administrative searches, as violated "in the circumstances of the case," *Pearson*, 555 U.S. at 232 (quoting *Saucier*, 533 U.S. at 121), were "clearly established" as of July 25, 2019—*viz.*, "at the time of the violation," *Vinyard*, 311 F.3d at 1349 (cleaned up). We think they've done just that.

Few principles of criminal procedure are more fundamental than our longstanding rule that "warrantless searches [are] 'per se unreasonable' in the absence of 'exigent circumstances[ ]'" or another recognized "exception" to the Fourth Amendment's general "warrant requirement[.]" *Coolidge v. New Hampshire*, 302 U.S. 443, 469–71 (1971); *see also Swint*, 51 F.3d at 995–96 ("Long before the raid[ ] at issue in this case, the Supreme Court, summarizing preexisting law, noted that '[a]bsent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant.' The Court specifically added that 'these same restrictions pertain when commercial property is searched for contraband or evidence of crime.'" (quoting *Donovan*, 452 U.S. at 598 n.6)). "Nevertheless, in cases involving arrests or warrantless searches or seizures, law enforcement officers are entitled to qualified immunity if they had even arguable probable cause," meaning that "reasonable officers in the same circumstances and possessing the same knowledge as

the Defendants could have believed that probable cause existed." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013) (quoting *Swint*, 51 F.3d at 996).

Based on the allegations the Plaintiffs have advanced in the Complaint, *see St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("The motion to dismiss will be granted if the complaint fails to allege the violation of a clearly established constitutional right[,] . . . accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor[.]" (cleaned up)), we're satisfied that "every reasonable official" in Hernandez's position "would have understood that what he [was] doing violate[d]" the Fourth Amendment, *Landau*, 2023 WL 6622208, at *7 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The Eleventh Circuit told us as much in *Swint* nearly thirty years ago—holding, "[u]nder law that had been clearly established years before," that "defendants [who] had no warrant to search the Club and seize its occupants [and] lacked even arguable probable cause to engage in such conduct . . . violated the Fourth Amendment." *Swint*, 51 F.3d at 998; *cf. Bailey*, 843 F.3d at 484 (explaining that "[a] plaintiff may identify a materially similar case from relevant precedent" to show that a right is clearly established). A comparison of the "particularized facts" of our case and *Swint* put it "beyond debate" that Hernandez had "fair warning that his conduct violated the law." *Gates*, 884 F.3d at 1296 (cleaned up).

In *Swint*, the court was tasked with determining whether the defendants had "arguable probable cause to conduct the extensive [and warrantless] raids of the Club" to search for narcotics based on "information from a reliable confidential informant regarding the sale of narcotics inside the Club." *Swint*, 51 F.3d at 996. The court made clear that they didn't. *See ibid.* ("Law enforcement officers in the position of these individual defendants could not reasonably have concluded that adequate probable cause existed to justify the searches and seizures that occurred.").

Like the unconstitutional searches in *Swint*, the raid of Bellas "included a search of the premises," *ibid.*; *accord* Compl. ¶ 80 ("The Police illegally procured unfettered access to all of the

Property including spaces not accessible to members of the public, such as the Property's attic and basement[.]"), "the seizure of all employees, patrons, and owners present," *Swint*, 51 F.3d at 996; *accord* Compl. ¶ 71 ("Then everyone in the building was systematically rounded up."), "and the search of some of those who were detained," *Swint*, 51 F.3d at 996; *accord* Compl. ¶ 72 ("The Police held the patrons inside the establishment for approximately an hour, checked their identifications and belongings and then released them, while the scantily-dressed dancers were escorted by the Police to the dressing room, which is inaccessible to the public, to check their identification and conduct searches of their belongings and inside their lockers[.]"). But, unlike the *Swint* defendants, Hernandez had *no basis at all* to justify the raid. *See* Compl. ¶ 84 ("[T]here was no probable cause to believe Bellas was involved in human trafficking.").[18] "[T]he contours of the rules" about the extent to which the warrantless search was unconstitutional are thus even *more* clearly established in the circumstances of our case. *Zadeh*, 928 F.3d at 471.

Swint* also forecloses the Defendants' argument that "Hernandez's purported *supervision* and *oversight* of"—as opposed to his personal participation in—"the 'raid' on this closely regulated business" wasn't contrary to clearly established law. Reply at 13 (emphasis added). *Swint* plainly held that an official who "authorized . . . the raids on the Club [but] . . . was not personally involved in conducting the raids" can still "be found personally liable under § 1983." *Swint*, 51 F.3d at 999; *see also ibid.* ("[A]lthough § 1983 does require proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, '[p]ersonal participation . . . is only one

---

[18] *Cf. Swint*, 51 F.3d at 997 ("After entry during the March 29, 1991, raid, officers attempted in vain to identify and find the one who had sold drugs to the undercover officer a few minutes earlier. If that had been the extent of the intrusion on these two occasions, this would be a different case. But that was not the end of the intrusion. On the contrary, the officers proceeded to detain at gunpoint dozens of citizens for an hour and a half, search a number of them, and search the premises as well. In the process, the officers completely disrupted the business of the Club. All of this was done without even arguable probable cause to justify anything beyond the search and arrest of a single individual on each occasion.").

of several ways to establish the requisite causal connection.'" (first quoting *Zatler v. Wainwright*, 802

F.2d 397, 401 (11th Cir. 1986); and then citing *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976))). So,

Hernandez also had fair warning that "orchestrat[ing]" a warrantless raid in violation of the Fourth

Amendment would subject him to liability. *See* Compl. ¶ 116; *see also Keating v. City of Miami*, 598 F.3d

753, 762 (11th Cir. 2010) ("[S]upervisors are liable under § 1983 . . . [if] 'the supervisor directed the

subordinates to act unlawfully[.]'" (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir.2003))).

    Based on the Plaintiffs' allegations, *Swint* "dictate[s], that is, truly compel[s] . . . the conclusion

for every like-situated, reasonable government agent that" Hernandez's conduct "violates federal law

in the circumstances." *Crosby*, 187 F.3d at 1345. Since nothing in the facts before us suggests that the

HPD had even arguable probable cause to search Bellas "for anyone under the age of eighteen or

anyone who is being forced to work there," Compl. ¶ 87, Hernandez cannot rely on qualified immunity

at this early stage of the case. We therefore **DENY** the Defendants' Motion to Dismiss Count III.[19]

### IV.    Municipal Liability (Counts II & IV)

    The Plaintiffs also assert their First and Fourth Amendment claims against the City. *See* Compl.

¶¶ 139–58 (Count II: First Amendment); *id.* ¶¶ 180–202 (Count IV: Fourth Amendment). Having

concluded that the Plaintiffs plausibly suffered injuries under the First and Fourth Amendments, we

must now determine whether the City can *also* be held liable for those constitutional violations.

    "[T]he Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech*

*v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003). A municipality can be liable under § 1983 only

---

[19] Because we're denying the motion on these grounds, we needn't also consider whether the Plaintiffs have stated a claim under their alternative theory of Fourth Amendment liability. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 507 (2002) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (2002)). Instead, we'll let the parties present their arguments on the reasonableness of *the manner* in which the (administrative) search was executed after they've taken discovery. *See St. George*, 285 F.3d at 1337 ("[T]he defense of qualified immunity is typically addressed at the summary judgment stage of a case.").

when "the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). That's because "*Monell*, the Supreme Court has explained, is a case about responsibility, and is meant to limit the § 1983 liability to acts which the municipality has officially sanctioned or ordered." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (cleaned up); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

Our Plaintiffs rely on a "final policymaker" theory of municipal liability. Resp. at 25. As the Eleventh Circuit explained in *Scala v. City of Winter Park*, "'municipal liability may be imposed for a single decision by municipal policymakers . . . where action is directed by those who establish governmental policy,' . . . provided that 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" 116 F.3d 1396, 1399 (11th Cir. 1997) (emphasis omitted) (first quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 470 (1986); and then quoting *id.* at 481); *see also Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) ("A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." (citing *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479–80 (11th Cir. 1991))). An official, however, "does *not* have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Id.* at 1401 (cleaned up). To survive a motion to dismiss, a plaintiff must only "allege a policy, practice, or custom of the City which caused the [constitutional violation]." *Hoefling*, 811 F.3d at 1280.

Our Plaintiffs have done precisely that. According to the Complaint, "Hernandez was the supervisor and final decisionmaker [for] all the departments involved in the raid," and his "decision to cause the raid to occur . . . had legal effect without further action by any other governing body."

45

Compl. ¶ 191. To support that allegation, the Plaintiffs direct us to Hialeah's City Charter, which provides that the mayor "has the power to 'exercise the executive powers of the city and supervise all departments'" and "is responsible for 'the administration of all departments, divisions and agencies of city government[.]'" Compl. ¶ 12 (first quoting CITY OF HIALEAH, FLA., CHARTER art. II, § 2.01(a); and then quoting *id.* art. IV, § 4.01). In other words, the mayor is in charge of "the practical management and *direction of* the [City's] executive department and its agencies." *Administration*, BLACK'S LAW DICTIONARY (10th ed. 2014). And, "while the Hialeah Chief of Police . . . [is] the principal officer[ ] of the[ ] [police] department[,] [he] is subject to the supervision of the mayor." Compl. ¶ 13 (first citing CITY OF HIALEAH, FLA., CHARTER art. II, § 4.04; and then citing CITY OF HIALEAH, FLA. CODE OF ORDINANCES ch. 2, art. II, § 2-57); *see also* CITY OF HIALEAH, FLA., CODE OF ORDINANCES ch. 2, art. II, § 2-57 ("Subject to the supervision of the mayor, the chief of police shall administer the affairs of the department that include the immediate direction and control of the police force."). So, by virtue of the Charter, the mayor plausibly retains authority over "managing, directing, or overseeing" police affairs. *Supervision*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Although the determination of whether a particular official had "final policymaking authority for the local governmental actor concerning the [violation] alleged" is a question of law, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (cleaned up), "identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement,'" *Hoefling*, 811 F.3d at 1280 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). The Plaintiffs "needed only to 'allege a policy . . . of the [City] which caused the [violation of their constitutional rights,]'" *Christmas v. Nabors*, 76 F.4th 1320, 1330 (quoting *Hoefling*, 811 F.3d at 1280), which they did by alleging that Hernandez, "[i]n his capacity as mayor," "deci[ded] to cause" and "orchestrated" the departments he supervised to raid Bellas, Compl. ¶ 191; *see also Jackson v. City of Stone Mountain*, 232 F. Supp. 2d 1337, 1365 & n.24 (N.D. Ga. 2002) (holding that, because "the Mayor was responsible for the day-to-

day operations of the city and all of its departments, and also to see that all laws, ordinances, and rules are executed[,] . . . when all of the actions were taken under a direct command from the Mayor, such a command had the force of a City policy with respect to the plaintiffs' flagpole, and the entire course of conduct is attributable to the City itself under Section 1983").

The City offers two reasons for its view that Hernandez's decision to order the raid *wasn't* a final municipal policy. At least at this stage of the case, neither is persuasive.

*First*, the City says that Hernandez is not a final policymaker over police activity because "it is the City Council"—rather than the mayor—"that maintains the authority to pass legislation," and the City Council can "override" the mayor's veto. MTD at 16 (citing CITY OF HIALEAH, FLA., CHARTER art. II, § 2.02(a)). According to the City, "[a]bsent from the duties and powers of the mayor is any similar authority to pass legislation or even recommend adoption of ordinances." *Ibid.* (citing CITY OF HIALEAH, FLA., CHARTER art. II, § 2.01(a)). But a final decision needn't be expressed through an ordinance to constitute an official municipal policy. *See Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 ("Local governments are directly liable under § 1983 . . . for constitutional deprivations resulting from [ ] an unconstitutional action taken pursuant to an officially promulgated policy statement, decision, regulation *or* ordinance[.]" (emphasis added)). And it's plausible to believe that, pursuant to the mayor's authority to "exercise the executive powers of the city and supervise all departments," CITY OF HIALEAH, FLA., CHARTER art. II, § 2.01(a), Hernandez was a "decisionmaker [who] 'possesse[d] final authority to establish municipal policy with respect to [an] action ordered[ ]'" to the police, *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003) (emphasis omitted) (quoting *Pembaur*, 475 U.S. at 481).

The City also points to a provision of the Charter that gives the City Council "the power and duty to 'inquire into the conduct of any municipal office, department, agency or officer and to investigate municipal affairs[.]'" Reply at 13 (quoting CITY OF HIALEAH, FLA., CHARTER art. II, §

2.02(a)). But whether the City Council can *investigate* the mayor tells us nothing about whether it can *override* his executive actions (or how it would go about doing that). In any event, "it would be inappropriate for the Court to decide this issue solely on the basis of the City's submissions" about the City's "code of ordinances[.]" *White v. City of Athens*, 169 F. Supp. 3d 1254, 1267 (N.D. Ala. 2016). So, while the City "might prevail on this [claim] on summary judgment or at trial by demonstrating that the decisions of Mayor [Hernandez] were subject to meaningful administrative review"—or that those decisions were otherwise outside the scope of Hernandez's final policymaking authority— "under *Hoefling*, [the Plaintiffs] must have the opportunity to develop evidence that supports the allegations in the complaint." *Ibid.*

Second, the City claims that Hernandez's "alleged actions involving a 'political hit' do not subject the City to liability" because those actions "would have been to benefit [Hernandez] himself rather than the City[.]" MTD at 18. Municipal liability does not attach where the underlying actions of the decisionmaker "were private rather than official acts." *Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir. 1989). For example, the Eleventh Circuit once declined to hold a municipality liable for a mayor's illegal conduct because the mayor "was not executing municipal policy when he acted contrary to controlling law regarding bribery and extortion." *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) (citing *Starrett*, 929 F.2d at 638). And, in *Starrett*, which the Eleventh Circuit cited favorably in *Manor Healthcare*, the court similarly found that a county was not liable for an official's sexual harassment because those acts "did not concern any official terms of employment, such as job title or description, salary levels, or other conditions" the official had "final policy authority over[.]" *Starrett*, 876 F.2d at 819.

In *Manor Healthcare*, the city wasn't liable for the defendant's conduct (in part) because the mayor's illegal acts fell outside the legitimate scope of his authority and because the city "neither adopted nor ratified [the mayor's] bribery and extortive activities." 929 F.2d at 638; *see also ibid.* ("[N]o

matter how much power an official has, no municipal liability exists if that official does not set the policy at issue . . . [or does not] have final policy-making authority in that area." (quoting *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340 (5th Cir. 1989))). What matters to our analysis, then, is not Hernandez's "underlying intent or motivation" for making the decision, *Church v. City of Huntsville*, 30 F.3d 1332, 1346 (11th Cir. 1994) (cleaned up)), but whether the decision was made "by an official of such rank that he or she could be said to be acting *on behalf of* the municipality," *Sewell*, 117 F.3d at 489 (emphasis added); *see also Davis v. City of Apopka*, 424 F. Supp. 3d 1161, 1175 (M.D. Fla. 2019) (Dalton, J.) ("The actions and decisions attributable to the City are at issue here, not the underlying motives . . . . So, [the official's] motives aside, the City may still be liable for the unlawful search.").

Unlike bribery, extortion, and sexual harassment, directing the affairs of the police department plausibly falls within the Mayor of Hialeah's legitimate executive authority. *See* CITY OF HIALEAH, FLA., CHARTER art. II, § 2.01(a)(1) (authorizing the mayor "[t]o exercise the executive powers of the city and supervise all departments"); *cf. Trump v. United States*, 144 S. Ct. 2313, 2354–55 (2024) (Barrett, J., concurring in part) (recognizing the majority's distinction between the private act of "bribery" and an "official act connected to the bribe"). In fact, the Defendants argue *elsewhere* in their Motion (in support of Hernandez's case for qualified immunity) that, in directing the raid, "Hernandez was performing a . . . job-related function through means that were well within his power to use." MTD at 10. We agree with the Defendants on that point—just not on their contrary position here.

So, if Hernandez were "responsible for establishing final government policy respecting" police operations, *Manor Healthcare*, 929 F.2d at 637 (quoting *Pembaur*, 475 U.S. at 481–82), we wouldn't simply be "holding the city vicariously liable for a mayor's personal acts," MTD at 18 (citing *Manor Healthcare*, 929 F.2d at 638). Instead, the City would be liable *precisely because* its governmental structure permitted Hernandez to officially adopt the "policy . . . which caused the [alleged constitutional

violation]." *Hoefling*, 811 F.3d at 1280. Since the Plaintiffs have plausibly alleged that this is exactly what happened, we **DENY** the Defendants' Motion to Dismiss Counts II and IV.

\* \* \*

Accordingly, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Joint Motion to Dismiss [ECF No. 12] is **DENIED**.

2. **By November 19, 2024**, the parties shall submit an amended joint scheduling report, proposing new dates for trial and all remaining pretrial deadlines.

3. The Clerk shall **REOPEN** this case.

**DONE AND ORDERED** in the Southern District of Florida on November 5, 2024.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record