**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-cv-22747-ALTMAN/Reid**

**JAMES TUNDIDOR, SR.**, *et al.*,

     *Plaintiffs*,

v.

**CARLOS HERNANDEZ** and **CITY OF HIALEAH**,

     *Defendants*.

_____/

## ORDER

An adult-entertainment club and its owners sued Hialeah and its then-mayor, alleging First Amendment and Fourth Amendment claims. The parties have now filed dueling summary-judgment motions. After careful review, we **GRANT in part** and **DENY in part** both motions.

## THE FACTS

### I.    Background

"Porky's Cabaret, Inc.," doing business as "Bellas Cabaret" ("Bellas"), is an "adult entertainment venue" in "Hialeah, Florida." Plaintiffs' Statement of Material Facts (the "PSMF") at 1–2; Complaint [ECF No. 1] ¶ 18. James Tundidor, Sr. ("James, Sr.") "owns the property and structure . . . where Bellas . . . operates" and has two sons. PSMF at 2. One son—James Tundidor, Jr. ("James, Jr.")—served in 2019 as "vice president of Bellas." *Ibid.* The other—Jesus Tundidor ("Jesus")—ran for Hialeah City Council during "the 2019 election." *Id.* at 1. Dulce Tundidor ("Dulce") "owns Bellas," the "operating business," and the "liquor license," is "James[,] Jr.'s mother," and "considers Jesus like a son." *Id.* at 2; *see also* Compl. ¶ 16 ("James[,] Sr. and Dulce were married for over twenty years and James[,] Jr. is their adult son.").

The undisputed facts show that the Tundidors "supported" Jesus's campaign—both "financially" and in terms of "moral support." PSMF at 8; *see also* Defendants' Statement of Material Facts (the "DSMF") [ECF No. 206] at 6 ("In late 2018, Jesus received at least twelve . . . $1,000 contributions to his campaign from family members and their related businesses."). James, Sr. made "contributions exceeding $85,000" to "a political action committee ('PAC') that supported Jesus's campaign" and "hosted Jesus's first fundraiser in November of 2018 which raised approximately $25,000." PSMF at 8 (citations omitted). "James[,] Jr. was the campaign treasurer for Jesus's 2019 campaign, donated the maximum amount to Jesus's campaign for City Council, and donated $4,000 to a PAC that supported Jesus's candidacy." *Ibid.* "Bellas Cabaret also made a donation in support of Jesus's candidacy." *Ibid.* And "Dulce donated $1,000 in support of Jesus's candidacy and contributed to his campaign by participating in caravans, distributing flyers door to door, and generally working his campaign." *Ibid.*

Carlos Hernandez served as mayor of the City of Hialeah (the "City") "from May 2011 through November 2021." *Id.* at 2. In "late 2018," "Jesus came to Hernandez's office . . . to ask Hernandez to support his 2019 candidacy," but "Hernandez said he was not interested in making decisions." DSMF at 6–7. "During an interaction at the Hialeah Parking Racing and Casino . . . in early 2019, Hernandez remembers telling Jesus that he would not get elected." *Id.* at 7. During the election cycle, Christian Navarro and Jesus Navarro—"longtime supporters of Mayor Hernandez and contributors to his campaigns and affiliated PACs," Compl. ¶ 62—"requested" a meeting with James, Sr., DSMF at 7, with whom they discussed Jesus's candidacy, *see* Jesus Navarro Dep. [ECF No. 214-13] at 14; James, Sr. Dep. [ECF No. 197-1] at 60. "On November 19, 2019," Jesus won the "election." DSMF at 13.

"In the evening hours of July 25, 2019, the City of Hialeah Police Department," along with "individuals from other City departments such as Building, Licensing, Code, [and] the Fire Department," "entered Bellas." PSMF at 2–3. Joined by "Adriana Quintana, a news reporter from

2

America Teve," as well as "her cameraman," DSMF at 7, the City officials executed an "operations plan," which stated:

> The Hialeah Police Department will be conducting a business check at Bellas Cabaret with the intent to locate any traces of Human Trafficking. Also, a business license and safety operational check will be conducted. In the event a Human Trafficking case is located, a special Victims Detective will be present and D.C.F. will be notified. Other City of Hialeah departments will be available to conduct a safety and license check at the scene.

Operations Plan [ECF No. 214-9] at 517–18

After entering Bellas, "[t]he officers turned on the lights, instructed the DJ to turn off/down the music, and then separated the staff from the patrons." DSMF at 9. "The Police verified the entertainers' identities and interviewed each of them." PSMF at 4. "Personnel from the City's Building Department, Fire Department, Code Enforcement, Zoning, and Fire Department (and the media) were provided access to Bellas Cabaret only after the Police entered and cleared the scene." *Ibid.* (quotation marks omitted). Over the course of the operation, the City officers used a "K-9 unit," Plaintiffs' Factual Responses (the "PFR") [ECF No. 225] at 6, and gained "access . . . into different areas" of Bellas, including "the locker room," "the basement," "a locked office," and "the attic," DSMF at 10.

"The Building Department deemed Bellas 'unsafe' and 'red tagged' it." *Id.* at 11; *see also ibid.* ("Violations included improper accessible routes throughout and additions without proper permitting as there was a basement below grade under construction without a permit to be used for purposes other than storage (wet bar visible in video), a failure to comply with FBC accessibility requirements along with exposed cables, and structural modifications."); *ibid.* (noting that "[i]nterior and exterior alterations [were] in progress without permits," that "[t]he property was visibly under construction at the time of entry," and that "[c]aved floors and new plumbing [were] in the basement"). "After the property was closed, the Plaintiffs immediately retained counsel." *Id.* at 13. Ultimately, the "Tundidors and the City entered into a compliance agreement which included addressing the life safety issues

3

through two consulting firms to provide a plan on achieving compliance." *Ibid.* "Bellas was allowed to reopen on January 8, 2020, after providing life safety reports detailing how the life safety issues would be addressed and in what order." *Ibid.*

## II.      Procedural History

In July 2023, James, Sr., Dulce, James, Jr., and Bellas (the "Plaintiffs") filed the Complaint against Hernandez and the City (the "Defendants"), alleging four counts. Counts I and II advance First Amendment retaliation claims against Hernandez and the City, respectively. *See* Compl. ¶¶ 121–58. And Counts III and IV assert Fourth Amendment claims against Hernandez and the City, respectively. *See id.* ¶¶ 159–202.

In November 2024, we issued an order denying the Defendants' Motion to Dismiss (the "MTD") [ECF No. 12]. *See* MTD Order [ECF No. 65]. That order proceeded in five parts. *First*, it rejected the argument that the Complaint was a shotgun pleading. *See id.* at 9 (noting that "the Complaint describes *at length* how each Plaintiff was harmed by the Defendants' alleged actions"). *Second*, it confirmed the Plaintiffs' Article III standing. *See id.* at 15 (finding that the Complaint alleges "concrete" injuries, "traceable to the Defendants' conduct," "which would be adequately redressed by damages"). *Third*, it held that Count I "stated a valid First Amendment retaliation claim against Hernandez"—and, for qualified-immunity purposes, that "the egregious nature of Hernandez's alleged conduct" *was* "obviously unconstitutional." *Id.* at 25, 29 (cleaned up). *Fourth*, it found that Count III "plausibly alleged that the July 25th raid violated their Fourth Amendment rights"—"either because it was an invalid warrantless search or because it was an administrative inspection that was unreasonable in its scope and execution"—and that, for qualified-immunity purposes, "every reasonable official in Hernandez's position would have understood that what he was doing violated the Fourth Amendment." *Id.* at 41–42 (cleaned up). *Fifth*, we found that the Plaintiffs sufficiently

asserted Counts II and IV against the City. *See id.* at 45 (finding that the Plaintiffs sufficiently alleged that "Hernandez's decision to order the raid" was "a final municipal policy").

Both sides moved for summary judgment in July 2025. *See* Plaintiffs' Motion for Partial Summary Judgment (the "PMSJ") [ECF No. 193]; Defendants' Motion for Summary Judgment (the "DMSJ") [ECF No. 207]. Over the next two months, the parties filed responses to—and then replies in support of—those dueling motions. *See* Plaintiffs' Response [ECF No. 241]; Defendants' Response [ECF No. 223]; Defendants' Reply [ECF No. 229]; Plaintiffs' Reply [ECF No. 233].[1] This Order follows.

## THE LAW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And an issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid.* "All reasonable inferences must be drawn in favor of the nonmoving party, but a mere scintilla of evidence will not suffice to overcome a motion for summary judgment." *Ismael v. Roundtree*, 161 F.4th 752, 758–59 (11th Cir. 2025) (cleaned up); *see also Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) ("When a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but by affidavits, depositions, answers to interrogatories, and admissions must show that there are specific facts demonstrating that there is a genuine issue for trial."). "The moving party has the burden of

---

[1] A note on the motion-practice timeline. On August 25, 2025, the Plaintiffs moved for leave to file their response to the DMSJ, explaining that "Plaintiffs' counsel inadvertently failed to file" the Plaintiffs' Response, "despite having prepared the document in advance and timely filing related documents." Motion for Leave [ECF No. 238] at 3. On September 9, 2025, we granted that request. *See* Paperless Omnibus Order [ECF No. 240].

demonstrating that there are no genuine issues of material fact," but "[o]nce a summary judgment movant's initial burden is met, the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (cleaned up).

## ANALYSIS

The Plaintiffs and Defendants each move for summary judgment—as to *Monell* liability, the First Amendment retaliation claims (Counts I and II), and the Fourth Amendment claims (Counts III and IV). We address those three issues in turn.

### I.    *Monell* Liability

The Plaintiffs assert two claims against the City. *See* Compl. ¶¶ 139–158 (Count II); ¶¶ 180–202 (Count IV). But, "[a]s a municipality, the City cannot be held vicariously liable under § 1983 for constitutional violations committed by its officers." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). Instead, "municipal entities may be held liable under § 1983 only where action pursuant to official municipal policy of some nature caused a constitutional tort." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1370 (11th Cir. 2024) (quotation marks omitted); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) ("Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). We thus begin by determining whether the Plaintiffs can subject the City to liability.

"A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights."

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022). As to the final-policymaking approach, "a single decision by an official policymaker can establish the existence of an unconstitutional municipal policy." *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992). But "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997).

Our Plaintiffs press a final-policymaking theory. They argue that "Mayor Hernandez was the administrator of all departments, providing oversight to all department heads," and that his "direct supervision over the Police was not subject to review, reversal, or veto by any other governing body or official." PMSJ at 6; *see also ibid.* ("The City's Chief of Police and all department supervisors are subject to the supervision of the mayor."); Pl. Resp. at 6 ("[T]he powers that reside with the Council do not confer the Council meaningful administrative review over the decisions of the Police Chief, the Building Official, and other departments that were involved in the Raid.").

The Defendants offer two responses. *First*, they say that "Hernandez did not make any 'single decision' as to Bellas" and "was not the final policymaker with respect to the alleged action." Def. Resp. at 8. To the contrary, they insist, "[a]ll record evidence establishes Hernandez was not consulted and had no knowledge of the operation before it took place," whereas "[i]t is undisputed that the task force . . . was initiated by Building Official Alexis Riveron," who "request[ed]" that "the police department initiate[ ] an operational plan to ensure the safety of all City employees participating in the operation as well as the patrons and employees of Bellas." *Id.* at 4; *see also id.* at 7 ("It is uncontroverted that the City employees involved in the operation at Bellas were acting upon orders from Fire, Building, and Police Departments."); *id.* at 8 ("The fact that Hernandez was mayor does not make him individually liable, or the City vicariously liable, for any and every alleged constitutional violation that may have occurred during his tenu[r]e.").

*Second*, the Defendants contend that Hernandez's "decisions" were, in any event, "subject to the meaningful opportunity for review." *Id.* at 9. As they see it, "Hernandez's Charter authority to supervise the department heads from an employment standpoint is limited by the approval of the City Council," such that "[o]nly the Council could approve the appointment of department heads by the Mayor," "ratify the removal of a department head by the mayor," "determine the organization of the city government and the power and duties assigned to the various departments," and employ "additional powers beyond general investigation." *Id.* at 6; *see also* DMSJ at 4 ("As reflected in the Charter and the City's organizational charts and Code of Ordinances, the City Council has sole legislative authority over the City, and the City Council has equal oversight with the mayor over all the departments."); *id.* at 5 ("Absent from the duties and powers of the mayor is any similar authority to pass legislation or even recommend adoption of ordinances.").

"The determination of whether or not a particular official has final policymaking authority is governed by state law, including valid local ordinances and regulations." *Chabad*, 48 F.4th at 1229 (quotation marks omitted). So, we'll survey relevant "state and local positive law" to determine whether Hernandez had the *capacity* to serve as the final policymaker over the operation. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004). After careful review, we find that he did.

The Plaintiffs rely on four provisions. The first states that "[t]he mayor . . . shall have the . . . power[] . . . [t]o exercise the executive powers of the city and supervise all departments." CITY OF HIALEAH, FLA., CHARTER art. II, § 2.01(a)(1).[2] The second provides that "[t]he mayor shall be the chief administrative officer of the city and shall be responsible for the administration of all city affairs." *Id.* art. IV, § 4.01. It further notes that "[t]he mayor shall be responsible for the administration of all

---

[2] On July 21, 2025, the Plaintiffs asked us to take judicial notice of the City's Charter as well as a section from the City's Code of Ordinances. *See* Plaintiffs' Motion for Request to Take Judicial Notice [ECF No. 192]. We did so on July 25, 2025. *See* Paperless Omnibus Order [ECF No. 218].

departments, divisions and agencies of city government and for carrying out policies adopted by the city council," and that "[t]he mayor shall be recognized as head of city government for all ceremonial purposes and for purposes of military law, service of process, and the execution of duly authorized contracts, deeds or other documents." *Ibid.* The third states that "[t]he chief of police"—the "principal law enforcement officer of the city and the administrative head of the police department"—"shall be subject to the supervision of the mayor." *Id.* art. II, § 4.04. Finally, the fourth provision provides that, "[s]ubject to the supervision of the mayor, the chief of police shall administer the affairs of the department that include the immediate direction and control of the police force." CITY OF HIALEAH, FLA., CODE OF ORDINANCES ch. 2, art. II, § 2–57.

Those duties sweep broadly. They authorize the mayor to exercise the "executive powers of the city," administer "*all* city affairs" and the work of "*all* departments," and supervise "*all* departments," including the "chief of police"—who, in turn, wields "immediate direction and control of the police force." The Charter thus invests the mayor with the power to govern, oversee, and run the Police Department—along with all other departments. *See* BLACK'S LAW DICTIONARY 53 (12th ed. 2024) (defining "administer" as "[t]o manage" or to "provide or arrange (something) officially as part of one's job"); *id.* at 418 (defining "control" as "[t]o exercise power or influence over" or to "regulate or govern"); *id.* at 716 (defining "exercise" as "[t]o implement the terms of"); *id.* at 745 (defining "supervise" as "managing, directing, or overseeing persons or projects"); *see also* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2150 n.158 (2016) ("That's why textualists rely on dictionaries. Dictionaries may not provide authoritative, binding interpretations of the language of a statute, but they do tell courts something about how the ordinary user of the English language might understand that statutory language.").[3]

---

[3] That's not to say those four provisions delegate final policymaking authority in *all* arenas to the mayor. To the contrary, in making the mayor "responsible . . . for carrying out policies adopted by

The Defendants never argue that the Plaintiffs *overread* the powers the Charter confers on the mayor. They instead challenge the Plaintiffs' theory on two main grounds—both unpersuasive.

*First*, the Defendants contend that Hernandez—policymaker or not—lacked "legal authority" over the Building, Fire, and Police Departments for actions taken in connection with the raid. DMSJ at 6 (cleaned up). On their telling, those departments "each had authority to initiate inspections pursuant to Florida law," and so "the authority to conduct the inspection at Bellas" traced back to "State laws and City ordinances," "not any policy from the mayor." *Id.* at 7. But no one disputes that the departments *could* inspect for code compliance. The question is whether the mayor held the *ultimate* power over those inspections—and the Charter suggests that he did.

If the mayor wields the broader power to oversee all departments and administer their work, it follows that he has the more modest power to order, scrap, and otherwise tailor an inspection. *See Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020) ("[T]he greater power ordinarily includes the lesser power[.]"). Arguing otherwise empties the operative statutory terms ("supervise," "exercise," "administer") of meaning and leads to the bizarre conclusion that a superior—our country's President, for instance—loses final-decisionmaker status if an inferior officer retains discretion to make some decisions too. *See Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) ("[T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority.

---

the city council," § 4.01 contemplates policies the mayor *executes* but doesn't *create*. And by deeming the mayor the "head of city government" *only* for a limited array of "purposes" (*i.e.*, "ceremonial purposes," "military law, service of process, and the execution of duly authorized contracts, deeds or other documents"), § 4.01 indicates that the mayor sits as the head of government in only certain—not all—contexts. *See Esteras v. United States*, 606 U.S. 185, 195 (2025) (defining "in plain English" the "well-established canon of statutory interpretation," *expressio unius est exclusio alterius*, as "expressing one item of an associated group or series excludes another left unmentioned"); *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health."). Still, § 4.01 makes plain that the mayor *administers* and *supervises* every department. The plain text thus supports the Plaintiffs' argument that the Charter gave Hernandez final authority over the deployment of Police, Fire, and Building officers.

Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review."); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("[T]he purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy."). We reject that unnatural reading of the Charter. *See Hamilton v. Lanning*, 560 U.S. 505, 520 (2010) (rejecting an interpretative approach that "would produce senseless results that we do not think Congress intended").

*Second*, the Defendants point to the City's "'Strong Mayor-Council' form of government" and argue that "the City Council had *equal* oversight and could meaningfully review [Hernandez's] conduct through an investigation." DMSJ at 4, 6 (emphasis added). To that end, they cite provisions in the Charter that authorize the City Council to "legislate for the city by adopting ordinances and resolutions in the best interest of all the citizens of the city," CITY OF HIALEAH, FLA., CHARTER art. II § 2.01(a)(1); "determine . . . the origination of the city government and the power and duties assigned to the various departments," *id.* § 2.02(a)(3); and "approve the appointment of department heads by the mayor," *id.* § 2.02(a)(4). But even if those provisions give "the City Council . . . equal oversight with the mayor over all the departments," Def. Resp. at 9, the Defendants fail to account for the fact that, "[w]ith respect to a particular action, more than one official or body may be a final policymaker; final policymaking authority may be shared," *McMillian v. Johnson*, 88 F.3d 1573, 1578 (11th Cir. 1996). In any event, for the purposes of identifying the final policymaker over the *operation*, we fail to see the relevance of those provisions. These powers might furnish evidence of the uncontroversial proposition that the mayor isn't the head of the government for *all* purposes. But our inquiry here concerns only *one* purpose, and we don't see how the City Council's ability to adopt ordinances, organize departmental powers, and approve departmental heads constrains the mayor's power to conduct a raid. *See ibid.* ("An official or entity may be a final policymaker with respect to some actions but not others.").

This logic applies with equal force to the veto-specific provisions the Defendants marshal. That the mayor's removal of a department head becomes effective "only . . . when ratified by an affirmative vote of at least 4 councilmembers" has no bearing on whether the City Council must ratify a mayor's decision to conduct inspections. §§ 2.01(a)(5)–2.02(a)(5). The same goes for the requirement that mayoral appointments receive four councilmember votes. *See* § 2.01(a)(4). Indeed, the only veto power related to substantive policy on which the Defendants rely is the City Council's ability to "override[ ]" the mayor's "veto power over ordinances or resolutions adopted by the city council." §§ 2.01(a)(7)–(a)(8). But that power means only that the mayor isn't the final policymaker of ordinances passed by the City Council. It has nothing to do with executive decisions made by the mayor in the first instance.

*   *   *

"*Monell* is a case about responsibility." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). And a review of the relevant statutes here leaves no question that responsibility over the Police Department—and all other departments—lies with the mayor. At the time of the operation, then-Mayor Hernandez held "final policymaking authority in the area of the act or decision" to raid Bellas. *McMillian*, 88 F.3d at 1577; *see also S. Atl. Companies, LLC v. Sch. Bd. of Orange Cnty.*, 699 F. App'x 842, 846–47 (11th Cir. 2017) ("What matters" is whether the decisionmaker "*could* have intervened in the decision-making process and, as the entity vested with final policymaking authority, decided the matter.").

Whether Hernandez indeed arranged the raid is a separate story. But that's a merits question we'll examine below. *See Mandel*, 888 F.2d at 793 ("The court must . . . ensure that the municipal official possesses the authority and responsibility for establishing *final* policy with respect to the issue in question. Only after this determination is made is the second step of the inquiry relevant: Did the challenged decision or act of the official cause the deprivation of the plaintiff's rights? The answer to

12

this question is, of course, for the jury." (citations omitted)). For now, we hold only that the Plaintiffs have done enough to establish *Monell* liability. *See ibid.* ("[T]he identification of the final policymaker is a question of state law for the trial judge, not for the jury."); *Megladon, Inc. v. Vill. of Pinecrest*, 2025 WL 1517181, at *33 (S.D. Fla. May 28, 2025) (Altman, J.) ("The Supreme Court has made plain that the question of whether a municipal official is a final policymaker is a legal question for the court, not the jury." (cleaned up)).

## II.      The First Amendment Claim

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or . . . the right . . . to petition the government for a redress of grievances." U.S. CONST. amend. I.  "As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). "To state a § 1983 First Amendment retaliation claim, a plaintiff generally must show: (1) she engaged in constitutionally protected speech, such as her right to petition the government for redress; (2) the defendant's retaliatory conduct adversely affected that protected speech and right to petition; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech and right to petition." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).

Our parties agree that the Plaintiffs have satisfied the first element here. *See* DMSJ at 10 ("[I]t is undisputed that Plaintiffs engaged in protected speech by supporting and funding Jesus' campaign."). So do we. The Supreme Court has made clear that "[t]he right to participate in democracy through political contributions is protected by the First Amendment[.]" *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014); *see also Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political candidates both

fall within the First Amendment's protection of speech and political association."). Our analysis of this first element therefore begins and ends there.

We also find that the Plaintiffs have met the second element. "When reviewing an official's retaliatory conduct for adverse effect, we consider whether his alleged conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019) (quotation marks omitted). "Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). Exacting political revenge by raiding (and shuttering) a business—if indeed that's what occurred here—meets that mark. After all, "[t]he threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights." *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) ("What [a government official] cannot do, however, is use the power of the State to punish or suppress disfavored expression."); *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1281–82 (11th Cir. 2025) ("[B]eing ordered out of a meeting room by a chief of security and a police officer can be . . . humiliating and damaging to a person's personal reputation . . . . And since there is no justification for harassing people for exercising their constitutional rights, the adverse effect need not be great to support a violation." (quotation marks omitted)).

That leaves only the third element. But causation presents a harder task—for two reasons. *First*, the Defendants maintain that "Hernandez had no involvement in the Bellas task force whatsoever." DMSJ at 10. *Second*, "proving the link between the defendant's retaliatory animus and the plaintiff's injury in retaliatory prosecution cases is usually more complex than it is in other retaliation cases." *Lozman v. Riviera Beach*, 585 U.S. 87, 97 (2018); *see also Gonzalez v. Trevino*, 602 U.S. 653, 664 (2024) (Alito, J., concurring) ("[T]he machinery of criminal justice often works through

14

multiple government officers . . . . Thus, it is often challenging to draw a straight line between the plaintiff's protected speech and the defendant from whom he seeks recovery.").[4]

That's the rub here. To prevail on their First Amendment claims, the Plaintiffs "must establish a causal connection between the government defendant's retaliatory animus and the . . . subsequent injury." *Nieves*, 587 U.S. at 398. But "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Ibid.* Animus, in other words, "must be a 'but-for' cause, meaning that the adverse action against the plaintiff[s] would not have been taken absent the retaliatory motive." *Id.* at 399.

The Plaintiffs insist that, "[b]ut for Hernandez's retaliatory motive against Plaintiffs (and Jesus), the Raid perpetrated by the City would not have taken place." Pl. Resp. at 12; *see also ibid.* ("Bellas Cabaret would have continued to be subject to its Annual Assembly inspections where the Fire Department either 'passed' Bellas Cabaret or provided a list of remedial measures, the Building Department would have remained unprompted by the Fire Department or civilians, the Business Tax Receipt division would have continued accepting Bellas Cabaret's payments for the required

---

[4] Because "unlawful motive can be easy to allege and hard to disprove," retaliation claims "can trigger complex causation disputes." *Grady v. Cratsenburg*, 170 F.4th 995, 996 (6th Cir. 2026). "To account for this problem of causation," the Supreme Court has required that—for "retaliatory prosecution cases" and "retaliatory arrest claim[s]"—"plaintiffs plead and prove the absence of probable cause for the underlying criminal charge." *Nieves*, 587 U.S. at 400, 406; *see also Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) ("This Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause."); *but see Nieves*, 587 U.S. at 407 ("[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."). Some circuits have extended this probable-cause requirement to other contexts, including retaliatory-search claims. *See, e.g., Stanley v. Bocock*, 160 F.4th 573, 578 (4th Cir. 2025) ("[W]e're satisfied that *Hartman* extends to First Amendment-based retaliatory search claim.").

Even if the probable-cause bar applies to (allegedly) retaliatory *inspections*, we needn't decide whether that prerequisite complicates the Plaintiffs' claims here because the Plaintiffs plainly allege that "there was *no probable cause* to believe Bellas was involved in human trafficking," Compl. ¶ 84 (emphasis added), and the Defendants offer no argument to the contrary.

documentation."). But, in the absence of evidence tying Hernandez to the operation, the Defendants maintain, "[t]here is no causal connection between any defendant's retaliatory motive . . . that serves as the 'but-for cause' of the adverse action." DMSJ at 11; *see also id.* at 10 ("To the extent that other city officials took adverse action, it is clear that the actions were taken without any retaliatory animus."). Having already determined that Hernandez had the *authority* to serve as final policymaker, we must now examine whether he in fact *served* in that role.

The Defendants believe the record shows a "complete lack of concrete evidence establishing that Hernandez had any involvement" with the operation. *Id.* at 9. They direct us to Riveron's sworn statement to the effect that, in "July 2019," "Da[ ]y[len] Docampo, the former Assistant City Attorney, approached me in my capacity as Building Official, regarding the occupational licenses for Bella[ ]s Cabaret." Riveron Aff. [ECF No. 212-9] at 8 (cleaned up). In turn, Riveron testified that he "informed Ms. Docampo that Bella[ ]s . . . had a documented history of legal and non-compliance issues . . . dat[ing] back to 2010 when a task force identified multiple life safety violations," and that he "expressed [his] apprehension that the City's failure to enforce compliance could result in significant legal liability, particularly in the event of a fire or loss of life." *Ibid.*; *see also* Riveron Dep. [ECF No. 208-1] at 31 ("I'd rather be sitting here in this deposition than in a criminal trial . . . or lose my license, my livelihood . . . . And in 2019, this was already weighing heavily on my conscious [sic] for several years."). According to Riveron, "Sergio Vela[z]quez, former Chief of Police, . . . walked in on the discussion" and "indicated that the Police Department would initiate a bar check consistent with Florida's Alcohol Beverage Law and coordinate with [the] Building Department along with other enforcements units as had been done in the past." Riveron Aff. at 8. "Within a day or so," Riveron continued, "the Chief agreed to conduct a Task Force Inspection and agreed to coordinate the Inspection with all Departments and Units." *Ibid.*

But, "[p]rior to July 25, 2019," Riveron claimed, "I had no discussions or communications with Mayor Carlos Hernandez . . . regarding Bella[ ]s Cabaret." *Id.* at 9. Indeed, Riveron said that he "*never* . . . s[ought] consultation or guidance from the administration or Mayor Hernandez or any mayor regarding any decisions I make in my capacity as Building Official." *Ibid.* (emphasis added); *see also* Riveron Dep. at 164 ("Q. [D]id the Building Department have to obtain any kind of authorization to participate in the operation? A. No. Q. Okay. Would that have been something that you would have communicated to Carlos Hernandez? A. No."); *id.* at 347 ("Q. Tell me, did Mayor Hernandez have anything to do with your request of a task force at Bellas? A. No. Q. Did you consult with him, were you instructed by him, did you speak with him at all before you made the request for a task force at Bellas? A. Not at this moment. And in no task force in the past. And no unsafe structure in the past, never. Q. Did Mayor Hernandez ever request that you take any action against any Tundidor property? A. He's never requested to take any action on no one."); *id.* at 72 ("Q. Did you communicate with Carlos Hernandez prior to this operation about this operation? A. No. Q. Okay. Did you communicate with Carlos Hernandez prior to the operation about the Plaintiffs[ ] in this case, the Tundidors? A. No.").

The Defendants rely on similar testimony from Velazquez, Major Hubert Ruiz, and Commander Yan Perez. *See* Velazquez Deposition [ECF No. 212-8] at 14–15 ("Q. Did . . . then Mayor Carlos Hernandez direct you to put together an operations plan to enter Bellas Cabaret on July 25, 2019? A. No, ma'am. Q. Did Mayor Carlos Hernandez, during the time you were the chief of police, ever express to you his desire to target the owners of Bellas Cabaret? A. No, ma'am . . . . Q. Did then Mayor Carlos Hernandez ever direct you to take punitive police action against the Tundidors? A. No, ma'am."); Ruiz Deposition [ECF No. 215-2] at 19 ("Q. [D]id you have any communication with Carlos Hernandez about this building, this police operation at all? A. No."); Perez Deposition [ECF No. 215-

17

1] at 212 ("Q. [W]hen you told Jimmy, [']sorry, this came from the big boss['‚] . . . you were referring to Vela[z]quez? A. The chief of police, yes.").

Still more testimony comes from Hernandez himself, who claimed to have had no knowledge of the events until "[a]fter the raid occurred." Hernandez Deposition Part II [ECF No. 212-6] at 307; *see also id.* at 305 ("Q. You are aware of the raid that took place at Bellas Cabaret on July 25, 2019, correct? A. I don't know [the] exact date[,] I would have to look, but I was aware of it after it happened. Q. Okay. And how did you become aware of it? A. Either a day or so, after somebody brought it up to me that there had been an inspection done at the Cabaret, the strip club and that it was closed for violations, health violations, and construction violations." (objections omitted)); *id.* at 25 ("Q. Do you usually get operation plans for operations that involve multiple departments within the City of Hialeah? A. No."); *id.* at 4 ("Q. Did you send the Navarros or anyone else to . . . ask Jesus Tundidor to stand down? A. No."). Hernandez also denied holding any animosity toward Jesus. *See* Hernandez Dep. Part I [ECF No. 212-5] at 172 (claiming that Jesus sought his help "with my father's business, the problem," and that Hernandez replied: "I don't have a problem" (quotation marks omitted)); *id.* at 181 ("I didn't know Jesus Tundidor whatsoever."); *see also* DMSJ at 3 ("After Jesus joined the Council, he and Hernandez began texting each other about gym workouts, vacations, and Tundidor's newborn child, referring to each other as 'brother' and signing off with 'un abrazo.'").

Despite this testimony, the Plaintiffs maintain that "[t]here is ample evidence, especially when viewed in light most favorable to Plaintiffs, that the Raid . . . was a political hit job, ordered and/or orchestrated by Hernandez, against the Tundidors." Pl. Resp. at 10. And that "mosaic of evidence," they insist, consists of at least *twelve* parts: (1) "Hernandez's threats against Plaintiffs"; (2) "Hernandez's use of City resources to 'research' Plaintiffs' compliance with administrative codes"; (3) "the City's call to Jesus on behalf of the mayor's office regarding Bellas Cabaret"; (4) "the meeting scheduled prior to the Raid and rescheduled to a date following the Raid to address Plaintiffs' compliance"; (5) "the

18

involvement of multiple City departments who, for many years, had access to and prior knowledge of the condition of the building, had approved continued use of the building, had accepted payment for business tax receipts, and abandoned a permit without taking further action"; (6) "the Chief of Police and Building Official's knowledge, prior to the Raid, that Bellas Cabaret was owned by Jesus's family"; (7) "the highly inflammatory human trafficking objective of the Raid"; (8) "the unreasonable scope of the Raid"; (9) "the Building Official's imposition of the most extreme remedy, despite having broad discretion to impose a lesser sanction"; (10) "the presence and participation of the media at the City's invitation"; (11) "the number, scope, and nature of historical inspections at Bellas Cabaret"; and (12) "the use of the fabricated human trafficking narrative against Plaintiffs and Jesus by Hernandez and his consultants during the election." *Id.* at 10–11 (citations omitted).

That overstates the evidence. Seven of those twelve claims—even if true—provide no support for the theory that Hernandez "ordered and/or orchestrated" the raid. That the police knew the Tundidors owned Bellas doesn't confirm that *Hernandez* (as opposed to anyone else) masterminded the raid. So too the scope and investigatory purpose of the raid, the involvement of several departments, the presence of the media, the history of inspections, and the severity of the sanctions, none of which resembles a Hernandez-specific smoking gun. This evidence, to be sure, fits well with a theory of *vengeance*. But that leap requires speculation—and "[s]peculation does not create a genuine issue of fact[.]" *Robinson v. Sauls*, 46 F.4th 1332, 1344 n.7 (11th Cir. 2022) (quotation marks omitted).

Of those twelve so-called pieces of evidence, then, only five—the alleged threats, research, call, rescheduled meeting, and election-cycle comments—seem capable of supporting the Plaintiffs' claim. And those five pieces are *just* enough to survive summary judgment.

We'll start with James, Sr., who testified that Jesus Navarro conveyed a threat on behalf of Hernandez that "[y]ou need to tell your son to drop out or he's going to shut your businesses down." James, Sr. Dep. at 65; *see also id.* at 63–64 ("[I]t was almost as if Jesus was almost pleading with me.

19

You need to stop. This guy is serious."); *id.* at 66 ("Q. Jesus Navarro will say that . . . he advised you that the Mayor told him he would shut down your businesses? A. I believe that he will. Remember, they had a close relationship and blackmail is a way to do business in Hialeah." (citations omitted)); *id.* at 67–68 ("Q. So it's your position that the operation was initiated by the Mayor? A. Yes. Q. And what facts do you have to support that? A. Many. That he threatened my son. Then there was another threat through Jesus and through Christian . . . and I was warned and it happened so if you put the two together and figure maybe there's something here."); *see also* Navarro Dep. [ECF No. 214-13] at 14 ("I told him that . . . at the time it was not a good time for his son, according to what I had heard, to become a councilman.").

James, Jr. corroborated that testimony. He testified that, "at that meeting with Mr. Navarro and his son," "[w]e're told that the mayor is not happy that Jesus continues to run, and that he should stop running, and if he doesn't, the mayor is going to attack our businesses." James, Jr. Dep. [ECF No. 197-2] at 95; *see also id.* at 94 ("[At] a fundraiser that my brother goes to, . . . he ends up crossing paths and has a conversation with the mayor on the second time that he wants to appeal to the mayor . . . . [T]he mayor tells him, don't run. You shouldn't run. It's not your time . . . . So my brother asks, you know, so what do you want me to do? He says, don't run. You know, don't run. You have other things like your father's businesses to worry about. You should be worried about those. So don't run, if you know what's good for you.").

For his part, Jesus testified that, "a couple days before . . . the qualifying deadline," he "received a call . . . from the legal department . . . stating that I needed to come in to the city to discuss issues regarding . . . the license for the club[.]" Jesus Dep. [ECF No. 198-1] at 86; *see also id.* at 87 ("I asked where in any of that information do they see my . . . name, and it was made clear that they received direction from the administration to bring me in to have a meeting."); *id.* at 88 ("Q. The female on the phone told you . . . who directed her? A. That the . . . mayor's office had directed her

to call me."); *id.* at 245 ("A. I just told them that my name is Jesus and my name should not be anywhere on those documents. I'm not involved. How did you get my number? Q. And what was relayed to you? A. That the number was given to her by the mayor's office."); DSMF at 6 ("DoCampo attempted to reach James[,] Jr. for rescheduling purposes, but she could not get a hold of him and contacted Jesus instead.").

Testimony from Yesenia Gruich, a "business tax official for the City," also linked Hernandez to the raid. Gruich Dep. [ECF No. 214-3] at 8. On her telling, Daylen Docampo—the Assistant City Attorney responsible for "building, code[,] and business tax"—conducted "research" about the club's business-tax compliance on April 24, 2019, because the property "was brought up to her attention." *Id.* at 35. Gruich further explained that Docampo scheduled a meeting with James, Jr. for July 15, 2019, "for compliance to try and obtain compliance," but added that this meeting was later "set for . . . July 26, 2019," and then "rescheduled" again (on July 23, 2019) for "July 30, 2019." *Id.* at 104, 106, 111. And, as the Plaintiffs emphasize, Hernandez himself conceded that his campaign ran ads referencing "9-11 calls," "murder, prostitution, human trafficking and drugs" about "the businesses owned by the Tundidor family." Hernandez Dep. Part I at 279.

None of the Plaintiffs' evidence supplies *definitive* proof of Hernandez's involvement in the raid. But we don't need *definitive* proof. At summary judgment, "the court's function is not to weigh the evidence." *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018) (quotation marks omitted); *see also ibid.* ("Nor does Rule 56 require that an otherwise admissible affidavit be corroborated by independent evidence."). Even "[m]aking credibility choices between competing views of the evidence is inappropriate in summary judgment proceedings." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987). "Rather, on summary judgment, the district court must accept as fact all allegations the non-moving party makes, provided they are sufficiently supported by evidence of record." *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020).

The record today leaves us with two competing narratives. One suggests officials other than Hernandez pushed the operation—all without Hernandez's knowledge or involvement. The other—reliant on threats against the Tundidors that were allegedly made on Hernandez's behalf, on efforts within Hernandez's own office to dig into Bellas *before* the raid, and on the Hernandez campaign's disparagement of Bellas—supports the Plaintiffs' claim that Hernandez played *some* role in the raid. Either narrative could fall flat at trial. But "when competing narratives emerge on key events" at summary judgment, "courts are not at liberty to pick which side they think is more credible." *Sconiers*, 946 F.3d at 1263; *see also Stein*, 881 F.3d at 857 ("[N]othing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving. Indeed, . . . most affidavits submitted in response to a summary judgment motion are self-serving." (cleaned up)). We therefore deny both parties' summary judgment motions as to Counts I and II.

*   *   *

The Defendants liken the "Plaintiffs' version of events . . . to a degree of manipulation reminiscent of *The Truman Show*." DMSJ at 1 (emphasis added). But the Plaintiffs present credible evidence of Hernandez's role in the operation—and that's all that matters here. *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgement."). To the extent the operation occurred without *any* involvement from Hernandez, a reasonable jury might conclude that the operation would have proceeded anyway. *See Lozman*, 585 U.S. at 99 ("[T]he causal connection between the defendant's animus and the prosecutor's decision to prosecute is weakened by the presumption of regularity accorded to prosecutorial decisionmaking." (quotation marks omitted)). To the extent that Hernandez ordered the raid, a jury very well *might* see "a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury," *Nieves*, 587 U.S. at 398 (quotation marks omitted)—although there's no guarantee of that, *see*

22

*Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."). Either way, this causation question must be resolved by a jury, not by us.

But we *can* decide one thing today: Qualified immunity cannot shield Hernandez at this stage of the case if his animus indeed caused the raid. That's not because we find that the right to be free from political retaliation is insufficiently established. *See Bennett v. Hendrix*, 423 F.3d 1247, 1256 (11th Cir. 2005) ("[T]his Court has held since at least 1988 that it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights[.]"); *see also* Madison's Report on the Virginia Resolutions (Jan. 7, 1800), in 17 PAPERS OF JAMES MADISON 345 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991) (suggesting that the right to "examin[e] public characters and measures" through "free communication" is the "guardian of every other right"). Instead, it's because the Defendants request that we pass *no* judgment on that question. As they see it, "[w]ithout a violation by Hernandez, the Court *need not reach the question* of whether Plaintiffs' rights were clearly established." DMSJ at 15 (emphasis added); *see also ibid.* ("There can be no liability when there is no underlying constitutional violation."). The Defendants thus abandoned their qualified-immunity defense—at least for now.[5]

Resting solely on the first prong of the qualified-immunity inquiry strikes us as a strange choice. *See ibid.* ("With no evidence Hernandez violated a constitutional right, Plaintiffs bear the burden of showing that qualified immunity should not apply to bar their First Amendment retaliation claims against Hernandez[.]" (citations omitted)). But "[q]ualified immunity . . . is an affirmative defense that may be waived." *Edwards v. Grubbs*, 169 F.4th 1261, 1275 (11th Cir. 2026) (quotation

---

[5] We leave for another day the question of whether, given this forfeiture, the Defendants will be entitled to advance a qualified-immunity defense at trial.

marks omitted). And it's not our place to rewrite the Defendants' arguments. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) ("As federal courts do not have *carte blanche* to depart from the principle of party presentation basic to our adversary system, it is an abuse of discretion for a court to override a party's deliberate waiver." (cleaned up)).

### III.     The Fourth Amendment Claim

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). To that end, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Under one such exception, "[s]earch regimes where no warrant is ever required may be reasonable where special needs make the warrant and probable-cause requirement impracticable, and where the primary purpose of the searches is distinguishable from the general interest in crime control." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) (cleaned up). We call that exception an "administrative search." *Ibid.* (cleaned up).

The parties dispute whether the raid constituted an administrative search. The Defendants claim they conducted "a true administrative inspection," not some "pretext for an investigation of ordinary criminal wrongdoing," along with a brief "protective sweep." DMSJ at 17, 20. In the alternative, they insist that the "Plaintiffs' acquiescence and assistance in the search preclude[ ] a finding that . . . [the] Plaintiffs' rights were violated." *Id.* at 18–19 (emphasis omitted). The Plaintiffs

24

counter that the "Raid was not considered by the Police to be an administrative search of a closely regulated business," and that, in any event, "it was unreasonably excessive in execution and/or exceeded the permissible scope of such a search," PMSJ at 7; that the Defendants cannot "justify an unconstitutional search" as a mere protective sweep, Pl. Resp. at 18; and that "the Plaintiffs did not consent to the Police's search," *id.* at 14.

We examine each of these arguments below. *First*, we consider the administrative-inspection theory. *Second*, we move to the protective-sweep theory. *Third* and finally, we take up the consent-based theory. In the end, only the last prevails.

### a.   The Administrative-Inspection Theory

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment[.]" *Katz v. United States*, 389 U.S. 347, 357 (1967). "We have recognized exceptions to this rule, however, when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989) (quotation marks omitted). "Included in this exception are searches of . . . highly regulated businesses" as well as "administrative searches designed to assure compliance with building codes." *Benjamin as Tr. of Rebekah C. Benjamin Tr. v. Stemple*, 915 F.3d 1066, 1069 (6th Cir. 2019) (Sutton, J.). In the former, officers can dispense with a warrant if they satisfy the three-part test set forth in *New York v. Burger*, 482 U.S. 691 (1987). Not so in the case of the latter, which requires that the subject of the search receive "an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420.

Our Defendants principally claim that they conducted an administrative inspection of a closely regulated industry and so were excused from any need for a warrant, probable cause, or pre-compliance review. We disagree. Bellas indeed counts as a closely regulated business with weakened privacy expectations. But the Defendants fail the *Burger* test and thus cannot use the administrative-

inspection exception to evade the strictures of the Fourth Amendment.

### i.   Closely Regulated Industries

"[A]n exception from the search warrant requirement has been recognized for pervasively regulated businesses and for closely regulated industries long subject to close supervision and inspection." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) (cleaned up); *see also ibid.* ("Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise . . . . [W]hen an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation."). Our analysis thus begins by considering whether the industry in which Bellas operates qualifies as "closely regulated."

Over the course of the last half-century, the Supreme Court "has identified only four industries" that fit that bill: "liquor sales"; "firearms dealing"; "mining"; and "automobile junkyard[s]." *Patel*, 576 U.S. at 424. In declining to expand that list, the Supreme Court seeks to prevent "what has always been a narrow exception [from] swallow[ing] the rule." *Id.* at 424–25. Most recently, it declined to "classify hotels as pervasively regulated," holding that "nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare." *Id.* at 424.

The Defendants find it "undisputed that liquor establishments, including nightclubs and bars like Bellas[,] are closely regulated." DMSJ at 15 (quotation marks omitted). We agree. The "liquor industry" has "long [been] subject to close supervision and inspection." *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970). Indeed, "this strict regulation, which began in England and was adopted by the American Colonies, preceded the enactment of the Fourth Amendment." *Crosby v. Paulk*, 187 F.3d 1339, 1346 (11th Cir. 1999); *see also United States v. Biswell*, 406 U.S. 311, 315 (1972) (explaining that "governmental control of the liquor industry" is "deeply rooted in history"); *Zadeh v. Robinson*, 928 F.3d 457, 466 (5th Cir. 2019) ("English commissioners could inspect brewing houses on

demand in the 1660s, and . . . a 1791 federal law that has continued in various forms [ ] permit[s] federal officers to perform warrantless searches of distilleries and imposing an excise tax on distilled liquor.").

To be sure, the parties often refer to Bellas as an *adult-entertainment*, not *liquor-serving*, establishment. *See, e.g.*, Compl. ¶ 4 ("Plaintiffs . . . own and operate Bellas, an adult entertainment venue[.]"); *id.* ¶ 18 (describing "Porky's" as "an adult entertainment venue"); *id.* ¶ 69 ("[T]he police yelled for the music to stop and the lights to be turned on inside the adult entertainment venue."); *id.* ¶ 79 (noting that Villa told James, Jr. and Dulce that he'd never seen "such a 'clean' strip club"); *id.* ¶ 150 (referencing the "Tundidor family's adult entertainment businesses"); DMSJ at 20 (deeming Bellas "[a] strip club with a history of human trafficking"); DSMF at 10 ("The officers entered the locker room . . . to . . . see if anyone was forced to be at the strip club."). Even so, our Circuit's precedents foreclose any attempt to recast Bellas as a *non*-closely regulated industry.

In *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231 (11th Cir. 2022) (Marcus, J.), the Eleventh Circuit found the "adult entertainment industry" "closely regulated for Fourth Amendment purposes." *Id.* at 1248. As a preliminary matter, the panel acknowledged that, "[e]ven though closely regulated industries are the exception and not the rule, the lower federal courts have recognized a number of additional industries" beyond the four listed in *Patel. Ibid.* And, as to the merits, it explained that "the nude dancing and adult entertainment industry" has "a substantial history of heavy regulation"—from "limitations concerning the hours of operation, to zoning restrictions, to prohibitions on their ability to serve alcohol, to rules governing the very size of the establishments"— such that "no reasonable expectation of privacy could exist for the proprietor." *Id.* at 1249.

Our Plaintiffs thus cannot escape "the unique problem of inspections of closely regulated businesses." *Burger*, 482 U.S. at 700 (quotation marks omitted). The Plaintiffs' "expectations of privacy . . . are diminished by reason of their participation in an industry that is regulated pervasively

to ensure safety[.]" *Skinner*, 489 U.S. at 627; *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 271

(1973) ("The businessman in a regulated industry in effect consents to the restrictions placed upon

him."). We can therefore proceed with "a more relaxed standard for interpreting whether a

warrantless-search ordinance is constitutional." *Club Madonna*, 42 F.4th at 1249.[6]

---

[6] We might characterize the challenge we've rejected above as a *hybrid*-industry theory, under which one aspect of a business (say, its adult-entertainment offerings) overshadows another (its license to serve liquor). And we think this challenge finds support in both *Patel*—which deemed the hotel industry insufficiently regulated, even though hotels serve alcohol—and *Club Madonna* itself, which treated the relevant venue as an *adult-entertainment* (not liquor-serving) establishment. If it has bite, this theory might cast doubt on *Club Madonna* for two reasons.

*First*, *Patel* suggests that the four-exception list is *near*-exhaustive. *See Patel*, 576 U.S. at 424 ("Over the past 45 years, the Court has identified only four industries with such a history[.]" (cleaned up)). And more than a decade has passed without the Supreme Court expanding that list. Some circuits, to be sure, refuse to read *Patel* narrowly. *See, e.g.*, *Killgore v. City of S. El Monte*, 3 F.4th 1186, 1191 (9th Cir. 2021) ("Killgore does not cite any authority suggesting that *Patel* detonated the long line of cases applying the 'closely regulated' industry doctrine to additional businesses."); *Bell v. City of Chicago*, 835 F.3d 736, 741 (7th Cir. 2016) ("*Patel* . . . was not a seismic shift in Fourth Amendment jurisprudence[.]"). But others recognize the uncertainty *Patel* has engendered. *See, e.g.*, *Rivera-Corraliza v. Morales*, 794 F.3d 208, 219 & n.16 (1st Cir. 2015) (noting that the argument that "tightly-regulated businesses are only those businesses that deal with devices that could endanger lives (*e.g.,* guns) or that can serve as a fence for stolen goods (*e.g.,* auto junkyards)" "may have more traction given the Court's *Patel* decision"); *W. Oilfields Supply Co. v. Sec'y of Lab. & Fed. Mine Safety*, 946 F.3d 584, 590 (D.C. Cir. 2020) (Garland, C.J.) ("The Court has 'identified' mining as one of the *few* such industries." (emphasis added)).

*Second*, *Patel* excludes industries that "*can* be put to use for nefarious ends," but which aren't themselves "intrinsically dangerous." 576 U.S. at 424 n.5 (emphasis added); *see also Donovan v. Dewey*, 452 U.S. 594, 602 (1981) ("[T]he mining industry is among the most hazardous in the country[.]"). *Compare Owner-Operator Indep. Drivers Ass'n v. United States Dep't of Transportation*, 840 F.3d 879, 894 (7th Cir. 2016) ("[T]he Supreme Court signaled in *Patel* that courts should consider whether the industry is inherently dangerous."), *and Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024) ("If the new industry presents a substantial new threat (such as the nuclear-power industry), it could still be considered closely regulated despite the absence of any history specific to the industry."), *with Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 968 (5th Cir. 2023) ("Appellants fail to identify any textual or historical reason why the Fourth Amendment distinguishes between industries that pose a clear and significant risk to the public welfare, and those that do not."), *and Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 284 (6th Cir. 2018) ("Plaintiffs argue that *Patel* . . . limit[s] the businesses that may qualify as closely regulated to only those that are ultra-hazardous. We disagree." (cleaned up)). So, while we await further guidance on this part of the *Patel* test, we recognize that the *hazards* inherent in the adult-entertainment industry differ to a significant degree from those involved in, for instance, nuclear activities.

## ii.   The *Burger* Test

"Because the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context." *Burger*, 482 U.S. at 702 (citations omitted). Still, "even warrantless searches of businesses in closely regulated industries must meet three criteria, as delineated by the Supreme Court in *New York v. Burger*, in order to be deemed reasonable[.]" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 281 (6th Cir. 2018). *First*, "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Burger*, 482 U.S. at 702. *Second*, "the warrantless inspections must be necessary to further the regulatory scheme." *Ibid.* (cleaned up). *Third*, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* at 703.

Applied here, the first two parts of that test support the Defendants' administrative-inspection theory. As to the first prong, the government maintains a strong interest in combatting both alcohol-related dangers and human trafficking. *See Pitt News v. Pappert*, 379 F.3d 96, 106 (3d Cir. 2004) ("There can also be no dispute that the asserted government interests—preventing underage drinking and alcohol abuse—are, at minimum, 'substantial.'"); *Club Madonna*, 42 F.4th at 1250 ("[C]urbing human trafficking and barring underage persons from dancing nude on a public stage are substantial

---

In time, the Supreme Court might revisit *Patel* to confirm whether anything beyond the liquor, mining, automobiles, and arms industries counts as closely regulated. It might even rule out the adult-entertainment industry entirely. *See, e.g.*, *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 170 (3d Cir. 2016) ("The pornography industry, like the hotel industry in *Patel*, is not subjected to a level of regulation even approximating the pervasive regulation aimed at the liquor industry, firearms dealing, mining, or independent automobile junkyards." (citations omitted)). Today, however, we remain bound by *Club Madonna*. *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("A circuit court's decision binds the district courts sitting within its jurisdiction[.]").

governmental interests."); *Killgore v. City of S. El Monte*, 3 F.4th 1186, 1192 (9th Cir. 2021) ("[T]here is no question that curtailing prostitution and human trafficking is a substantial government interest."). And, as to the second prong, "the lack of strict temporal limitations is essential to the effectiveness of the . . . regulatory scheme." *Club Madonna*, 42 F.4th at 1231. After all, "[r]equiring inspectors or other law enforcement agents to obtain warrants before conducting an investigation might alert nightclub and bar owners to the impending inspection, which would defeat the purpose of the inspection[.]" *Crosby*, 187 F.3d at 1347; *see also City of Ontario v. Quon*, 560 U.S. 746, 763 (2010) ("This Court has repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment . . . . Judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the government might have been accomplished." (cleaned up)).

That brings us to the final prong—the notice, scope, and discretion afforded by a regulatory statute. Our Defendants identify three candidates. *First*, they look to the "Florida State Beverage Law," DMSJ at 8, which provides that "[l]icensees, by the acceptance of their license, agree that their places of business shall always be subject to be inspected and searched without search warrants by the authorized employees of the division and also by sheriffs, deputy sheriffs, and police officers during business," FLA. STAT. § 562.41(5); *see also* § 562.41(2) ("Any . . . officer may enter in the daytime any building or place where . . . any alcoholic beverages, are manufactured, produced, or kept, so far as may be necessary, for the purpose of examining said beverages. When such premises are open at night, such officers may enter them while so open, in the performance of their official duties."). *Second*, the Defendants rely on CITY OF HIALEAH, FLA., CODE OF ORDINANCES ch. 18, art. V, § 18-208, which provides that "[i]t shall be unlawful for any establishment providing entertainment and/or consumption of alcoholic beverages . . . to refuse or prevent reasonable inspection by police officers during any time in which the establishment is open for business." *Third*, the Defendants invoke CITY

OF HIALEAH, FLA., CODE OF ORDINANCES ch. 38, art. V, § 38-36—the "Fire Prevention Code."

DMSJ at 7. Section 38-36(a) provides that "[a]ny person authorized by the fire chief to enforce the

fire prevention code may, at any reasonable time, enter, monitor, sample, test, and inspect, as often as

may be necessary, any property . . . to enforce the provisions of the fire prevention code[.]" And § 38-

36(d) states that "[a]n inspection, entry, monitoring, testing and sampling pursuant to this section may

be conducted only after: (1) Consent . . . is received from the owner or person in charge of the

property, building, premises or place; or (2) An inspection warrant is obtained."

We needn't decide whether those statutes satisfy the *Burger* test because none relates to the

express purpose of the raid. Sections 562.41 and 18-28 regulate the sale and consumption of alcohol,

while § 38-36 concerns fire safety.[7] In our case, of course, the Defendants insist that "the *primary*

purpose of the operation . . . was limited to detecting evidence of human trafficking." DMSJ at 17

(emphasis added). Given that concession, we cannot deem the Defendants' conduct "routine or

administrative." *Bruce v. Beary*, 498 F.3d 1232, 1245 (11th Cir. 2007); *see also Swint v. City of Wadley*, 51

F.3d 988, 998 (11th Cir. 1995) ("While legislative schemes authorizing warrantless administrative

searches of commercial property do not necessarily violate the Fourth Amendment, pretextual

administrative searches do." (cleaned up)); *United States v. Grey*, 959 F.3d 1166, 1183 (9th Cir. 2020)

("If the person challenging the execution of the warrant shows that the officers' primary purpose was

to gather evidence in support of an ongoing criminal investigation, the conduct does not satisfy the

---

[7] We'll note, in any event, that § 38-36—which the Defendants invoke in a footnote—conditions inspections on *consent* or a *warrant*. *See Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989, 992 (11th Cir. 2010) ("[B]ecause Bell mentions its . . . argument in passing in a footnote only and does not elaborate on it in any further detail in either one of its briefs, we deem this argument waived."). Arguing that § 38-36 authorizes *warrantless*, *non-consensual* inspections thus defies plain meaning. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1336 n.5 (11th Cir. 2025) ("If a party makes only a passing reference to an argument in a footnote of its brief, the argument is waived." (cleaned up)).

Fourth Amendment."); *Ruttenberg v. Jones*, 283 F. App'x 121, 133 (4th Cir. 2008) ("[A search] so divorced from a regulatory purpose . . . cannot be considered administrative in nature that the Fourth Amendment is transgressed."); *Generis Ent., LLC v. Donley*, 2026 WL 473765, at *4 (6th Cir. Feb. 19, 2026) ("[I]f the true purpose of a search is not administrative but is instead to investigate a crime, that search is not conducted for the sort of 'special need' that would exempt it from the warrant requirement.").

To be sure, "suspicions about criminal wrongdoing do not . . . render an administrative inspection pretextual." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 198 n.7 (5th Cir. 2009); *see also Burger*, 482 U.S. at 716 ("The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect."). Courts often decline "to use the label 'pretext' simply because of an overlap between an administrative search and a criminal search." *Cotropia v. Chapman*, 978 F.3d 282, 290 (5th Cir. 2020) (quotation marks omitted). And, for its part, the Eleventh Circuit has refused to "draw a brightline rule" clarifying the level of "specific suspicion of wrongdoing" that turns a purportedly administrative search into an unlawful evidence-gathering exercise. *Landau v. City of Daytona Beach*, 2023 WL 6622208, at *8 (11th Cir. Oct. 11, 2023).

But things are much simpler here. Unwittingly or not, the Defendants *admit* that they used alcohol- and fire-specific regimes to investigate something *other than* alcohol and fire. *See* DMSJ at 17 ("[T]he primary purpose of the operation was not to detect evidence of ordinary criminal wrongdoing, and was limited to detecting evidence of human trafficking."); Def. Resp. at 11 (noting that "the purpose of the inspection" was "to investigate any traces of human trafficking"). Instead of defending the raid as a standard-fare alcohol-and-fire inspection of a business with human-trafficking risks,[8] in

---

[8] And such an argument finds record support. *See, e.g.*, Villa Dep. Part I [ECF No. 214-9] at 23–24 ("Major Ruiz told me to put on inspection together and for Bellas Cabaret, and that we're going

other words, the Defendants concede *the opposite*—that they went looking for human trafficking but kept an eye out for alcohol and fire violations.[9]

The administrative-search context (it's true) invites difficult questions. *See Bruce*, 498 F.3d at 1241 ("We share our sister circuits' concern that the administrative search exception not be allowed to swallow whole the Fourth Amendment."). But "one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations." *Burger*, 482 U.S. at 724 (Brennan, J., dissenting); *see also Verdun v. City of San Diego*, 51 F.4th 1033, 1040 (9th Cir. 2022) (Bress, J.) ("[W]arrantless administrative searches must bear a sufficient connection to the governmental interests they serve and cannot advance as their 'primary purpose' uncovering evidence of ordinary criminal wrongdoing." (cleaned up)); *Abel v. United States*, 362 U.S. 217, 226 (1960) ("The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts."). In our case, as we've said, the Defendants admit to executing an "operational plan" that does just that:

> The Hialeah Police Department will be conducting a business check at Bellas Cabaret *with the intent to locate any traces of Human Trafficking.* Also, a business license and safety operational check will be conducted. In the event a Human Trafficking case is located, a special Victims Detective will be present and D.C.F. will be notified. Other City of Hialeah departments will be available to conduct a safety and license check at the scene.

Operations Plan at 517–18 (emphasis added).

That plan "hardly seems to be what the Supreme Court had in mind in *Burger* when it held that the Constitution is not offended by statutes authorizing the regular, routine inspection of books and records[.]" *Bruce*, 498 F.3d at 1244; *see also Landau*, 2023 WL 6622208, at *7 ("The level of advanced

---

to do an inspection for the license. And since we were going to do that as well, to also look at the human trafficking factor of it, so I was instructed to put an operational plan together and get all units involved to be able to conduct this inspection.").

[9] Making matters worse, the Defendants neglect to pinpoint a statute authorizing code inspections. They instead invoke alcohol- and fire-specific regulations, which they claim somehow allow for building-code inspections.

planning undertaken well before the administrative search was conducted . . . exhibited the hallmarks of a direct and extensive criminal investigation."). On the record before us, in short, we cannot say that the raid constituted an administrative inspection.[10]

\*   \*   \*

The Defendants insist that "[i]t is not the role of the court to tell local government how to conduct an administrative search to enforce state beverage laws as to underage and alcohol sales." DMSJ at 20. Our Constitution says otherwise. *See Fuqua v. Turner*, 996 F.3d 1140, 1150–51 (11th Cir. 2021) ("Traditional police searches as well as administrative inspections designed to enforce regulatory statutes are within the Fourth Amendment's ambit." (quotation marks omitted)); *Indigo Room, Inc. v. City of Fort Myers*, 589 F. App'x 938, 945 (11th Cir. 2014) ("The Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial businesses.").

"[A]bsent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance

---

[10] Another note on probable cause. "[T]he exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes." *Whren v. United States*, 517 U.S. 806, 811–12 (1996). So, given their concession, the Defendants needed probable cause to conduct the raid. *See Michigan v. Tyler,* 436 U.S. 499, 508 (1978) ("[I]f the authorities are seeking evidence to be used in a criminal prosecution, the usual standard of probable cause will apply." (quotation marks omitted)); *see also Landau*, 2023 WL 6622208, at \*5 n.4 ("The Supreme Court has made clear that administrative searches do require an analysis of pretext, *because* they are exempt from the Fourth Amendment's probable cause requirement.").

To be sure, the Defendants claim to have harbored suspicions of criminal conduct. They note, for instance, that Bellas has "a history of human trafficking, Russian mob connections, and regular calls for service from the police department." DMSJ at 20; *see also id.* at 3 (emphasizing a "history of uncorrected life safety issues"); *id.* at 11 (referencing "a history of nine years of problems at Bellas"); DFR at 3 ("In the one-year period prior to July 25, 2019, there were several disturbances and HPD was called for service to Bellas including larceny, burglary, and assault and battery."). But the Defendants never argue that they *had* probable cause, so we see no need to consider whether probable cause might have justified the raid.

review before a neutral decisionmaker." *Patel*, 576 U.S. at 420. The Defendants never suggest that the Plaintiffs received any such opportunity. Nor do they identify *any* exigent circumstances. And while we can "excuse" the precompliance-review requirement in the context of a closely regulated industry, we may do so only "sparingly"—and only upon the satisfaction of the three-part *Burger* test. *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 108 (2d Cir. 2025). Since the Defendants fail that test, the administrative-search exception doesn't help them here.

### b.  The Protective-Sweep Theory

The Defendants also defend the raid as a protective sweep. In their view, the officers "were executing a lawful administrative inspection" and so needed to "conduct[ ] a protective sweep" for "the security and safety of officers." DMSJ at 20. That "sweep," they say, was "short" and "not a full-blown search," as the officers "only opened doors that were large enough to harbor a person." *Ibid.* The Plaintiffs reject that justification, arguing that the Defendants committed an "unconstitutional search" beyond the bounds of a "good faith administrative search" and that "the propriety of any such sweep presupposes lawful entry." Pl. Resp. at 18.

This second theory fares no better than the first. As a preliminary matter, the Defendants *weren't* conducting a lawful administrative inspection, as we've explained. In any event, protective sweeps require "reasonable suspicion that the area to be swept harbors an individual posing a danger to those on the . . . scene." *United States v. Yarbrough*, 961 F.3d 1157, 1163 (11th Cir. 2020) (quotation marks omitted). Here, however, the Defendants extract from the club's (allegedly) checkered past a generalized, historical risk. And rather than identify "*specific and articulable facts* which, viewed in the totality of the circumstances, gave rise to a reasonable suspicion justifying a protective sweep," *id.* at 1165 (emphasis added), the Defendants simply insist that "[a] strip club with a history of human trafficking, Russian mob connections, and regular calls for service from the police department, undoubtedly supports a concern for the security and safety of officers," DMSJ at 20.

That might be true on the merits. But protective sweeps require "specific and articulable facts"—"not a mere inchoate and unparticularized suspicion or hunch"—of "an armed and dangerous individual." *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (quotation marks omitted); *see also United States v. Serrano-Acevedo*, 892 F.3d 454, 460 (1st Cir. 2018) (rejecting a sweep based on "unfounded speculation" rather than "articulable facts" (quotation marks omitted)); *United States v. Walker*, 143 F.4th 889, 897 (7th Cir. 2025) ("[T]he district court erred by concluding that officers may initiate a protective sweep following an arrest merely based on the possibility that other persons could be present. More is required. A protective sweep requires officers to have reason to believe the premises harbor not just a person, but a person who poses a *danger* to those on the scene."); *United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004) ("Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course[.]").

Reasonable suspicion can make for a "low threshold," requiring only "a minimal level of objective justification." *United States v. Johnson*, 163 F.4th 933, 938 (5th Cir. 2026) (quotation marks omitted); *see also Yarbrough*, 961 F.3d at 1165 ("The multiple cars indicated multiple people on the property; the tips about the drugs indicated multiple people who may have had access to weapons; and Shellie's refusal to follow police directions indicated that, if other people were in the house, they might have likewise been non-compliant."); *United States v. Rivera*, 824 F. App'x 930, 934 (11th Cir. 2020) ("[T]hey also had reason to believe that Rivera was a suspect in multiple robberies involving the use of [a] short-barreled shotgun and that he had been assisted by one or more persons in a Ford Expedition. Moreover, . . . [t]he officers had not been monitoring the door . . . . So, there was a risk that the motel room contained another unknown person with access to a firearm."); *United States v. Dabrezil*, 603 F. App'x 756, 760 (11th Cir. 2015) ("Officer Catlin was lawfully within the residence because exigent circumstances existed; he too was responding to a 911 call that reported a domestic

assault with injuries and it was objectively reasonable to believe that someone inside was in danger.”). In failing to offer *any* real-time facts about the events of the evening, however, our Defendants shirk that modest burden.

Perhaps enough information existed to justify a protective sweep. *See* DMSJ at 9 n.10 (“One of the patrons advised the officers that he had a gun.”); DFR at 3 (“In the one-year period prior to July 25, 2019, there were several disturbances and HPD was called for service to Bellas including larceny, burglary, and assault and battery.”). But the Defendants fail to offer any such information— and we cannot do it for them. *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) (“To prevail on a particular theory . . . a party must present that argument to the district court. Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties.” (citations omitted)).

We should note, though, that, even if we were to scour the record for supportive evidence, we’d find datapoints that undermine the Defendants’ position. *See* Villa Dep. Part II [ECF No. 214-10] at 32 (“[W]e have to do” a “safety sweep . . . of every aspect of that location once we’re inside”— “for my officer safety and also for anything else that might be going on. For all we know they could have children tied up down there, we don’t know that.”); Perez Dep. at 224 (“Q. You weren’t looking for indicia of safety in the building? A. I wasn’t.”) So, without the Defendants themselves contextualizing the record and developing their argument, we cannot—on the briefing before us— chalk up the operation to a protective sweep.

But there’s still another issue with this theory. Although sweeps can “last no longer than is necessary to dispel the reasonable suspicion of danger,” *Buie*, 494 U.S. at 335–36, the Defendants never clarify just how long this “short sweep” lasted, DMSJ at 20. Of course, “[t]he brevity of [a] sweep is a point in favor of its justification.” *Yarbrough*, 961 F.3d at 1165. The sweep at issue in *Yarbrough*, for instance, “took approximately one minute.” *Ibid.* And courts “typically approve[ ] only

short sweeps[.]" *United States v. Hernandez-Mieses*, 931 F.3d 134, 142 (1st Cir. 2019); *see also United States v. Alatorre*, 863 F.3d 810, 815 (8th Cir. 2017) (approving a sweep that "lasted two minutes"); *United States v. Henderson*, 748 F.3d 788, 793 (7th Cir. 2014) ("[N]o longer than five minutes[.]"); *United States v. Laudermilt*, 677 F.3d 605, 608–09 (4th Cir. 2012) ("from start to finish, lasted about five minutes"); *United States v. Hauk*, 412 F.3d 1179, 1184 (10th Cir. 2005) ("approximately five to ten minutes"). All we know here is that "[t]he inspection, from first-one-in to last-one-out, lasted a little over two . . . hours[.]" DMSJ at 22. We presume—though the Defendants never say so—that the sweep comprised only a portion of those two hours. *See* Def. Resp. at 16 (explaining that, "[a]fter a brief protective sweep," the officers "check[ed]" the dancers for identification and "then maintained a perimeter while the Fire and Building personnel inspected"). But the Defendants never specify—and, again, it's not our place to do their job for them.

*   *   *

The Defendants invoke the protective-sweep doctrine without supplying specific facts or a timeline—and despite searching the *entire* "premises." Def. Rep. at 16; *but see Buie*, 494 U.S. at 335 ("We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless *not a full search of the premises*, but may extend only to a cursory inspection of those spaces where a person may be found." (emphasis added)). The doctrine thus cannot insulate them from Fourth Amendment liability.[11]

---

[11] The protective-sweep doctrine evolved in the context of an *arrest. See Buie*, 494 U.S. at 327, ("A 'protective sweep' is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others." (emphasis added)). But several circuits—including our own—have extended it beyond that context. *See United States v. Timmann*, 741 F.3d 1170, 1181 (11th Cir. 2013) ("A protective sweep may also be undertaken without an arrest warrant, so long as the officers are lawfully within the premises[.]"); *see also United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005) ("[W]e hold that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant."); *United States v. Gould*, 364 F.3d 578, 584 (5th Cir. 2004) ("[W]e hold that arrest is not always, or *per se,* an indispensable element of an in-home protective sweep, and that although arrest may be

38

### c. The Consent-Based Theory

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Having failed to establish the administrative-inspection or protective-sweep exceptions to the warrant requirement of the Fourth Amendment, the Defendants invoke a consent-based theory. They claim that the "Plaintiffs' acquiescence and assistance in the search preclude[ ] a finding that the totality of the circumstances create an inevitable conclusion that Plaintiffs' rights were violated." DMSJ at 18–19 (emphasis omitted). After careful review, we agree.

"While the Fourth Amendment generally prohibits the warrantless entry of a person's home, the prohibition does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *United States v. Estadella*, 167 F.4th 1163, 1175–76 (11th Cir. 2026) (cleaned up). But not all consent triggers this exception. Consent must instead "be the product of a free and voluntary choice"—a question that "must be decided in light of the totality of the circumstances." *Andre v. Clayton Cnty.*, 148 F.4th 1282, 1301 (11th Cir. 2025) (quotation marks omitted).

The parties dispute whether the Plaintiffs consented—explicitly or implicitly—to the raid. The Defendants emphasize that, "at no point did the Plaintiffs, specifically James[,] Jr., refuse entry or access to HPD, Building, Code, or Fire personnel to any area requested." Def. Resp. at 13. Specifically, they tell us that "[t]he undisputed video footage shows that James[,] Jr. was friendly and compliant at all times, escorting City personnel through the building, shaking hands with City officials and making

---

highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances.").

The Defendants don't point to any exigent circumstances here. And we've already rejected the use of the administrative inspection. But even if a multi-departmental effort to uncover human trafficking and underage drinking in a strip club *does* qualify for protective-sweep consideration, the Defendants nonetheless fail to establish the doctrine's remaining requirements.

friendly conversation with Major Fernando Villa." *Id.* at 14 (emphasis omitted). Indeed, they continue, James, Jr. "even offered a step ladder for inspection into the attic," "willingly gave the City of Hialeah employees access to all parts of the building," and—when he "could not access one of the rooms"— "requested that his mother bring him the key in order to have it opened for the officers." DMSJ at 19; *see also ibid.* ("Notably, Dulce immediately went to the business, never called a lawyer, never considered not bringing the key, and did not instruct Jr. to refuse access." (quotation marks omitted)). What's more, the Defendants note that "the undisputed video evidence is devoid of any officers threatening force or coercing Plaintiffs to conduct the inspection or open the locked doors, nor were they verbally abusive toward James[,] Jr. or Dulce." Def. Resp. at 14 (emphasis omitted); *see also* Def. Reply Facts [ECF No. 228] at 6 ("No doors were broken down. James[,] Jr. opened up 'anything they asked me to open.' James[,] Jr. even gives a thumbs up to Villa." (citations omitted)).

The Plaintiffs contest that narrative. They maintain that they "did *not* consent to the Police's search of Bellas" and that "consent cannot be inferred" "[i]n light of the totality of the circumstances." Pl. Resp. at 14 (emphasis added); *see also* PSMF at 5 ("Plaintiffs did not consent to a search of Bellas Cabaret with the use of a Police K9 unit, including in the lockers, dressing room, the entertainers' belongings, and likely the basement, as well."); *ibid.* ("The Police did not seek permission from Bellas Cabaret to allow media access to the property or for crime scene technicians to photograph the premises despite a notice warning: 'no photos or videos allowed.'"). In any event, they add, "[n]o valid consent can exist when a group of officers gain entry by a show of official authority under the pretext of an administrative inspection, looking for evidence of criminality, without . . . providing an essentially free and unconstrained choice." Pl. Resp. at 14 (quotation marks omitted); *see also ibid.* (arguing that, "[h]ad Plaintiffs denied Police access," they "would have been subject to criminal liability, a misdemeanor").

"When evaluating the totality of the circumstances underlying consent, we look at several factors, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1307 (11th Cir. 2021) (quotation marks omitted); *see also United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984) (enumerating those factors and explaining that "none . . . is dipositive"). Still, "there is no neat talismanic definition of voluntary consent," so "[w]e look to the specific facts of the case to decide if a person's consent to search was voluntary." *United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (cleaned up). "The government has the burden to prove that consent was freely and voluntarily given." *United States v. Hankerson*, 2024 WL 3668487, at *4 (11th Cir. Aug. 6, 2024). As we explain below, our Defendants have met that burden here.

This Section proceeds in seven parts. *First*, we'll consider the officers' entry into Bellas. *Second*, we'll turn to the officers' search of the attic and basement. *Third*, we'll do the same for the locked office. *Fourth*, we'll move to the dressing room. *Fifth*, we'll consider the officers' use of a K-9 sniff. *Sixth*, we'll cover the scope of any consent offered by the Plaintiffs. And *seventh*, we'll examine whether the presence of the media impacts the constitutional calculus.

### i. The Entrance

We'll start with the officers' entrance. According to the Defendants, "[e]ight officers"—none with their faces "covered"—"arrived around 10:50 p.m." DSMF at 9; *but see id.* at 9 n.9 ("The undercover narcotics detectives concealed their faces when they entered the building."). "Six officers entered through the main floor, with two going down the stairs at the entrance." *Id.* at 9. The Defendants say that "no weapons were drawn" and that the officers "walked in slowly to the point that no one moved or noticed until the music turned off and the lights came on." *Ibid.*

41

On the Plaintiffs' telling, the "[p]olice"—"wearing tactical gear"—"entered Bellas," "demanded that the music stop," "turned on" the lights, and "commanded that the employees of the establishment[] . . . be separated from the patrons in order to investigate the human trafficking aspect of it." PSMF at 3 (quotation marks omitted). At that point, the Plaintiffs say, the "dancers, staff, and patrons were told by Police not to move, to sit down and put their hands up," with "[m]any subjected to pat downs." *Id.* at 4.

Neither side claims the officers sought—or that anyone withheld—consent to *enter* Bellas. Indeed, the evidence suggests that James, Jr. was in the basement during the entrance and that Dulce was home. *See* James, Jr. Dep. at 85 ("I was in the lower level of the club, and all of a sudden . . . the music goes off."); Dulce Dep. at 66 ("I was at home. My son called me because he needed to open the office."). But that's beside the point. Whether the officers lawfully accessed each part of Bellas— the basement, attic, dressing room, and locked office—requires a fact-specific analysis. But whether they lawfully entered Bellas in the *first instance* isn't a question that turns on consent.

"[A] business establishment or an industrial or commercial facility enjoys certain protections under the Fourth Amendment." *Dow Chem. Co. v. United States*, 476 U.S. 227, 235 (1986). "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *Burger*, 482 U.S. at 700. For that reason, no "reasonable expectation of privacy" exists "in areas of [a] store where the public [i]s invited to enter and to transact business." *Maryland v. Macon*, 472 U.S. 463, 469 (1985). Instead, "the owner of commercial property has a reasonable expectation of privacy in those areas immediately surrounding the property only if affirmative steps have been taken to exclude the public." *United States v. Hall*, 47 F.3d 1091, 1096 (11th Cir. 1995).

Bellas is a commercial property that's open to the public. *See* PSMF at 6 (noting that the "basement" and "locked office" were "not open to the public"). And the police arrived during

42

business hours, while customers were patronizing the club. So, as circuits across the country have recognized, the mere fact that the officers *entered* Bellas without a warrant and without consent isn't itself violative of the Fourth Amendment. *See United States v. Long*, 797 F.3d 558, 566 (8th Cir. 2015) ("The district court thus did not err in concluding Long had no reasonable expectation of privacy in the public areas of the OC Store where the evidence was left in plain view because the store was open to the public when Officer Spargur entered."); *Patel v. City of Montclair*, 798 F.3d 895, 897 (9th Cir. 2015) ("Police officers do not conduct a search within the meaning of the Fourth Amendment merely by entering an area of private, commercial property that is open to the public."); *United States v. Bute*, 43 F.3d 531, 537 (10th Cir. 1994) ("Law enforcement officials may enter commercial premises at the times they are open to the public but may not enter without consent premises to which the public at large does not have access." (cleaned up)). If anyone could enter Bellas at that time of evening, therefore, so too could the officers. *See Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011) ("In carrying out their duties, the police are free to go where the public would be expected to go.").

That's especially true here. "It is well-established that police officers can enter onto residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business." *Ibid.* Here, the officers arrived at a *commercial* property to attempt to conduct an inspection pursuant to certain statutory regimes. Those regimes, as it turned out, didn't authorize the warrantless inspection that ensued. But that doesn't mean the police lacked the right to *enter* Bellas. To the contrary, § 562.41(2) makes plain that, when "any building or place where . . . any alcoholic beverages, are manufactured, produced, or kept" is "open at night," "officers may enter them while so open, in the performance of their official duties."

Evidence establishing coercion might change this outcome. But nothing in the record suggests that the officers forced their way into Bellas. And the video footage shows the officers making a calm, slow entrance, with patrons and dancers mainly nonplussed and cooperative. *See* Camera 6 at 21:50;

43

DSMF at 9 ("One patron even continued to smoke hookah after they were told to put their hands up."); *id.* at 21 ("[T]he individuals immediately at the entrance door remain staring at their phones without incident[.]"); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) ("There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts th[is] version of the story[.]").

Here's where that leaves us. Nothing prevents officers from walking into publicly available areas of commercial properties that are open for business—and nothing precludes them from observing what they can see in plain view in those areas. Section 562.41(2), in any event, entitled the officers to enter Bellas during those hours. And, on the record before us, we cannot say that the officers used unlawful force to gain entry to the premises. The officers therefore had the right to enter Bellas—with or without consent.

### ii.   The Attic and Basement

While inside the club, the officers accessed the attic and basement. *See* PSMF at 6 ("The Police, media, and other City departments accessed the basement."); *ibid.* ("As part of the Raid, Fire accessed the attic of Bellas Cabaret[.]"). The Plaintiffs contend that neither space is "accessible to the public," *ibid.*, and that they "did not consent to the search" of either area, *see id.* at 4 ("Commander Villa did not seek consent to access and search the basement level of the establishment."); *id.* at 5 ("Plaintiffs did not consent to the search of Bella Cabaret's attic."). And James, Jr. said as much in his deposition. *See* James, Jr. Dep. at 287–88 ("Q. Did you consent to the police's search of the basement? A. No . . . . Q. Or the attic? A. No.").

Here's the problem with the Plaintiffs' theory: James, Jr.'s *own* testimony established that he willingly allowed the officers to access both the attic and the basement. As to the attic, he explained that several officers—"Yan, Commander Vi[ll]a, Alexis," along with a "gentleman from the fire

department" and "an inspector"—"needed access or they wanted to know how they could access the attic[ ]." *Id.* at 127. So, James, Jr. continued, "I walked them around," "showed them where access was to that," and "spoke to those folks." *Ibid.* He reaffirmed that narrative later in his deposition. *See id.* at 252 ("Q. I think you told us they asked for access to the attic. A. Yes, ma'am."). And he conceded that he gave them a "step ladder" with which to access the attic. *Ibid.*; *see also ibid.* ("Q. So that's how you gave them, I guess, the ladder? A. The step ladder. Q. Yes? That's how they got access[ ], the step ladder? A. Yes, ma'am.").

As to the basement, James, Jr. recounted that the officers—including "Commander Vi[ll]a"—"asked me about the downstairs, if you know, if they could see the basement." *Id.* at 111. In response, James, Jr. admitted that he "took them down to the basement." *Ibid.* What's more, he acknowledged that the officers "asked" that he "show them the bathrooms," "the other hallways that are down there," and "some closets as well in that area." *Id.* at 125; *see also id.* at 124 ("Q. [Y]ou opened up all of the doors to the closets, is that right? A. Anything they asked me to open.").

Those interactions sound consensual. The officers "didn't use coercive police procedures"—they didn't "threaten or intimidate," "draw their guns," "yell," or use "handcuff[s]"—to obtain consent. *Morales*, 893 F.3d at 1368. To the contrary, according to James, Jr., the officers merely requested access to the attic and basement. Instead of refusing that request, James, Jr. obliged, even going so far as to supply a ladder to help the officers climb into the attic. *Cf. United States v. White*, 2024 WL 3249871, at *2 (11th Cir. July 1, 2024) ("As for the third *Chemaly* factor, White's cooperation with law enforcement—for instance, guiding the officers throughout his home, leading the officers to his bedroom, opening the bedroom door, and turning over the second phone without incident—also suggests that his consent was voluntary."); *United States v. Calderon-Fuentes*, 788 F. App'x 630, 635 (11th Cir. 2019) ("Calderon cooperated with the police during both interviews . . . . Calderon freely chose to speak with the agents and invited them onto his screened-in porch[.]").

45

At one moment in his deposition, it's true, James, Jr. used ambivalent language. *See* James, Jr. Dep. at 112 ("And they had me go downstairs. You know, none of these areas are accessible to the public, so, and they're not being used so, you know, *they made me* go down there. The[y] *made me* open up the closets that are usually locked and not accessible to anybody else, just the whole downstairs, *they had me* open up all the doors and show them around." (emphases added)). But context—not to mention video footage—reveals that this was just a figure of speech, not *actual force. See id.* at 251 ("Q. And just so I understand, the police did not break down any doors. They were unlocked and opened? A. Yeah. We had to unlock all the doors for them. Q. Okay. So nothing was broken in? A. No."). So does earlier testimony establishing that James, Jr. had already agreed to the officers' request. *See id.* at 110–11 ("Q. So back to the night of the operation, did you introduce yourself to Commander Vi[ll]a at the time? A. Of course. Q. Tell me how that discussion happened? A. Well, I came up to him. I told him I was the person in charge, and I asked him . . . [w]hy is this happening? And he said this was a human trafficking operation . . . . So I asked him, okay, what's going to happen here, what do we do? And he told me, we're going to search the employees. We're going to search the staff. We're going to make sure that there's no one under the age of 18 working in the establishment, there's no drugs, and if everything's okay, then we'll leave. *Q. What did you say in response? A. Okay.* There's nothing I couldn't do or say. Q. So what happened next? A. Since I was the representative for the business and the person in charge, *he asked me to give him access, to walk him to different areas of the establishment*, and I had to do so." (emphases added)).

One stray comment, divorced from context, doesn't negate the clear thrust of James, Jr.'s testimony. His deposition confirms that the officers made *requests*, not *demands*, that he capitulated to those requests, and that he did so *voluntarily. See id.* at 111 ("[H]e asked me to give him access, to walk him to different areas of the establishment[.]"); *ibid.* ("They asked me about the downstairs, if you know, if they could see the basement."); *id.* at 124 ("Q. So once you had your discussion with the

Commander, you went with his officers to give access to the property? A. Right."). In these circumstances, we think our cases require a finding that James, Jr. consented. *Compare United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004), *amended*, 2004 WL 3059008 (11th Cir. Nov. 15, 2004) ("Pineiro led investigators on a tour of his home and . . . cooperated with their search efforts. His cooperation included moving his dog into the garage and then into the yard to enable the agents to enter. The agents first identified themselves and explained the purposes of their search. And, although at least four agents entered Pineiro's home and the agents were armed, no one had a gun drawn and the guns were not visible."), *and Fuqua*, 996 F.3d at 1153 ("We know that the mere failure to object to an officer's entry into the home does not constitute valid consent to the entry, but that some affirmative indication, even if non-verbal, that the officers are welcome to enter may be enough . . . . Finally, we know what factors might tip the determination one way or the other: how many officers are present; whether the officers are armed, whether the arms are visible, and whether they are drawn; whether the agents explain the purpose of the search; and whether the homeowner actively aided the officers in searching his home."), *with WBY, Inc. v. DeKalb Cnty.*, 766 F. App'x 852, 861 (11th Cir. 2019) ("[T]he inspection of Follies involved a total of thirty-six officials, including twelve members of the SWAT unit's Strike Force . . . . The officers yelled at patrons and employees using unprovoked profanity, shoved an employee who was complying with officer commands, and removed the part-owner from the club in a 'pain hold' and refused to permit him to use the restroom despite his medical condition. Patrons were ordered to sit and be quiet and were not permitted to leave for at least twenty minutes. All fifty-five of Follies's entertainers were ordered to line up and submit to individual photographs in which they were required to hold up a whiteboard displaying their legal name, stage name, and date of birth, a process that lasted two hours. An entertainer was 'put to the floor' and arrested for talking on her cell phone as the entertainers were assembling."). Our facts are a lot like *Pineiro*'s and *Fuqua*'s—and nothing like *WBY*'s.

* * *

James, Jr. claims he never consented to a search. But his post-hoc assessment of the undisputed evidence doesn't bind us. Instead, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Here, James, Jr.'s own testimony indicates that his decision to grant access to the basement and attic bore all the hallmarks of consent: The officers "simply asked" for access and "never removed their weapons"; they never yelled or physically restrained or assaulted anyone; James, Jr. agreed without "any objection" and even assisted the officers by bringing them a step ladder with which to access the attic; and the interaction was at all times "friendly and cordial." *Gonzalez-Zea*, 995 F.3d at 1307 (quotation marks omitted). All of this, we should add, was corroborated by Bellas' *own* surveillance videos. We therefore cannot say that the interaction ran afoul of the Fourth Amendment.

### iii.   The Locked Office

The officers also accessed "a locked office" that wasn't "open to the public." PSMF at 6. Here too James, Jr. denies consenting to that search. *See* James, Jr. Dep. at 287–88 ("Q. The locked office? A. No. Q. The locked office within the other locked office? A. No, ma'am."). And here too his testimony paints a different picture.

James, Jr. testified that the officers "*asked* me to go to the office." *Id.* at 126 (emphasis added). So, he explained, "[w]e went into the office," where "they also saw that there was a door" that "leads to . . . [an]other office." *Ibid.* Because "I didn't have the keys," James, Jr. continued, "I had to call my mother to come . . . and open up[.]" *Ibid.* After "ten minutes," Dulce "came in through the back door, and she gave me the key, and then I opened up." *Id.* at 126–27. But at no point did he object to the request:

> Q. Did you pose any objection to opening that back door?
> A. I asked them why. And they said we need to . . . open it up.
> Q. Okay. And then you opened it?
> A. Yeah. I opened it after she came.

*Id.* at 127 (objections omitted). Dulce's testimony corroborated this narrative. She recounted that her son called to say that "he needed to open the office because he had forgotten his key" and "the police and the City of Hialeah were at the business." Dulce Dep. at 66–67. She confirmed that he opened the office. *See id.* at 73 ("Q. So who opened the office door? A. James."). And she explained that neither she nor James, Jr. objected to the officers' request:

> Q. [W]hat was the discussion?
> A. Just open the office.
> Q. And . . . he opened the office; right? He didn't say no; right?
> A. No.
> Q. You didn't say no; right?
> A. No.

*Id.* at 77. That testimony supports a finding of consent. Nothing in those depositions suggests that the officers coerced James, Jr. or Dulce into compliance. *See id.* at 82 ("Q. You would agree with me that everything was calm when you arrived? A. Yes, nobody was fighting. Q. You . . . didn't see any kind of guns drawn, or anything like that; right? A. No." (objections omitted)); *id.* at 129–30 ("Q. And you weren't handcuffed that day; right? A. No."). To the contrary, James, Jr.—of his own accord— instructed his mother to drive over to Bellas to provide the key, and Dulce raised no objection to that request. The Plaintiffs therefore consented—voluntarily and intelligently—to unlocking the office. *See United States v. Spivey*, 861 F.3d 1207, 1216 (11th Cir. 2017) (finding consent where the "encounter was polite and cooperative, and the officers used no signs of force, physical coercion, or threats"); *United States v. Martinez*, 2024 WL 3451867, at *7 (11th Cir. July 18, 2024) ("[T]he record evidence did not establish that officers used any coercive tactics and Martinez appeared to be openly cooperating . . . . These facts weigh in favor of . . . finding that Martinez . . . voluntarily consented to the search."); *see also* James, Jr. Dep. at 129 ("So when my mother gets there and, you know, I open

the office for the police officers, and Commander Vi[ll]a pulled us aside and . . . he goes, you know, I really want to commend you guys, because in my 20 years of being a police officer, I've never seen a strip [club] look so clean . . . . So congratulations. You guys did a good job."); Villa Dep. Part II at 33–34 ("Q. You didn't ask for permission to enter the office. Correct? A. Yes, we did. We did ask permission from the owner. The owner provided us a key. He cooperated with everything. Like I said, everything was done here with the cooperation of the owners. The one office that was locked, we asked the owner what was in there. He says I'm going to get you a key.").[12]

### iv.   The Dressing Room

"As part of a safety component to the operation," the Defendants say, "officers accompanied the strippers to the dressing rooms when they were retrieving their IDs." DSMF at 5. In so doing, we're told, the "officers entered the locker room with the strippers as they looked in their respective belongings[—]i.e.[,] purse[s] or locker[s][—]for identification." *Ibid.* According to the Defendants, "[o]fficers looked at the purses or the opened lockers, but did not search the strippers, the purses or the lockers," and "later placed the belongings on the floor for the exterior K-9 sniff to avoid damaging anyone's property." *Ibid.*[13] But the Plaintiffs maintain that they "did not consent to a search of . . . the lockers, dressing room, [and] the entertainers' belongings[.]" PSMF at 5.

---

[12] We'll note that "voluntary consent to search may be obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see also ibid.* ("Common authority . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes[.]"). Here, no one suggests that either James, Jr. or Dulce exceeded the scope of their authority in cooperating with the officers. *See, e.g.*, James, Jr. Dep. at 111 ("I was the representative for the business and the person in charge[.]"); Dulce Dep. at 15–16 ("Q. Is it your testimony today that you're only an employee of Bellas? A. I am the owner." (objections omitted)).

[13] One note of clarification. The parties refer to a search of the "dressing rooms" and of the "locker room." But the record indicates that these spaces are one and the same. *See* DFR at 5 ("[O]fficers accompanied the strippers to the dressing rooms when they were retrieving their IDs. The officers entered the locker room with the strippers as they looked in their respective belongings . . . . Officers looked at the purses or the opened lockers, but did not search the strippers, the purses or the lockers."); PSMF at 5 ("The City did not seek consent to enter or search the

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Accordingly, "a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Terrence Byrd v. United States*, 584 U.S. 395, 410 (2018). Applied here, that principle undercuts the Plaintiffs' complaint about the locker-room activity. "[T]o show the violation of his (and not someone else's) Fourth Amendment rights," a party "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quotation marks omitted); *see also United States v. Davis*, 109 F.4th 1320, 1329 (11th Cir. 2024) ("Ordinarily, a person cannot challenge the search of a third party[.]"). We fail to see how the Plaintiffs can maintain any such interest—possessory or otherwise—in the personal belongings that were stored in the dancers' purses or lockers.[14] *See United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) ("Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which [one] has no reasonable expectation of privacy.").[15]

---

entertainers' dressing room, manipulate and search the entertainers' belongings, or search the locked lockers.").

[14] The Plaintiffs challenge the dressing-room aspect of the operation on behalf of the dancers. But a challenge defending the Plaintiffs' *own* Fourth Amendment interests fares no better. The Defendants maintain (and the Plaintiffs don't contest) that the officers merely "looked at the purses or the opened lockers, but did not search the strippers, the purses[,] or the lockers." DFR at 5. And the Plaintiffs never argue that *they* retain a privacy interest in their *employees'* purses or lockers. *Cf. United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984) ("Fourth Amendment rights are personal rights that may not be vicariously asserted."); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995) (noting that "locker rooms . . . are not notable for the privacy they afford").

[15] The parties agree that, after entering Bellas, "the officers asked patrons for their identification." DFR at 4; *see also* PMSJ at 2 ("The dancers, staff, and patrons were systematically rounded up, separated, patted down, forced to provide identification, and interviewed separately.").

51

### v.   The K-9 Sniff

Both parties agree that "[t]he Police brought a K-9 drug detection unit to search Bellas." PMSJ at 2; *see also* DMSJ at 21 ("Officer Herrera and his K-9, dual trained in narcotics and apprehension, were on scene and conducted an exterior sniff of the strippers' belongings."). The Plaintiffs *initially* claimed that the officers used the dog "in the lockers, dressing room, through the entertainer's belongings, *and likely* the basement as well." PMSJ at 13 (emphasis added). But the Defendants point out that the "Plaintiffs' video surveillance of the basement establishes the K-9 *did not* go [into] the basement." DFR at 6 (emphasis added); *ibid.* ("James[,] Jr. only testified that the locker room was checked when asked to identify particular areas searched by the K9 . . . . In fact, immediately after the K-9 exits the dressing room, the K-9 is taken outside via the back entrance and is not seen re-entering Bellas."); *see also* Villa Dep. Part II at 114 ("I was not informed that the dog did an extra sweep of the basement. As you can see the location is not very safe for the dog to be walking through. There are cables showing everywhere, electrical wires showing. The last thing we want is the dog to get hurt. So, for those types of locations like that, it's customary for the dog not [to] go through because it is an animal."). And the Plaintiffs never argue otherwise, much less provide evidence to the contrary.

We thus cannot find that the use of the K-9 alters the equation here. The Defendants contend—and the Plaintiffs ultimately fail to refute—that the dogs sniffed *only* in the dressing room. *See* DSMF at 10 ("The officers had the ladies leave the locker room and the dual trained apprehension and detection sniffing K-9 and its handler came in and out several times and walked around sniffing. The officers placed the belongings on the floor for the K-9 sniff to avoid damaging anyone's property." (citations omitted)). So, "[e]ven assuming the K-9 sniff was not reasonable," the Defendants argue, "the only people who would have a Fourth Amendment claim [are] those

_____

Any claim arising from this activity faces the same third-party issue that dooms the dressing-room argument.

individuals whose possessions were sniffed, not [the] Plaintiffs." DMSJ at 21 n.11. We agree. To the extent *anyone* suffered a sniff-induced Fourth Amendment harm, it was the dancers, not the Plaintiffs.

In any event, "the canine sniff is *sui generis*." *United States v. Place*, 462 U.S. 696, 707 (1983). That's because it "reveals no information other than the location of a substance that no individual has any right to possess." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005); *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."). So, given that the Plaintiffs fail to dispute the Defendants' claim that the sniff "revealed no information," Def. Resp. at 16, the mere fact that the officers made use of a dog sniff cannot be said to have caused cognizable harm, *see, e.g.*, *United States v. Jensen*, 425 F.3d 698, 706 n.2 (9th Cir. 2005) ("[U]se of a narcotics-detection dog does not itself constitute a search so as to implicate Fourth Amendment concerns."); *United States v. Johnson*, 148 F.4th 287, 292–93 (4th Cir. 2025) ("[W]e read the Supreme Court's reasoning in *Place* and *Caballes* as categorical, not context-specific: Because a dog sniff can reveal only the presence of contraband, and there is no reasonable expectation of privacy in contraband, *a dog sniff is not a search—period*." (emphasis added)); *see also United States v. Fellmy*, 165 F.4th 501, 518 (6th Cir. 2026), (Thapar, J., concurring) ("After all, dog searches only tell us whether contraband is present. And there is no 'legitimate privacy interest' in contraband.").

### vi.   The Scope of Access

"A consensual search is confined to the terms of its authorization." *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). Indeed, "[t]he scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant." *Ibid*. So, "[w]hen an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless" but instead "constrained by the bounds of reasonableness: what a police officer

could reasonably interpret the consent to encompass." *Ibid.* "Whether limitations were placed on the scope of consent, and whether the search conformed to those limitations, is a question of fact determined by the totality of the circumstances." *United States v. Plasencia*, 886 F.3d 1336, 1342 (11th Cir. 2018).

Our Plaintiffs *do* challenge the scope of the operation. But they direct that challenge to the administrative-inspection theory, *not* the consent-based theory. So, they contend (correctly) that the raid "exceeded the permissible scope of an administrative inspection." Pl. Resp. at 14 (emphasis omitted); *see also* PMSJ at 7 ("[E]ven if it was an administrative search of a closely regulated business, it was unreasonably excessive in execution and/or exceeded the permissible scope of such a search."). But in response to the Defendants' alternative argument that the Plaintiffs *granted access* to Bellas, the Plaintiffs submit only that "consent cannot be inferred" "[i]n light of the totality of the circumstances." Pl. Resp. at 14. As to the scope of any such consent, however, the Plaintiffs remain silent.

The Plaintiffs *might've* argued that—to the extent *any* consent existed—James, Jr. never agreed to let the officers photograph the club. And the Plaintiffs nearly did: The PSMF notes that "[t]he Police did not seek permission from Bellas Cabaret to allow media access to the property or for crime scene technicians to photograph the premises despite a notice warning: 'no photos or videos allowed.'" PSMF at 5. But that's not the same as arguing that James, Jr. limited his consent to *eyeballing* (not *photographing*) the aforementioned areas of the club—an argument that *never* appears in the actual briefing.

We cannot make arguments for the parties. "Courts call balls and strikes; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. ___, ___ (2026) (slip op., at 3) (quotation marks omitted). So, we cannot pursue arguments the Plaintiffs *might've* but *didn't* press.[16]

---

[16] In that same vein, we'll flag another issue the Plaintiffs ignore. At times, the Defendants' briefing appears to divide the raid into four stages. At the first step, officers entered Bellas and

54

### vii.   The Media Presence

Finally, the Plaintiffs emphasize that "the Police escorted the media through Bellas Cabaret, uninvited and without permission, including through the areas that were not open to the public to capture images of the purported human trafficking operation, uninhibited by the media's City escorts, and obtained interviews of several City employees[.]" PMSJ at 2; *see also* PSMF at 6 ("The Police, media, and other City departments accessed the basement."); Pl. Reply at 3 ("[T]here was no administrative or neutral reason for the Raid, especially as here where the Raid was for the purpose of identifying evidence of human trafficking, with media in tow."). For their part, the Defendants claim that "Quintana only learned of the task force operation as it took place," DSMF at 11; that her participation "would have been approved by the chief of police," DMSJ at 11; that "[h]aving the media present at the operation was . . . not unique to Bellas," *id.* at 22; that "no case in the Supreme Court or the Eleventh Circuit . . . hold[s] that media presence into a highly regulated commercial building

---

conducted a "brief review of identification." DMSJ at 21. Officers next conducted a (so-called) "brief protective sweep of the premises." *Ibid.* During the third phase, "officers escorted the dancers to the locker room to verify their identity, check their ages, and discuss privately if anyone was being forced to work at Bellas." *Ibid.* Finally, in the last stage, officers "maintained a perimeter while the Fire and Building personnel inspected the premises for code violations with respect to plumbing, mechanical, and electrical, and issues threatening life safety." Def. Resp. at 16.

The Defendants never specify the contours of the second stage. But they indicate that the sweep extended to (at least) the "basement," "dressing rooms," and "locked" office. *Id.* at 15. The four-stage framing thus leaves open the possibility that the raid involved *two* searches: an *initial* search of the basement, dressing room, and locked office during the sweep, followed by a *second* search of those spaces by Fire and Building personnel. And, if that's true, it's possible that James, Jr. consented only the *first* (but not the *second*) time around.

But the Plaintiffs offer no such argument. They instead treat the raid as *one* search. *See, e.g.*, Pl. Resp. at 2 ("Following entry of the Police, a slew of City inspectors used the illegal access provided by the warrantless search to identify a number of violations, which they used as a justification for red-tagging the property and shutting down Bellas."); PMSJ at 2 ("The Police searched the entire premises, including areas of Bellas . . . that were not open or accessible to the public[.]"). Since the Plaintiffs never advance this argument, we won't consider it. *See Trump v. Illinois*, 607 U.S. ___, ___ (2025) (Alito, J., dissenting) (slip op., at 1) ("If a party passes up what seems to us a promising argument, we do not assume the role of advocate" and instead "decide the questions that the parties choose to present.").

during working hours is a violation of the Fourth Amendment," *ibid.*; and that "neither Jr. [n]or any other representative of Bellas refused Quintana or the America Teve cameraman access to any part of Bellas and thus consented to their presence," *ibid.*

Our Plaintiffs *might've* argued that the media presence *itself* constituted a Fourth Amendment violation. In *Wilson v. Layne*, federal and state officials invited a reporter and a photographer from the *Washington Post* to "ride-along" for the execution of an in-home arrest warrant, during which the photographer snapped "numerous pictures." 526 U.S. 603, 607 (1999). Writing for the Court, Chief Justice Rehnquist explained that, although the officers "were undoubtedly entitled to enter the . . . home in order to execute the arrest warrant," it did "not necessarily follow that they were entitled to bring a newspaper reporter and a photographer with them," as the reporters "did not engage in the execution of the warrant, and did not assist the police in their task." *Id.* at 611. The Court thus concluded that "it *is* a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id.* at 614 (emphasis added).

An argument rooted in *Wilson* might have force. Parading the media through a raid, after all, would seem to erode the Fourth Amendment's commitment to "the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner*, 489 U.S. at 613–14. And that's especially true given that Quintana appears to have been married to the Chief of Police. *See* Hernandez Dep. Part II at 10 ("Q. [Y]ou know now that [Adriana Quintana] is the wife of Sergio Velazquez, correct? A. Yes.").

But the Plaintiffs never press this argument. In fact, they never so much as cite *Wilson*. We therefore have no occasion to consider a *Wilson*-based argument. Because our adversarial system demands that we accept strategic litigation choices and adjudicate only those arguments the parties actually presented, we must instead consider only whether Quintana and her cameraman impacted the

calculus of consent. And, on the record before us, we see nothing to suggest that the presence of the media pressured James, Jr. and Dulce into consenting.[17]

*   *   *

Our Plaintiffs maintain that "[n]o valid consent can exist when a group of officers gain entry by a show of official authority under the pretext of an administrative inspection, looking for evidence of criminality[.]" Pl. Resp. at 14. But their uncontroverted evidence spins a different tale. James, Jr.'s own testimony reveals a willingness to cooperate with the officers. It says nothing about physical force, brandished weapons, raised voices, or threats. To the contrary, it makes clear that James, Jr. not only agreed to show the officers the spaces in question but that he then *facilitated* that access—on his own initiative—by providing a stepstool and summoning a key. And *both* Dulce's testimony and the video footage confirm this account.

To be sure, neither James, Jr. nor Dulce testified that the officers informed them of a right to refuse. But the officers "were not required to do so." *Spivey*, 861 F.3d at 1216. Indeed, the "Supreme Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *Gonzalez-Zea*, 995 F.3d at 1308 (quotation marks omitted); *see also Morales*, 893 F.3d at 1370 ("Had Morales objected to the search, it might be different. But he didn't. And his failure to do so rests on him . . . . [T]he officers didn't have a duty to ask him whether he objected to the search[.]"); *Spivey*, 861 F.3d at 1214

---

[17] Even if the Plaintiffs *had* raised this argument, they would've run into (at least) two obstacles. *First*, the Plaintiffs fail to present any evidence establishing that they asked the media to leave. *Second*, and perhaps more fundamentally, *Wilson* involved reporters entering a *home* during the execution of an arrest warrant, whereas this case involves media entering a *commercial* space—open to the public— during business hours. That seems to be an important distinction. *Cf. Payton v. New York*, 445 U.S. 573, 585 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (quotation marks omitted)); *Macon*, 472 U.S. at 469 (noting that no "reasonable expectation of privacy" exists "in areas of [a] store where the public [i]s invited to enter and to transact business").

57

("[A]n individual who interacts with officers undertakes a knowing risk that the officers may discover evidence of criminal behavior.").

Applied here, the remaining *Chemaly* factors tilt in the same direction. James, Jr. wasn't under arrest before or during the search. He cooperated with the officers and never acted in a manner that was suggestive of duress. *See* James, Jr. Dep. at 254–55 ("Q. [W]ho are you shaking hands with? A. That is one of the trade officials . . . Q. And then . . . that's you shaking Mr. Riveron's hand? Q. Yes, ma'am."); *id.* at 89–90 ("A. I've known Yan from the past, and I approached him. Q. Okay. When you spoke with Yan, what did you talk about? A. I was asking him why this was happening. Q. What did he say to you? A. He says, yeah, I'm sorry, man, this is coming from the big boss."); *see also* Villa Dep. Part I at 97 ("They complied with everything we asked. As a matter of fact, I believe him and I were in the back steps of the establishment talking. And he mentioned something about that he knew Commander Perez from . . . karate school. I think we even talked about the [D]olphins at that time. So, it was very—he was very polite, very genuine. Did not object to anything we were doing, and that was it."). His educational background and professional experience meet the requisite intelligence threshold. *See* James, Jr. Dep. at 13 (explaining that his "highest degree is a bachelor's of science in business" from "[t]he University of South Carolina"); *id.* at 15 ("Q. And what is your position at Porky's? A. At Porky's, I'm the vice president. Q. What are your duties as vice president? A. I oversee the entirety of the operation. Q. What . . . [is] your position at Tundidor, Inc.? A. I'm the president."). And his testimony indicates an awareness—but not a fear—of the incriminating evidence for which the officers searched. *See id.* at 155 ("It was my understanding they were doing a human trafficking operation."); *see also id.* at 289 ("[U]sually these dogs searched for drugs."); *id.* at 249 ("Q. How often would you have someone coming in to do a random check to make sure the club is in compliance with the liquor license? A. Typically for the past few years, it has not been a yearly thing. But after Covid, I'm seeing that they're coming in every year."). Given the friendliness of the encounter, the

58

lack of objections, the absence of coercive behavior, and James, Jr.'s intelligence, the totality of the circumstances suggest that the consent was voluntary.

"[T]his Court is not empowered to forbid law enforcement practices simply because it considers them distasteful." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see also Spivey*, 861 F.3d at 1218 ("Not all deception by law enforcement invalidates voluntary consent."). We decline to countenance the Defendants' efforts to run roughshod over the administrative-inspection exception. And we reject the attempt to turn the shield of a protective sweep into a tactical sword. But bound by precedent, the record before us, and the parties' briefing, we cannot say that James, Jr.—or anyone else—made anything but an "essentially free and unconstrained choice" to give the officers access to Bellas. *Schneckloth*, 412 U.S. at 225 (quotation marks omitted). The Plaintiffs' Fourth Amendment claims therefore fail.

## CONCLUSION

After careful review, in short, we **ORDER and ADJUDGE** as follows:

1. The Plaintiffs' Motion for Partial Summary Judgment [ECF No. 193] is **GRANTED in part** and **DENIED in part**.

   a. The Motion is **GRANTED** as to the question of *Monell* liability.

   b. The Motion is **DENIED** as to Counts I–IV.

2. The Defendants' Motion for Summary Judgment [ECF No. 207] is **GRANTED in part** and **DENIED in part**.

   a. The Motion is **GRANTED** as to Counts III and IV.

   b. The Motion is **DENIED** as to the question of *Monell* liability and as to Counts I and II.

3. The Clerk shall **REOPEN** this case.

4.   By **July 7, 2026**, the parties shall submit an Amended Joint Scheduling Report, proposing dates for all remaining pre-trial deadlines and trial.

**DONE AND ORDERED** in the Southern District of Florida on June 22, 2026.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record